IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| CROWLEY, HOGE & FEIN, P.C., Plaintiff, v. YOSEPH SEYOUM, Defendant. | Civil No. C-15-CV-22-004124 |

JURY TRIAL

Rockville, Maryland July 23, 2024

EXHIBIT E

SIMS 00264

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

------------------------------X
CROWLEY, HOGE & FEIN, P.C., :
Plaintiff, :
v. : Civil No. C-15-CV-22-004124
YOSEPH SEYOUM, :
Defendant. :
------------------------------X

Rockville, Maryland

July 23, 2024

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE: THE HONORABLE RONALD B. RUBIN, JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

CHARLES M. SIMS, Esq.
O'Hagan Meyer, PLLC
411 East Franklin Street
Suite 500
Richmond, Virginia 23219

FOR THE DEFENDANT:

YOSEPH SEYOUM, Pro Se



# I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Sylvia Adams | 251 | 272 | 293 | -- |
| Carlos Salvado | 296 | -- | -- | -- |
| For the Defendant: | | | | |
| Christopher Hoge | 8 | 180 | -- | -- |

| EXHIBITS | MARKED | RECEIVED |
|---|---|---|
| For the Plaintiff: | | |
| Exhibit No. 7-C | 72 | -- |
| For the Defendant: | | |
| Exhibit No. 2 | 278 | 280 |
| Exhibit No. 7 | -- | 245 |
| Exhibit No. 8 | -- | 202 |
| Exhibit No. 18 | -- | 183 |
| Exhibit No. 19 | -- | 187 |
| Exhibit No. 20 | -- | 192 |
| Exhibit No. 21 | -- | 194 |
| Exhibit No. 24 | -- | 204 |
| Exhibit No. 25 | -- | 201 |
| Exhibit No. 31 | -- | 208 |
| Exhibit No. 34 | -- | 211 |
| Exhibit No. 36 | -- | 212 |
| Exhibit No. 37 | -- | 215 |
| Exhibit No. 38 | -- | 217 |
| Exhibit No. 39 | -- | 218 |
| Exhibit No. 42 | -- | 220 |
| Exhibit No. 69 | -- | 230 |

P R O C E E D I N G S

THE CLERK: All rise. The Circuit Court for Montgomery County is now in session.

THE COURT: Good morning, folks. Please be seated.

Mr. Clerk, good morning. Recall this matter for trial, please.

THE CLERK: Yes, Your Honor. Recalling Civil Case C-15-CV-22-4124, Crowley, Hoge, and Fein, P.C. v. Yoseph Seyoum.

THE COURT: Folks, good morning to all of you. How's everyone today?

MR. SIMS: Good.

MR. SEYOUM: Good.

THE COURT: Good?

MR. SEYOUM: Yes, sir.

THE COURT: Are we ready to proceed?

MR. SEYOUM: Yes, sir.

THE COURT: I think -- did we find those additional -- have a seat folks. Did we find -- we want to make sure all the jurors checked in?

THE CLERK: I haven't gotten word, but I'll go and just check.

THE COURT: All right. Double-check and give us a heads up.

THE CLERK: Sure.

THE COURT: Let's see. Mr. Seyoum, do you have a

rough estimate, sir, of how much more time you need with the current witness on the stand?

MR. SEYOUM: Not really. Like, maybe two or three hours.

THE COURT: Well, do your best to titrate it down. Remember, the more time you spend with one witness, the less time you'll have to spend with another witness.

MR. SEYOUM: Yes.

THE COURT: So please balance it. If you want me to give you time markers, I will. It's sometimes hard to -- when you're doing it, it's sometimes hard to keep track. If you want me to be your timekeeper, I will.

MR. SEYOUM: Well, no. I -- I'll -- I'll keep the time because -- the time line of the past seven years in my head and all the trial experience, so I don't want any -- I know what I need to ask Mr. Hoge --

THE COURT: Well, that's fine.

MR. SEYOUM: -- to get to where we get --

THE COURT: And after Mr. Hoge --

MR. SEYOUM: -- because I only had half an hour with him yesterday.

THE COURT: -- who was your next witness?

MR. SEYOUM: Next witness will be Mr. Salvado.

THE COURT: Okay. Mr. Salvado, good morning.

MR. SALVADO: Good morning, Your Honor. How are you?

THE COURT: And for my planning and his planning, about how much time will you need with him on direct, please?

MR. SEYOUM: Mr. Salvado?

THE COURT: Yes, sir.

MR. SEYOUM: Maybe one or two hours.

THE COURT: Okay. Well, there's no need for you to stand around.

Can we agree that Mr. Salvado can be on call? And then we can call over to his office? The clerk --

MR. SEYOUM: Oh, yes. He's right over here, yes.

THE COURT: Is that okay with you?

MR. SIMS: I agree with that as well.

THE COURT: Is that okay with you?

MR. SALVADO: That's fine.

THE COURT: Mr. Salvado, would you give our clerk your phone number?

Mr. Salvado's going to be on call as a witness so he doesn't have to sit around all day. And --

MR. SALVADO: Thank you, Your Honor.

THE COURT: That's great. And after Mr. Salvado, I think you had -- you said something about --

MR. SEYOUM: Sylvia Adams.

THE COURT: Adams?

MR. SEYOUM: Yes.

THE COURT: That should take us through the day.

MR. SEYOUM: Yes, sir.

THE COURT: Let's do our best to get all that done today. I think if we can do all that today with direct and cross, we're going to stay on schedule. I know it's going to be hard, but we're going to do it.

THE CLERK: And we have all the jurors, Your Honor.

THE COURT: Great. Then bring the jury in, and we'll continue.

Mr. Hoge, if you'd like to get comfortably situated, we can proceed.

(The jury enters the courtroom.)

THE COURT: Folks, good morning. Thank you for coming back and being so prompt. Could you please take your seats?

(Discussion off the record.)

THE COURT: Folks, good morning to all of you. Please take your seats. I hope everyone had a nice evening. We have fresh pencils for you if you wish. There are additional pads if you need them.

And again, if there's anything at all you need, please let us know.

All right. We ready to proceed?

Mr. Hoge, you're still under oath, sir.

Sir, go ahead, please.

Please.

MR. SEYOUM: Thank you.

Good morning, everybody.

RESUMED DIRECT EXAMINATION

BY MR. SEYOUM:

Q Good morning, Mr. Hoge.

A Good morning.

Q So I just want to summarize what happened yesterday, then get you to the next question. Yesterday you heard me read Ms. Deucher's -- your assistant's deposition and testimony. I read into -- read it into the record. Do you remember?

A Yes.

Q Okay. Can you tell me why Ms. Deucher is not here?

MR. SIMS: I object, Your Honor.

THE COURT: Sustained.

BY MR. SEYOUM:

Q Is Ms. Deucher going to be here today?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained.

We've been over that, sir. Please move on.

MR. SEYOUM: Okay. Sorry.

THE COURT: Thank you. No problem.

BY MR. SEYOUM:

Q During Ms. Deucher's testimony, did you notice how many times she said, "I don't recall", "I don't remember", "that the record reflect" --

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Overruled.

If you know, sir.

A I heard what you read.

BY MR. SEYOUM:

Q Okay. All right. She worked on my case a lot, right?

A Yes.

Q Okay. But she was not the first person that was hired to work on my case? Because on the retainer agreement for the research, you had a different person.

A At the time you retained me, I had an associate by the name of Elena Iuga, I-U-G-A. Ms. Iuga went on to a different position. I then hired Ms. Deucher to replace Ms. Iuga, and then she took over working on your case.

Q Okay. So you put Ms. Deucher on my case?

A You met her. We agreed that she would work on your case.

Q Okay. Is she a protective order or family custody case expert?

A No.

Q Okay. Is she a legal malpractice expert?

A Well, yes, to the extent that Ms. Deucher was about two years out of law school, and when I hired her, she had been a clerk for a federal judge in Alexandria, Virginia, after

graduating from Georgetown Law School. Before that, while she was in law school, she was my law clerk, and she worked with me on a number of legal malpractice cases, so she did have some knowledge of legal malpractice through that.

Q     Okay. But she never participated in any trials before?

A     No, she's a young lawyer.

Q     Okay. Yes, she was fresh out of college for two years?

A     Out of law school, not college.

Q     Out of law school. Sorry. I don't know. Big difference. And you tasked her to do the analysis about my case, to do the research, the case laws, preparation of motions, a whole lot of stuff, she was responsible?

A     Various things like that, yes.

Q     So she was two years out of law school with no trial experience, no litigation experience, and she was managing my case, and billing me?

A     No, she was not managing your case. I was managing your case.

Q     Oh. She was --

A     And I was billing you. She was billing for her time. She was entering her time in our timekeeping system, and I was the one responsible for sending you the bills.

Q     Okay. So for all the work that she did, if I wanted

to question her to see what she did with the hours worked, she's not available?

MR. SIMS: I object, Your Honor.

A   Mr. Seyoum --

THE COURT: Sustained.

Sir, move on. We've been over that. Go ahead, please.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q   So if I wanted to question Ms. Deucher about invoices, I can't?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained. Same ruling.

Sir, please move on, please.

BY MR. SEYOUM:

Q   Do you have Ms. Deucher's detailed notes regarding the invoices?

A   I don't know that she made detailed notes regarding invoices. We have a timekeeping program called Timeslips, and each time either she, or I, or a paralegal would work on your case, we would enter our time into the Timeslips program.

Q   Right. Yesterday, you testified -- you said you take detailed notes.

A   Yes.

Q   And Ms. Deucher was your prodigy, right?

A    I don't know if "prodigy" is the right word. She was my -- she was my associate.

Q    She was your associate. Okay. But you taught her how to conduct a trial, and manage a case, and work on case, take notes, and so on?

A    Well, first of all, she did not do a trial while she was with me.

Q    All right.

A    Secondly, yes, I told her how I want work done.

Q    But she did do a trial with us, right, on my case? She participated in a trial?

A    She was a second chair, much as Mr. Thomas back there is a second chair. He's an associate working on the case.

Q    Okay. Understood. All right. So from yesterday's -- Ms. Deucher's testimony, you heard that she had no notes available, she disposed of them, and they're not available?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

We've been over this.

BY MR. SEYOUM:

Q    So there is nothing I could review in regards to the invoice produced by Ms. Deucher (unintelligible 9:39:40)?

A    Well, you have the invoices.

Q    But the underlying work that was done?

A   Well, you had the pleadings that she worked on.  We sent you drafts of motions.  We -- you -- you worked a lot with her on discovery, on answering interrogatories, on responding to docket requests.  You were intimately involved working with her because she was asking you for documents that needed to be produced to the other side of the case.

Q   Okay.

A   You were asking the other side to produce documents to us.  You worked with her on that.  You were working regularly, you talked to her regularly, you emailed with her regularly.

Q   Right.  So she did a lot of the heavy lifting, and doing the research, and the case law, and all that stuff?

A   Yes.

Q   And she was two years out of the law school?

A   Yes.

Q   Okay.  Were there a whole lot of emails between you and her?

A   Certainly, there were some.

Q   Would you agree?

A   I mean, we were mostly talking, but certainly, I'm sure there was some -- some emails.

Q   Were those emails produced as evidence or part of discovery?

A   I don't know if they were asked for.

Q   I couldn't find any.

THE COURT:  Sir, remember the no sort of chiming in your personal testimony during the examination of the witness.

MR. SEYOUM:  I'll phrase another question.

THE COURT:  Please, remember that.

MR. SEYOUM:  Okay.

THE COURT:  Thank you.

BY MR. SEYOUM:

Q   Would I be correct if I said I don't recall seeing any emails?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  Wrong witness.

BY MR. SEYOUM:

Q   Did you produce any emails that you sent to Ms. Deucher to us?

A   I don't recall.  I turned over whatever documents you asked for to my counsel, and they would have been responsible for turning those documents over to you.

Q   Okay.  Thank you.  Understood.

THE COURT:  If you're going to show him something, could you please have it marked by the clerk for identification?

MR. SIMS:  Can you show me as well?  Do you have a copy for me?

MR. SEYOUM:  I might, yes.  I'll get you one too.

He has a copy.

THE COURT:  Mark for ID, please.

BY MR. SEYOUM:

Q    So yesterday, you enlightened me that you did speak to Mr. Stein --

A    Yes.

Q    -- regarding the case?  So you spoke to -- after you charged me $4,000, and we signed the agreement for you to do the research analysis of viable valid claim, you spoke to Atty. Sylvia Adams and Mr. Stein?

A    Yes.

Q    Okay.  That is true?  You did speak with them?

A    Yes.

Q    Right.  There are emails where you told me that you did speak with them, and also --

A    I think so, but I -- I'm not sure I remember the emails, but I suspect so.

Q    Yes, so I just wanted to clarify that you did talk to them.  Okay.

A    I did talk to them.

Q    And if I could make the statement that you did not talk to them, I'm trying to make sure that what I'm saying is you did not talk to them about my case regarding the value for Salvado's performance, but you did talk to them about Sylvia attorneys -- Sylvia Adams's testimony, how helpful at custody

case.  That's what you talked to them about?

    A    I'm not sure I understand your question.

    Q    Okay.  Yesterday, you testified by saying you spoke to Atty. Paul Stein about my case in regards to Atty. Sylvia Adams's testimony, and you said it was helpful?

    A    Yes.  And I have to say that I'm going to revise that because I actually looked at my notes of talking to Mr. Stein afterwards, and actually, what he said that she was not that good a witness.

    Q    Oh, so you spoke to him since yesterday?

    A    No.  I looked at my notes from talking to him back at the very beginning, that first conversation.  I misrecollected [sic] yesterday what he said.

    Q    So you're saying that Ms. Adams was a bad witness?

    A    I'm saying that Mr. Stein said something, and I have the exact words in my notes.  I know that my counsel has those notes, you know, that Mr. Stein said something to the effect of she was not that good a witness.  I can tell you the exact words if you want to get my notes.

    Q    Okay.  Okay.  Thank you for clarifying.

    A    Sure.

    Q    Now I'm confused, and the reason I'm confused is because yesterday you said she was a good witness, and based on that is why you told me I had a claim.  Now today, you're saying Mr. Stein told you she was a bad witness, and if Mr.

Stein told you she was a bad witness, then why did we go forward with the case saying Sylvia Adams is a good witness and put her on the trial?

THE COURT: Sir, I need to remind you to turn your phone off, please.

MR. SEYOUM: I did turn off everything. I don't know why this thing is acting up.

THE COURT: All right.

MR. SEYOUM: But I'll turn it off.

THE COURT: Very good.

MR. SEYOUM: And I did try. I tried airplane -- every mode. I --

THE COURT: All right.

MR. SEYOUM: -- canceled all the alerts. Sorry.

THE COURT: So restate the question, please.

MR. SEYOUM: I apologize. I did really try.

THE COURT: It's all right. Just restate the question for clarity, please.

MR. SEYOUM: Yes.

BY MR. SEYOUM:

Q    I am really confused, Mr. Hoge. My understanding was that you spoke to Atty. Sylvia. You found her to be credible that what she told you was that I spoke to her before taking Aaron and Ms. Redae's car to Pennsylvania. And she gave me legal advice. You researched it. You said advice of counsel

is a valid argument. That's the center for our case, right?

And then you contacted Mr. Stein to verify if she was a good witness. Now you're telling me Mr. Stein told you she's not a good witness, and then, on one hand, you're telling me that's the core that Salvado -- the mistake that Salvado did that he didn't call a very valuable witness to corroborate what I was saying that I had legal advice.

I was walking on eggshells around this woman. I walked carefully and did as I was told by the advice I was given by an attorney. You said that was a good idea. That is what was needed for Judge Callahan to hear to say this guy is not violent, this guy is not volatile. He was actually forward looking. He was walking carefully. He understands that Ms. Redae is volatile, vindictive, and he's doing everything he can to avoid stepping on a landmine. And you agreed with me on that, and you said Mr. Salvado should have brought it in.

Now, when you tell me yesterday that that's what Mr. Stein said was the right thing to do, and then today, you check your notes and you tell me that's not what he said, I'm kind of surprised that -- why would you say that?

THE COURT: Sustained.

MR. SIMS: I'm going to --

THE COURT: Sir, I'm not sure what the question is. If you ask him a direct question, he will answer you --

MR. SEYOUM: Yes.

THE COURT: -- or I'll have him answer you, but it --

MR. SEYOUM: Yes.

THE COURT: -- can't be a three page long of a question because then we're not sure what the question is, so try to make it in bite-sized pieces.

THE WITNESS: And also if I might --

THE COURT: Wait, wait, wait -- wait for a question, Mr. Hoge.

So go ahead, sir.

BY MR. SEYOUM:

Q    Which version is true?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained.

Rephrase, please. Ask him what you want to know in a sentence that has no more than one or two commas in it, okay?

BY MR. SEYOUM:

Q    So I was correct when I said you didn't tell me what Mr. Stein said about your discussion?

A    No. I think I did tell you what Mr. Stein told him -- told me.

Q    So you are implying that if you had told me Mr. Stein said she was a bad witness, I would still go forward?

A    Well, first of all, you're using the word "bad". He didn't use the word "bad". I think he said something -- and again, it's in my notes -- something like she wasn't such a

great witness. Whatever he told me, I would have told you, Mr. Seyoum, because that's what I do. I tell my clients everything.

Q Okay. Is it possible you changed your testimony because Mr. Stein is going to have to testify anything he might have misspoken and it might contradict you?

A No.

Q Are you sure?

A Yes.

Q We'll find out. All right. So you remember you said yesterday that after the 4,000-dollar research analysis gig was over, without having another agreement or retainer agreement, you sent a demand letter, or what do you call it, sir? I think it's a --

A A notice.

Q A notice letter, right?

A Yes.

Q Okay. In that notice letter, can you see Mr. Stein's name on that?

A Yes, I do.

Q Okay.

A First of all, let me just point out this is a draft of the notice letter.

Q Okay. Are you saying that the actual letter that you sent is much different than that?

A    I'd have to look at it.  I think it was pretty much the same, but I don't recall if I made any changes.  It says right at the top "draft attorney work product, attorney-client privileged".

Q    Okay.  Fine.  But in this draft that you sent to me, right?

A    Yes.

Q    May I read it for you?

MR. SEYOUM:  May I read?

THE COURT:  I'm sorry.  What do you want to do, sir?

MR. SEYOUM:  I want to read from the evidence orally.

THE COURT:  Well, if you -- may I see it, please?

MR. SEYOUM:  Sure.

THE COURT:  Thanks.

MR. SEYOUM:  So --

THE COURT:  If there's no objection, and if you think it would be helpful, go ahead.

MR. SEYOUM:  Yes.

BY MR. SEYOUM:

Q    So on the second paragraph over here, it says, significantly, Sylvia Adams did testify at the trial, and according to Mr. Seyoum's trial counsel, Paul Stein, she was an effective witness.

A    Yes.

Q    So he did say she was an effective witness?

A    In the sense that he had a successful result at your custody trial after hearing the testimony of Ms. Adams.

Q    Okay.

A    But he also said she wasn't such a great witness in sort of a candid conversation with me.  But this is a notice letter.  I'm not going to be telling Mr. Salvado the problems with our case.  I'm trying to tell him why we think we have a good case.

Q    I'm sorry.  Can you repeat that?

A    Certainly.  In a notice letter to a potential defendant, such as Mr. Salvado, I'm not trying to tell him about the weaknesses in our case.  I'm not trying to tell him that Mr. Stein said that maybe Ms. Adams wasn't such a great witness.  I want to let Mr. Salvado know that according to Mr. Stein, after having had Ms. Adams testify at your custody trial, you had a successful result, and therefore, she was effective.

Q    So this statement is a lie then?

A    No.

Q    Okay.  This letter was sent to me?

A    A draft was sent to you as --

Q    Right.

A    -- I always do for your commentary.

Q    Okay.  And I approved this to be sent?

A    I guess you did.

Q     Okay.  Under the assumption that Mr. Paul Stein said that she was effective witness regarding Ms. Sylvia Adams?

A     I don't know why you approved it.

Q     If I said this is the part that made me --

THE COURT:  Sir, you're testifying.  Just ask the witness a question, please.

BY MR. SEYOUM:

Q     I took this letter to be authentic and I wrote Mr. --

MR. SIMS:  Again, I'm going to --

THE COURT:  Sustained.

Sir, kindly rephrase, and if you can, just ask him a question without more for now, please.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q     And after reading this and based on the information that was put in here, I approved this letter to be sent?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q     Okay.  We do agree that Atty. Paul Stein is a very famous, well-known family law protective order case expert, and he did handle my custody case, right?

A     I agree that he's well-known.  Famous, I don't know.  Whether he does a lot of protective order cases, I don't know.  But he certainly does a lot of domestic relations cases.

Q    Right.  And Mr. Stein, after Mr. Salvado quashed my case, my protective order, I lost my --

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    After I acquired --

THE COURT:  Sir -- sir, kindly -- I've sustained the objection.  Kindly re-ask -- either restate the question or ask a different question, please.

BY MR. SEYOUM:

Q    Are you aware that I hired Mr. Stein to represent me for the child custody case?

A    Yes, sir.

Q    Okay.  And at the child custody case, I had to overcome the protective order conviction during the custody trial, right?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  Rephrase.

BY MR. SEYOUM:

Q    Are you aware that I had issues at the custody trial because of the protective order?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Overruled.

If you know, sir.

A    Yes, you did.

BY MR. SEYOUM:

Q Yes. And because of the protective order, it increased my time in acquiring 50/50 custody, and I had to overcome it, and that's why we said Mr. Salvado, had he not lost the protective order trial, my custody case would have been smaller, faster, cheaper?

A One of the damages that we claimed was the additional expense of having to pursue your child custody case because you had the problem or the hurdle of getting over that protective order, yes.

Q Right. And in the child custody trial, we entered all the evidence that Mr. Salvado didn't. We called Ms. Sylvia Adams to testify, and she helped me secure 50/50 custody. You're aware of that?

A I know she testified. I know you secured 50/50 custody. How significant of a role her testimony played in that, that's not for me to evaluate.

Q Okay. But in the letter that we just saw, Mr. Paul Stein said she was a good witness, true?

A Mr. Stein told me that she had been effective in the sense that after her testimony and after all the other testimony that came out at your custody trial, you had a successful result, i.e., 50/50 custody.

Q Okay. Is it true in your understanding that Ms. Sylvia Adams' testimony convinced Judge Cho to rule in my favor

as explaining why the circumstances were?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained.

Rephrase.

Wait for a question, sir.

BY MR. SEYOUM:

Q    Did we discuss Ms. Sylvia Adams's testimony, and did I send you emails with cutouts of her testimony from the custody trial for you to review, and upon that review, you agreed she was a good witness?

A    I certainly reviewed the testimony. I had the whole transcript of the custody trial. So I don't know if you'd sent me cutouts, but I certainly reviewed her testimony, and as I said, you had a successful result.

Q    All right. You never asked Mr. Paul Stein to review Mr. Salvado's performance?

A    No.

Q    Did you ask him for legal advice as to if advice of counsel is a valid legal reason for a malpractice case?

A    No.

Q    Did you do any research where you found out that advice of counsel has ever been used in a protective order trial malpractice case?

A    Have I ever done legal research as to whether advice of counsel was a defense that we used in a protective order

case?

Q    Was any case law?  Any research?

A    I don't know that I did any specific -- I'm not sure there are any cases out there on that particular point, but I was relying on an expert, Mr. Rumer.

Q    Okay.  We'll get to that.  But with the $4,000 that I paid you to do the analysis and after talking to Mr. Stein, you never said this is what we're trying to do.  Do you think it would have helped with Salvado's case?  And did you review the Salvado case with him?

A    I just said no.

Q    Okay.

A    With Mr. Stein?

Q    Yes.

A    No.  But I -- I'm very familiar with advice of counsel as a defense in all kinds of civil claims.

Q    Right.

A    So --

Q    But you never got an expert -- advice from the request of the order?

A    Well, I actually litigated a case, a -- a -- a two-week-long trial, that was specifically on the point of advice of counsel as a defense, but it was not in a protective order proceeding.

Q    Right.  But it wasn't a legal malpractice case?

A    It wasn't a legal malpractice case.

Q    And were you successful?

A    No.

Q    It didn't work?

A    No.

Q    And you know about this and you tried it on my case?

A    I told you about it.

Q    You told me what?

A    I told you about that case.

Q    You told me advice of counsel -- legal strategy you used on another legal malpractice case failed, and I said, oh, that's a good strategy, let's go ahead with that.

A    It was a totally different kind of case, totally different kind of advice of counsel.  I told you -- Mr. Seyoum, I told you from the very beginning, this was going to be a hard case for you to win.

Q    Apparently the work wasn't done.

MR. SIMS:  I object, Your Honor.  I move to strike.

THE COURT:  Sustained.

Jury, kindly disregard the examiner's last comment. It's not evidence.

Next question, sir, please.

MR. SEYOUM:  I apologize.

THE COURT:  It's okay.

(Discussion off the record.)

THE COURT: If there's a debate, bring it to my attention, please.

(Discussion off the record.)

BY MR. SEYOUM:

Q    This is a Maryland --

THE COURT: First, have it marked, second, approach the bench, and then third, we'll see.

(Bench conference begins)

THE COURT: What about it?

MR. SIMS: I'm going to object to this. I think this is a legal memoranda. I mean, what are you going to use it for?

MR. SEYOUM: I'm just citing the Maryland Rule of Conduct for attorneys. I mean, that's everything that every lawyer know.

MR. SIMS: So what are you going to ask him?

MR. SEYOUM: I'm going to ask him --

THE COURT: Hold on.

MR. SEYOUM: -- I'm going to ask him if he knows the Maryland Professional Rule of Conduct.

THE COURT: This is not a rule of conduct. It's an amalgam. What's at the top is the -- apparently, I haven't checked it, but Maryland Rule 508, which deals with certain exceptions to the rule against hearsay.

MR. SEYOUM: I can't hear you, sir.

MR. SIMS: It's a rule of evidence.

THE COURT: It's a rule of evidence, and the second piece is from the Court's -- it's also from the Maryland Rules about -- you can ask him questions, but this document can't be displayed for the jury.

MR. SEYOUM: Okay.

THE COURT: But you can't just say, let me read this to you; isn't it true?

MR. SEYOUM: Okay.

THE COURT: You can't ask him that.

MR. SEYOUM: Okay.

THE COURT: But you can say, do you know how you use prior testimony if the witness is unavailable? You can ask him that. You can ask him, do you know how you use a deposition at trial? You can ask him that. But what you may not do, and please don't do it, is just read that piece of paper to the jury, and then ask the witness, isn't this true? Okay?

MR. SEYOUM: Don't read it?

THE COURT: Don't read it.

MR. SEYOUM: Okay. Can I cite the rule number?

THE COURT: You can ask him if he knows what Rule ABC is, and he'll say yes or no.

MR. SEYOUM: So --

THE COURT: But you can't just read that piece of paper to the jury. Let's move on.

(Bench conference concluded)

THE COURT: Let's go.

MR. SEYOUM: Okay.

THE COURT: I've told you how to do it. Go ahead. Go ahead.

MR. SEYOUM: Okay. Well, don't I --

THE COURT: Sir, I'm done --

MR. SEYOUM: This is an important --

THE COURT: Sir -- sir. I'm done --

MR. SEYOUM: This is a bench conference.

THE COURT: Sir, please continue.

Mr. Clerk, do you have that last exhibit that was marked, but not used?

THE CLERK: I do not, Your Honor.

THE COURT: Sir, you need to give the clerk the exhibit that we discussed so --

MR. SEYOUM: Oh.

THE COURT: -- he can -- he needs to keep them all, whether they're shown to the jury or not, for his work, please. Thank you.

THE CLERK: Thank you, Your Honor.

MR. SEYOUM: I'll find it and I'll give it to him, sir. I won't forget.

THE COURT: I'd actually prefer we found it now because things have a way of wandering off inadvertently,

but -- thank you. Very good.

He has to mark it. You have to show it to the other side.

MR. SIMS: I've seen it.

MR. SEYOUM: I did.

THE COURT: All right. Give me a second.

Any problem?

MR. SIMS: I don't have an objection, Your Honor. No objection.

THE COURT: Okay. Great.

Sir, here you go.

MR. SEYOUM: I can use it?

THE COURT: Yes.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q This is for you, sir.

A Okay. I've read it.

Q Okay. One of the issues that we had with Mr. Salvado that your expert, Mr. Rumer, highlighted was that I had entered into an agreement with Mr. Salvado for $1,000 to take care of my protective order case at the district court, correct?

A That was one of the facts that Mr. Rumer looked at, yes.

Q Okay. Without my consent -- without my informed consent, Mr. Salvado transferred the protective order case to a

circuit court?

MR. SIMS: I'm going to object, Your Honor. He's testifying --

THE COURT: What is the basis? What is the basis of the objection?

MR. SIMS: He's testifying. It's lack of foundation.

THE COURT: Sustained.

Rephrase, please.

BY MR. SEYOUM:

Q Did your expert, Mr. Rumer, highlight the deficiencies of Mr. Salvado's actions by stating that Mr. Salvado, without my consent, even though I had an agreement with him to take care of my protective order case at the district court  -- without my informed consent, he moved my case from district court to circuit court and that was a strategic devastating miscalculation?

A I'm going to have to give a detailed answer to that question.

THE COURT: Okay.

A The whole issue of whether or not --

MR. SEYOUM: I would object, sir. I just asked him a question to answer --

THE COURT: Well --

MR. SEYOUM: -- if Mr. Rumer's --

THE COURT: -- your objection --

MR. SEYOUM: I'm asking if Mr. Rumer said.

THE COURT: That's not what you asked him, so he's entitled to -- you asked him that among several other questions that were embedded in a long question, so he gets to answer.

MR. SEYOUM: Sure.

THE COURT: You asked, he answers.

Go ahead, sir.

A So the issue of whether or not the protective order should have been defended either in the circuit court or in the district court was first brought to my attention by Mr. Rumer many, many months after you had come to me to complain about Mr. Salvado, and it was not one of the issues he would've raised with me.

Mr. Rumer raised it as something to at least look at because there was a strategic question as to whether or not Mr. Salvado ought to have simply taken the case over to circuit court rather than to have an initial hearing in district court. Mr. Rumer thought that there were problems with that decision. I don't recall Mr. Rumer ever getting into the question of whether or not you were informed or gave consent to what Mr. Salvado did.

BY MR. SEYOUM:

Q Okay. To the best of your recollection, if I say -- and I said to you that I did not consent, and I was not aware --

THE COURT: Sustained.

Sir, whether directly or indirectly, you can't testify unless you're on the stand. You're not -- you can ask him a question, but you can't phrase it in a way that effectively makes you the witness. So rephrase, please.

BY MR. SEYOUM:

Q Did you ever ask me if I consented for the protective order trial to be moved to circuit court?

A I don't really recall any conversation about that one way or the other to tell you the truth, Mr. Seyoum.

Q So your statement here today is that we never had that conversation?

A I'm saying I don't recall such a conversation.

Q Okay. Did Mr. Rumer, the expert you hired, emphasize that that was actually the most crucial thing that Mr. Salvado did that damaged my case?

A Definitely not. He thought that was a side issue that might be worth looking into, but the main issue was, was evidence put on that could have helped you? Such as the testimony of Ms. Adams and these other incidents involving Ms. Redae.

Q So you're telling me that Mr. Rumer looked at all that information you provided him through me by all the evidences, witnesses that should have been called, and he also opined about the devastating impact of me and my case being

moved from district court to circuit court, and he said the other stuff is more relevant than this issue about moving the case from district court to circuit court was not material?

A Well, first of all, Mr. Seyoum, there was a written -- lengthy written report from Mr. Rumer that goes into all of that. Secondly, Mr. Rumer testified at deposition thoroughly. Mr. Rumer testified at trial at length, and it was clear from the testimony that his emphasis was on the failure to present the evidence of Ms. Adams and these other events.

And in fact, I believe he kind of backtracked on this whole issue of going to the circuit court because there was a current availing expert, if you recall, Mr. Thomas Murphy, who had a number of reasons that he testified to as to why Mr. Salvado's decision was actually an appropriate decision. It was a strategic decision. So Mr. Rumer kind of fell off of that argument.

Q Okay. So you just cited Mr. Salvado's expert witness in defense of your argument?

A I just told you what Mr. Murphy said.

Q Right. So you cited Mr. Murphy's argument in defense of your conclusion?

A No. I told you that Mr. Rumer -- her -- first come up -- came up with this idea that maybe it was not a good idea to move your case directly to circuit court. We fought that issue after hearing what the opposing expert, Mr. Murphy, had

to say and realizing that Mr. Murphy may have had some points.

Q    Is that your testimony?

A    It is my testimony.

Q    Okay. Very interesting. Very interesting. Can you please explain to me what is the issue here? What is it that your expert is saying that Mr. Salvado did wrong by moving my case from district court to circuit court? What did I lose by moving my case from district court to circuit court with the protective order trial?

A    So the issue is how many levels of appeal you would have. If you had litigated the case initially in the district court, which is a somewhat lower court -- it panders on more minor matters than the circuit court, and when you have a protective order, Ms. Redae had gone to district court to ask for that protective order. And so it could have been litigated there, but Mr. Salvado believed that you would be better off because you can go directly -- you can remove the case out of district court directly to circuit court.

And because Mr. Seyoum wanted to have joint custody of his son, Mr. Salvado filed a petition for joint custody here in circuit court, and he felt that by having that circuit court case pending with the custody that you would be in a more favorable position than if you litigated this case initially in district court.

Also, if you litigated the case initially in district

court, your testimony would have been on record, as would the testimony of Ms. Redae's, and that could have been utilized in the proceeding that you could appeal to the circuit court over, so it was not necessarily much of an advantage.

Q    What you just said, isn't it actually contrary to what Mr. Rumer said?

A    No.

Q    Okay.  So if I had gone to district court per the agreement that I had, right --

A    I don't know if the agreement specified district court.

Q    It did.

THE COURT:  Well, sir, respectfully, I know you don't necessarily mean it, you can't insert facts into the record from the well of the courthouse, so please, please, please stop doing it.

MR. SEYOUM:  Okay.

THE COURT:  Ask him a question.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q    My case was supposed to go to a district court first, right?  But she --

A    She had filed for the protective order in district court.

Q    Right.  So my case was supposed to go to district

court, right?

    A    That I can't say. I figure it could have gone either place. Mr. Salvado did have the right and did in fact remove it to circuit court.

    Q    Did he have a right to move it without my consent?

    A    I'm not here as an expert to opine on expert -- on ethics. I would say that generally when a lawyer wants to do something like, yes, he should consult with the client and get the client's approval.

    Q    Okay. Thank you. So you just admitted that Mr. Salvado violated some rules --

    MR. SIMS: I'm going to object, Your Honor.

    THE COURT: Sustained. Disregard.

    Next question, sir.

    BY MR. SEYOUM:

    Q    So is it your opinion that Mr. Salvado violated some rules?

    MR. SIMS: Ob --

    THE COURT: Sustained. Same -- sir, move on, please.

    BY MR. SEYOUM:

    Q    Okay. So had I gone to district court and lost, what is the appeal process?

    A    Well, understand, I'm not an expert in a protective order procedure in Maryland, but my understanding of the procedure is that you file something called a de novo appeal to

the circuit court and you get sort of a do-over, but the testimony that was admitted during the district court proceeding is admissible in the circuit court proceeding.

Q   Okay.  So to summarize it, if I lost at district court --

MR. SIMS:  I'm going to --

THE COURT:  Sustained.

No summarizing.  Ask him a question, please.

BY MR. SEYOUM:

Q   If I lost at district court, I would get a brand-new trial?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

We just -- he just said that.

MR. SEYOUM:  Well --

THE COURT:  Next question.

MR. SEYOUM:  -- thank you for confirming.

THE COURT:  Sir -- sir.  Next question, please.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q   So after the loss and at my new trial, it's as if I get a brand-new fresh start --

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q   -- to bring a --

THE COURT:  It's the same thing.  Sir, kindly move to a new topic, please.

MR. SEYOUM:  I object, sir.  This is very important --

THE COURT:  Sir -- sir.  I appreciate that --

MR. SEYOUM:  -- to establish the contradiction that he had with his expert.

THE COURT:  -- you may not be in agreement with the ruling, but please abide.

MR. SEYOUM:  Okay.  I would object, sir.

THE COURT:  Very good.  Move on, please.

MR. SEYOUM:  All right.

BY MR. SEYOUM:

Q   Did Mr. Rumer, your expert, state that had I gone to district court and lost, I would have gotten a brand-new trial, fresh start, and having heard what Ms. Redae has said about me that made me lose, that is like getting free discovery, and then at the new trial, we know what she's going to say, we know what she said, what she's alleging, and then we can prepare with all the evidence that we need at the new trial and call her out for the lies.

And at this point, if I had gotten a de novo appeal, I could have gotten the police report, the bodycam, the 911 call, and all that -- additional witnesses could have been

brought in to impeach Ms. Redae and I would have walked away a free man; is that correct?

A    That's a very long question, Mr. Seyoum, and I think the only answer I can give you is Mr. Rumer's testimony speaks for itself.  He testified.  He gave a report.

Q    So by moving my case from district court without my consent to circuit court, and I went to trial, and I lost at circuit court, right?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

Sir, I asked you to not do two things.  I asked you to not testify from the well of the court; you're continuing to do that, so kindly stop doing that.  Number two, I sustained a number of prior objections, and I gently asked you to move on, so once again, I'm asking you to move on.

MR. SEYOUM:  Okay.  I object.  That was a valid question, sir.

THE COURT:  I understand.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q    So by moving my case --

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Same thing.  Move on, sir, please.

BY MR. SEYOUM:

Q    Did your expert say by moving my case to --

MR. SIMS:  I'm going to object, Your Honor.

BY MR. SEYOUM:

Q    -- the district court, I lost my right for an appeal?

MR. SIMS:  I object, Your --

THE COURT:  Sir, it's the same thing.  We've gone over this.  I've ruled.  I understand that you think I'm wrong. That's the way it is.  Please move on.

MR. SEYOUM:  Okay.  I would like to make an objection to this.  I'm not asking the same question.

THE COURT:  You've already done that, and I told you fine, so I'm going to tell you one last time, please move on to another topic.

BY MR. SEYOUM:

Q    Did your expert say that when I went to circuit court and lost, I lost the chance for a brand-new trial?

MR. SIMS:  I object, Your Honor.

THE COURT:  All right.  Sustained.

Move to another subject, sir, or you're done with the witness.  Those are your choices.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q    What kind of appeal did I get at circuit court?

A    The Court of Special Appeals.

Q    Okay.  And what kind of appeal is that?  Is that an appeal, like, you get a brand-new trial?  Or is it just an

appeal on the record?

A You can get a brand-new trial if you win at the Court of Special Appeals and the Court of Special Appeals reverses.

Q Right. So I lost at circuit court, and the only chance I have here is to appeal and I appealed.

A I guess.

Q I did not get a brand-new trial?

A No, you lost the appeal.

Q Right. The only way I could get a reversal of the loss at the circuit court is to appeal?

A And win.

Q Right. So can you explain to me how you appeal a case? Like, from a circuit court?

A I --

MR. SIMS: I'm going to object, Your Honor. I don't see the relevance.

THE COURT: Sustained.

That's -- we're not doing that. Move on, sir. It's not --

MR. SEYOUM: I --

THE COURT: -- it's not --

MR. SEYOUM: I would object.

THE COURT: I understand that you disagree. I know. But I'm kindly asking you to move on because I've ruled.

MR. SEYOUM: Can we have a bench conference?

THE COURT:  No.  Not necessary.  Thank you, though.

MR. SEYOUM:  I object to the (Sound) --

THE COURT:  Okay.  But you --

MR. SEYOUM:  -- the line of questions I have.

THE COURT:  -- your choices are to ask him a question or to move to another witness.

MR. SEYOUM:  This is addressing the expert's [sic] witness as a --

THE COURT:  Sir, I've given you choices.  You understand -- I get you don't agree, but please abide.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q    In reading this text message --

A    This is the same one you've just --

Q    Yes.  Yes.

A    -- handed me previously, Exhibit Number 4?

Q    Sorry.  No, it's the same.  Did Mr. Salvado lie to me in that text?

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.  Improper question.

MR. SEYOUM:  Okay.

THE COURT:  Implicates any multitude of numbers of problems --

MR. SEYOUM:  Okay.

THE COURT:  -- so sustained.  Next question, please.

MR. SEYOUM: All right. Sorry.

BY MR. SEYOUM:

Q Do you know the difference between the appeal processes for district court, circuit court, and the higher level of appeals that can (unintelligible 10:21:06) --

MR. SIMS: I object, Your Honor.

THE COURT: Sustained.

We've been over that. Move on, sir.

BY MR. SEYOUM:

Q Was an en banc appeal available to me after I lost at the district court?

MR. SIMS: Again --

THE COURT: After you -- I couldn't -- after you lost where, sir? I didn't --

MR. SEYOUM: Was the en banc --

THE COURT: No, no. I know what it is. I just didn't catch "after you lost" --

MR. SEYOUM: District court. After I lost district court, was en banc review available for me?

THE COURT: You may answer that question, if you know.

A Well, you didn't lose district court, so no -- the answer is no.

BY MR. SEYOUM:

Q Okay. If I lost at circuit court, was an en banc

review available for me?

A    I'm sorry.  If you lost at circuit court, was en banc review --

Q    If I lost at circuit court, would en banc review available for me?

A    There is an en banc process in the circuit court, but I have to tell you, I don't know the answer to that, Mr. Seyoum.

Q    And did you explore if that avenue was available for me?

A    I really don't recall.  It was very much of a side issue as far as I was concerned.

Q    Okay.  And did you review Mr. Salvado's explanation as to why he chose the appeal process for me, and made sure that if he was right or wrong, to impeach him at the trial?

A    I'm sure I reviewed his testimony.

Q    Okay.  In this text message that I gave you, Mr. Salvado is saying that I have an en banc review possibility, but he's going against it.  Does that --

THE COURT:  Hold on, sir.

MR. SIMS:  I'm just going to object on lack of foundation.  He hasn't established if the witness recalls or has seen this document.

MR. SEYOUM:  We'll see.

THE COURT:  I'm thinking.  Give me a moment.

Sustained. Lay a foundation. And may I see that again, please? I wasn't -- I don't remember who the declarants were.

MR. SEYOUM: It was part of the --

THE COURT: No, that's --

MR. SEYOUM: -- me making the case.

THE COURT: Sir, I can't read while you're talking to me.

Come to the bench, please.

(Bench conference begins)

THE COURT: I'm sorry. I'm not sure who the parties to -- I'm not sure what this is, and I'm not sure who the parties to it are, so that's why I'm struggling with the foundation, and authenticity, and all the other things because I don't know who the parties to the conversation are. Mr. --

MR. SEYOUM: The blue is Mr. Salvado. The black is me. Mr. Hoge has valued his -- his emails before --

THE COURT: I -- all --

MR. SEYOUM: It's an email between me and him back and forth, so it's --

THE COURT: Sir, you answered my question --

MR. SEYOUM: -- a valid part of discovery.

THE COURT: -- so please put a period at the end of it. I didn't ask you -- if I want more information, I'll ask it. You're spending your time, so I don't know why you want to

do that.

So the black is you and the blue is Mr. Salvado?

MR. SEYOUM: Yes, sir. And this is an email from me to Mr. Hoge.

THE COURT: What part of it is the email from you, sir, to Mr. Hoge?

MR. SEYOUM: This is the communication between me and Mr. Salvado that I shared with Mr. Hoge to review.

THE COURT: I see.

MR. SIMS: And that's the foundation I'm asking --

THE COURT: Yes. Objection's sustained.

(Bench conference concluded)

THE COURT: I got it now. Thank you.

MR. SEYOUM: Sustained?

THE COURT: You have to lay a foundation before you --

MR. SEYOUM: Okay. So lay the foundation first?

THE COURT: Please.

BY MR. SEYOUM:

Q    Did I share with you text messages between me and Mr. Salvado?

A    I think you did.

Q    Would that be one of those text messages that I shared with you?

A    You know, I can't tell if this is one I've seen

before or not. Probably, but I don't recall it specifically.

Q If I pulled up the emails and provided them to you, would that help you recollect?

A I'm not disputing that you showed it --

Q Okay.

A -- to me, Mr. Seyoum.

Q Good. So in this email, Mr. Salvado says to me --

A This is a text message.

Q I'm sorry, text message. Mr. Salvado says to me in a question that I asked to him, is there anything you need from me to file an appeal before today's deadline? And he answers, no, today is for an en banc review we are leaning against. That's because of the political climate here in Montgomery County. I like the Court of Special Appeals approach.

And then I replied, so we're not filing an appeal today? And then I followed up with a question that said, I thought you said deadline is today. We file today to preserve an en banc, and decide if we want to do special appeals later, and abandon en banc at our leisure. Did I misunderstand?

MR. SIMS: Your Honor, I'm objecting.

THE COURT: Sustained. I have two out-of-court declarants and can't even begin to work my way through the hearsay problems. Objection's sustained. With this witness is part of the problem. Go ahead.

Actually, move to another topic because there's no

further to go with that, please --

MR. SEYOUM:  All right.

THE COURT:  -- with this witness.  Possibly with a different witness, but not with this witness.

MR. SEYOUM:  Okay.  I object, but --

THE COURT:  Okay.

BY MR. SEYOUM:

Q    As you can see from the email, that I had discussions with Mr. Salvado regarding what kind of appeal should I go with, and he gave me advice on which we should --

MR. SIMS:  I'm going to --

THE COURT:  Sir, I sustained the objection.  Please move on.  Please.  I'm not going to -- I'm not going to ask you again, please.

MR. SEYOUM:  Okay.

BY MR. SEYOUM:

Q    Based on your understanding, did Mr. Salvado give me wrong advice?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

Move on, sir.

MR. SIMS:  May we approach, Your Honor?

THE COURT:  Is this on the new document?

MR. SIMS:  Yes.

THE COURT:  Let him mark it first, please, and then

let me take a look at it, and then we'll see what we need to do, please.  Thanks.

(Bench conference begins)

MR. SIMS:  All right.  So this is not admissible. This is just -- I don't know what this document is, but the main point I do want raise, Your Honor, is they raised no issue with their expert in this case about failure to proceed with claimant against Mr. Salvado was somehow defectively appealing or making a recommendation on how to appeal the decision that the protective order -- this is completely about their expert raise -- it does not raise the issue.  It's not raised in the complaint.

THE COURT:  Is that Mr. Lazzaro?

MR. SIMS:  Mr. Lazzaro.  He has not raised the issue in his opinion, and it's not raised in the complaint.  This is -- and in fact, Mr. Salvado didn't take on the appeal -- appeal to prosecute by another lawyer, and so it's not an issue.  How the appeal was progressed is not an issue in this. This is irrelevant.

MR. SEYOUM:  I profusely disagree because Mr. Rumer opined on this, and we want to know if Mr. Hoge understood what Mr. Rumer, his expert, was saying.  If he doesn't know the difference between en banc, and appeal, and de novo, then he gave me wrong information, and he gave me wrong advice, and if he proceeded with the trial without understanding what de novo,

and en banc, and appeals on the record is, then that's malpractice.

THE COURT: Well, I don't know what Mr. Rumer said and I don't know what his opinion is. What I do know is that, just to simplify, it's inadmissible, so as to the document, the objection is sustained.

(Bench conference concluded)

MR. SEYOUM: Okay. But I -- can I mark that?

THE COURT: I marked it.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q In regards to losing a case in district court, circuit court, do you know what the time -- how long it takes from a loss at a district court to get a new trial -- a loss at a circuit court to get a new trial?

A I don't know exactly. It's certainly shorter than going to the Court of Special Appeals from the circuit court.

Q Right. So if I had stayed at district court and lost, I would have gotten a new trial within days, weeks maybe?

A I'm not sure how long it would have taken.

Q Maybe months, but not years?

A I believe that an appeal to the Court of Special Appeals would have taken considerably longer than a de novo appeal to the circuit court.

Q So let me clarify if I understood. You were just --

my question is, if you lose at district court, you get a new trial within days or weeks, correct?

A    I don't know that.

Q    Okay.  You don't know that?

A    I don't know that.

Q    Okay.  If you lose at a circuit court and you appeal -- you appeal to the Court of Special Appeals and it takes much longer for them to --

A    I just indicated that I believe it does take longer.

Q    Okay.  And after they review, if you're lucky, which I was not, they would order -- if they decide in my favor, then I get a brand-new trial?

A    Yes.

Q    Sometimes maybe years later or a year later?

A    Yes.

Q    Okay.  So if you were Mr. Salvado and you were advising me, would you tell me to go -- stay in district court and see -- roll the dices [sic] and if we lose, we have a brand-new trial and getting free discovery, or would you have told me, no, I'm going to move you to circuit court, and if you lose, we're going to appeal, it's going to cost you more, and we're going to wait years to get a response?  Which would be a better choice for me based on your experience and your analysis?

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    If you were my attorney, which approach would you have given me?

MR. SIMS:  I object, Your Honor.

THE COURT:  Same question.  Sustained.

BY MR. SEYOUM:

Q    Is district court a better option or is circuit court a better option for a protective order case?

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    Did Mr. Salvado do me a favor by transferring my case to circuit court?

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

Rephrase.

BY MR. SEYOUM:

Q    Do you fault Mr. Salvado for moving my case from district court to circuit court?

A    I -- no.  I have no opinion about it independently.

Q    Okay.

A    I listened to what Mr. Rumer had to say about it.  I listened to what Mr. Murphy had to say about it.  It seems like there were strategic arguments to do one or the other.

Q    So are you testifying that you're saying the expert that you hired, Mr. Rumer, agrees with you?

A    Agrees with me on what?

Q    That it was okay to transfer my case from district court to circuit court, and losing my de novo appeal, right, and --

A    No.  What --

Q    -- drag out the appeal for a year and a year plus?

A    What I told you, Mr. Seyoum, is that Mr. Rumer initially questioned the wisdom of doing that, but when he heard what Mr. Murphy had to say and looked into it a little further, he decided that that was not our strongest argument.

Q    Right.  But at this point, you had engaged me.  I paid you to hire an expert.  The expert said Mr. Salvado screwed me over by moving the case from district court to circuit court --

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

Watch your use of language in this courtroom, sir, please.

MR. SEYOUM:  That's what he said.  Okay.

THE COURT:  That may be, but --

MR. SEYOUM:  Okay.  All right.

THE COURT:  -- rephrase the question in a polite --

MR. SEYOUM:  So rephrase it in a way that he didn't

say it?

THE COURT: Sir, I've ruled. You can --

MR. SEYOUM: Okay. I object.

THE COURT: -- either -- okay. But you may ask him another question.

BY MR. SEYOUM:

Q    Did Mr. Rumer criticize profusely Mr. Salvado's move from district court to circuit court as like strategically dumb move?

A    No.

Q    So when Mr. Rumer came here to testify, he wouldn't say that the move from district court to circuit court was dumb?

A    Mr. Rumer's testimony is on the record. Mr. Rumer came to testify primarily about Sylvia Adams, and about the evidence that was not presented at the protective order hearing that he believes should have been presented.

Q    Is it true that you're disagreeing with your expert because you didn't follow your expert's advice?

A    No.

Q    If your expert came here and said the de novo appeal was the central issue, I don't know why Mr. Hoge didn't do that, would he be wrong?

A    That did not happen, Mr. Seyoum.

Q    I'm saying, would he be wrong?

A     I have no opinion.

Q     You have no opinion?

A     As to whether he would be wrong on that, no.  That's why I hire an expert.

Q     Right.

A     I hire experts to give me advice.

Q     Right.  And give you advice, and you make that opinion based on their advice, and you have no opinion as to what your expert told you?

A     I -- I know that when my expert told me that he was having second thoughts about that side issue that he himself had raised, I had never thought that it was central to the case to begin with, and I chose to not really go there.  I did talk about it.  I know I talked about it at the trial.  I know I cross-examined Mr. Murphy about it.  But I made a tactical decision that that was not going to be our winning issue in the case.

Q     You just testified that -- you just testified -- you said that the de novo appeal was not the central part of this case, that what Mr. Salvado did was not that relevant -- all the other stuff about Sylvia Adams, the car accident, the nanny issue, and the vacation issue was more important than me losing my de novo appeal?  Is that what you're testifying?

A     Mr. Seyoum, that's exactly what you came to me complaining about.  The issue of the de novo appeal never even

surfaced in any of our conversations until after Mr. Rumer had highlighted it as a possible other error by Mr. Salvado.

Q   Right.  Because I'm not an expert.  I hired you to hire an expert to find the legal basis of what went wrong, and your expert said --

MR. SIMS:  I'm going to object, Your Honor.

BY MR. SEYOUM:

Q   -- my losing my de novo right was the most --

THE COURT:  All right.

BY MR. SEYOUM:

Q   -- crucial thing that happened to me, and you're saying you disagree with your expert?

A   I don't --

THE COURT:  All right.  Objection sustained.

Let's take a 10-minute recess, ladies and gentlemen. Stretch your legs, get a drink of water, do not discuss this case with anyone.  Do not let anyone discuss it with you. Please keep an open mind.  Don't speak with any parties, counsel, or witnesses, and don't look things up on the internet.  And please leave your pads on your chairs.  Stretch your legs, folks.

Sir, you may step down.

Take 10 folks and then we'll regroup.

THE CLERK:  All rise.  Court stands in recess.

(Recess)

THE COURT: Folks, thank you very much. Please be seated.

Sir, please continue.

(Discussion off the record.)

THE COURT: Sir, do you want this back? Number 6?

MR. SEYOUM: Sure.

THE COURT: All right.

MR. SEYOUM: Thank you.

THE COURT: If I may see the other one? Thank you. And -- Number 7, here you go.

MR. SEYOUM: Yes, sir.

THE COURT: Continue. Thank you.

RESUMED DIRECT EXAMINATION

BY MR. SEYOUM:

Q Are you familiar with that report, sir? It's the expert report by Darin Rumer that I paid for, that you hired --

THE COURT: Sir, let him -- he's going to look and he's going to say yes, I'm familiar with it, no, I'm not, and then you can follow up, but give him a moment, please.

MR. SEYOUM: Sure.

A You've handed me two documents, Mr. Seyoum. I assume you're asking me about Exhibit Number 6, which is the amended report and opinion of Darin L. Rumer, Esquire; is that correct?

BY MR. SEYOUM:

Q Yes, sir.

A    Yes, I'm familiar with it.

Q    Okay.  Are you familiar with the other blue paper?
Looks like a report, like a police report.  Have you ever seen
it --

THE COURT:  Just ask him, sir, are you familiar with
Exhibit 7?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

BY MR. SEYOUM:

Q    You're familiar with it?

A    Yes.

Q    Can you explain how you're familiar with it?

A    I've seen it recently.

Q    Recently?

A    Yes.

Q    How recently?

A    Maybe within the last several days.

Q    Okay.  So when we first met in 2021, you've never
seen this before?

A    No.

Q    From 2021 all the way to the trial of 2022 in July,
you've never seen this document?

A    I don't think I did.

Q    Okay.  Can you tell me what that document is?

A    It says incident number P1700808793, police report --

well, there's a heading on here, by the way, that I know I haven't seen because it says, "police report, Atty. Salvado, Stein, Rumer, Hoge, and Deucher failed to retrieve". I don't think that was on the original document.

Q  Well, here. Let me give you a different one then.

MR. SIMS:  Well, he's already marked --

MR. SEYOUM:  Oh. That's fine.

THE COURT:  You just need to give it to the clerk. May I see it, please? Something's been added to it?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Let me --

THE WITNESS:  On the top -- very top of this one.

THE COURT:  Let me just read it, thanks.

MR. SEYOUM:  If we can substitute it with this one, sir? It's the original.

THE COURT:  Well, why don't -- let's do this. Why don't we mark the other one as 7-A so they track. Will that work for you?

THE CLERK:  We can do that, Your Honor.

THE COURT:  We'll mark that one as 7-A, and why don't you use 7-A and not 7, please?

MR. SEYOUM:  Just this one?

THE COURT:  Well, have him mark it first, please. The one without the --

MR. SEYOUM:  Okay.

THE COURT: -- information --

MR. SEYOUM: All right.

THE COURT: -- that was not put there by law enforcement.

MR. SEYOUM: Okay. Give it to him now?

THE COURT: Uh-huh. Yes, of course.

MR. SEYOUM: I'm learning.

Sorry about that. So let's continue.

BY MR. SEYOUM:

Q So you've never seen this police report in 2021 -- in 2020 -- I mean, let me rephrase. Since the day I hired you and spent $9,000 and then additional $120,000, you've never seen that document?

A I have seen it a few days ago.

Q A few days ago. You never saw it in 2020?

A I don't recall seeing it in 2020.

Q You never saw it in 2021?

A Nor in 2021.

Q You never saw it in 2022?

A Nor in 2022.

Q You never saw that police report being used by Mr. Salvado in 2017?

A Do I recall seeing -- well, I never saw Mr. Salvado --

Q Well --

A    -- do anything, but --

Q    Sorry.  (Unintelligible 11:02:31).

A    -- the transcript --

Q    Sorry.

A    -- of the protective order hearing, I don't think I recall Mr. Salvado using this.

Q    So you never saw any police report, bodycam footage, 911 call tapes at the protective order trial of mine in December 11, 2017?

A    I don't recall if I've seen --

Q    There was nothing like that in the transcript?

A    No.

Q    Okay.  And if Mr. Salvado had got those bodycam footage, 911 call records, police reports, and used it, it would have been in the record?

MR. SIMS:  I'm going to object to lack of foundation, Your Honor.

THE COURT:  Can I see the document for a moment?

And I could ask you all to come up here, please?

(Bench conference begins)

THE COURT:  Sir, what drew the objection is that your question to the witness referenced not simply the police report and what, if anything, is described in it.  But then additional items, such as -- for example, bodycam footage and other things that are not before us, so that's what drew the objection.

So --

MR. SEYOUM:  Keep it separate?

THE COURT:  Well --

MR. SIMS:  He hasn't established if there is a body camera.

THE COURT:  I'm sorry?

MR. SIMS:  He hasn't established that fact -- those facts.

THE COURT:  Right.  There may or may not be a body camera and -- what did you want to -- while we're here and -- what's this?

MR. SEYOUM:  That's the custodial of the record.  So that --

THE COURT:  Well, that may be, but we can't not -- when I say "we", I can't, you can't, he can't, with --

MR. SEYOUM:  They're --

THE COURT:  -- sticky notes.

MR. SEYOUM:  Okay.  Can you please put it back there? I'll give you one that has photocopy on it that I provided as discovery.

THE COURT:  Well -- but whose handwriting is this?

MR. SEYOUM:  That's the person who provided me the report.

THE COURT:  You can't --

MR. SEYOUM:  It's part of the record, sir.



MR. SIMS: No, it's not.

THE COURT: Sir, what I have is a sticky note with handwriting on it.

MR. SEYOUM: I have provided that document with a sticky note xeroxed and given it to them as evidence. They've looked at it, they've accepted, they said it was authentic --

THE COURT: I'm sorry --

MR. SEYOUM: -- and we had a hearing about that where you looked at this, and you said it was admissible, and that it was not disputed by him.

MR. SIMS: No. Let me correct that record. I said --

THE COURT: Well -- sir, do me a favor and don't -- I know you don't probably mean to do it, but don't put words in my mouth because then I'm going to spend about two hours explaining to you what I said. What we had a hearing about was the other side said they would not challenge the authenticity of the police report. Period. Okay. The sticky note that you or somebody placed on Exhibit 7-A is not part of the police report.

MR. SEYOUM: I did not put the sticky note on there. The police put the sticky note on there and gave it to me. I did not produce that sticky note. The police custodian gave me that report and put that sticky note on there, sir. So I got it from the police department. That is not my handwriting. It

was produced to me and given to me by a police officer.

THE COURT: Mr. Sims, do you care about the sticky note? We're getting -- I mean, we can spend all day --

MR. SIMS: I am not going to care about that. I am going to object to the admissibility of this document.

THE COURT: Well, why --

MR. SEYOUM: And I object to that, sir.

THE COURT: Well -- you object to him objecting?

MR. SEYOUM: Yes.

THE COURT: I'm not going to ask you why. So what I'll ask Mr. Sims, since we're here, is I know you said you would not object to authenticity, therefore, Mr. Seyoum didn't have to go get a business record certification and all that business. Do you have an additional objection?

MR. SIMS: I will -- if he's going to introduce the document itself into evidence, I would object on the basis of -- it's double hearsay.

THE COURT: Oh.

MR. SIMS: It's an out-of-court record of a statement that Ms. Redae made to a police officer who can --

THE COURT: Who's the declarant?

MR. SIMS: Ms. Redae is the declarant, and she spoke to the, I'm guessing, police officer or an administrator in the police office, and then that person recorded her conversation, so that's the second level of hearsay. And then the third

level of hearsay is the document itself. It's a police report. And so it's -- so --

MR. SEYOUM: I completely disagree with the way you characterized the document.

MR. SIMS: I agree that it's all --

THE COURT: Can you do me a favor? Don't talk over him --

MR. SEYOUM: Oh.

THE COURT: -- and he won't talk over you, okay? Thanks.

MR. SIMS: So I agree that it's authentic, but it has multiple levels of hearsay that preclude its admissibility.

THE COURT: All right. Let me hear from Mr. Seyoum about -- what is this being offered to prove in this case, please?

MR. SEYOUM: It's a police report that has been available since 2017 that Mr. Salvado did not get, and Mr. Stein did not get. Mr. Hoge did not get. It's an original copy. I got it from the police department. I had brought it into the information of the person --

THE COURT: What are you offering it to prove? Are you offering it to prove --

MR. SEYOUM: As evidence that there -- I'm sorry.

THE COURT: You're trying to parse through this because a police report in and of itself, even if it's

authentic, even if it is the business records of the police -- so we've cleared authenticity and first-level hearsay, it's a business record. I know he challenged that, but he's going to lose. Overruled.

What he's focusing on is there is information embedded within it where the person making the statement is not the police officer who has a duty to accurately report and to tell the truth, but of a civilian who has not such duty. That piece of it, that's the embedded hearsay, so-called second-level hearsay. Unless there's an exception that would cover that, it makes it inadmissible, that piece of it. Not the whole report, just the statements of the declarant, meaning the non-police officer whose words are embedded within it.

MR. SEYOUM: I strongly disagree, sir. There is no proof that --

THE COURT: Well, I tell you -- what I will tell you is that --

MR. SEYOUM: -- that document that was produced and the statements that are produced are not the police officer's. You have no proof that the police officer did not write that report.

THE COURT: If you keep pointing at me, I'm going to take another recess because I find that to be not helpful.

MR. SEYOUM: Okay. I was pointing at the document, sir. Not at you.

THE COURT: Well, why don't you keep your finger at your side?

MR. SEYOUM: Okay. I'm sorry, sir.

THE COURT: I don't point at you. Okay? Okay.

Now, yes, it's a police report. Yes, it's authentic. I think the stipulation covers first-level hearsay that is a public record/business record of the police department. That's all fine, so those pieces are fine. What he's objecting to and what I'm trying to get you to respond to, as I said, whose words do we care about? And you say -- is it Ms. Lem -- her complaint in it?

MR. SEYOUM: That is a police report filed by a police officer.

THE COURT: All right. I'm not going to -- all right.

MR. SEYOUM: It's part of the report.

THE COURT: Section 804(B) of Judge Murphy's treatise, 5th edition, the second-level hearsay in this document, not admissible. Period.

MR. SEYOUM: I profusely object, sir.

THE COURT: Okay.

MR. SEYOUM: I don't think that's fair.

THE COURT: Thank you.

(Bench conference concluded)

MR. SEYOUM: You're biasing my case.

THE COURT: Sir, watch your use of language with me, please. Thank you. Please continue.

MR. SEYOUM: Can I please have that back?

THE COURT: It's not coming in in that form, so he's going to hold onto it, please.

MR. SEYOUM: I can't use the police report?

THE COURT: Not in that form for the reasons we discussed. If --

MR. SEYOUM: So what form can I use it?

THE COURT: I can't tell you how to do it. Just like I can't tell him how to do it.

Sorry.

MR. SEYOUM: Okay. Can I use the coversheet then?

THE COURT: Have it marked if there's no objection --

MR. SEYOUM: The issue was this part.

THE COURT: I can't tell you how to do it, sir. I can't do that for either side.

Show it to Mr. Sims, and then you can ask the clerk to -- if this is -- 7-C.

THE CLERK: 7-C?

THE COURT: I think that's the best sequence for later consideration.

MR. SIMS: I have no objection to the coversheet, Your Honor.

THE COURT: All right. 7-C, marked for

identification, no objection.

(The document referred to was marked as Plaintiff's Exhibit No. 7-C for identification.)

THE COURT: Ask away.

Do you have -- I think the clerk has your document, sir. Sir? I'm trying to get you to the clerk --

MR. SEYOUM: Oh.

THE COURT: -- whose going to give you the official 7-C that you're welcome to use with the witness if you wish.

THE CLERK: So each one we're re-marking? 7-A?

THE COURT: No, no, no. I want 7-A in its original form. I want 7-B in its original form. What I've -- can I have that? If you don't mind, mark that as 7-C --

THE CLERK: I believe this will be 7-B, Your Honor. We have 7 --

THE COURT: 7 -- I'll do this with you later. Just mark that, please, that one piece of paper as 7-C. Let the gentleman have it so that he can ask the -- and I'll do the tidying up with you a little bit later, okay? Thank you. I know we have to do it, but we'll do it in a bit. Thank you.

Go ahead sir.

MR. SEYOUM: All right. I'd like to make an objection and put it on the record.

THE COURT: You've just --

MR. SEYOUM: I'd like to use the document.

THE COURT: You've been doing that, so please continue.

MR. SEYOUM: So I can use this one?

THE COURT: Yes.

Go ahead.

BY MR. SEYOUM:

Q Have you ever seen that police report?

A As I've just stated, I've seen it a few days ago.

Q Okay. So in 2017, Mr. Salvado, to the best of your knowledge, never got a police report?

A As far as I know, he did not.

Q You did not see any police report in the protective order trial transcript?

A I don't recall seeing any reference to it.

Q You did not see any police report in the exhibits at the protective order trial documents?

A Again, I don't recall seeing it.

Q You did not see the police report at the de novo appeal trial?

A Correct.

Q Do you know why you didn't see it at the de novo appeal trial?

A Why I didn't see it? No, I don't know why I didn't see it.

Q     Because it didn't happen.  There was no de novo appeal.

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

MR. SIMS:  He's testifying.

THE COURT:  He said he hasn't see it, sir.  Please move on.

BY MR. SEYOUM:

Q     Did you see it at the circuit court trial transcript?

A     I don't recall seeing it there either.

Q     Did you see it at the appeal filing of the police report?

A     I do not.

Q     Do you know why it's not in the appeal --

A     No, I do not.

Q     -- docket or the appeal document that we submitted with the Court of Special Appeals to appeal the case?

A     Well, things that are in the record in the Court of Special Appeals can only come from a record of the circuit court, so if it wasn't in the circuit court, it wouldn't be in the record of the Court of Special Appeals.

Q     Right.  Right.  Because we went to -- he moved me from district court to --

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Well, I'm going to only sustain it to

your testifying from the well of the courtroom. But you may ask him a question.

BY MR. SEYOUM:

Q Okay. So the reason you don't see it in the circuit court appeal record is because I never got a brand-new trial, and the appeal was going to be on the record, and if you don't put in the evidence into the record at the trial, and you don't make a record of the error like I did, if something goes wrong and you feel somebody made a mistake, you make a record of it so you can appeal it; you don't see that in the Court of Special Appeals report?

A I don't understand your question, sir.

Q Did you see any police report citation in the Court of Special Appeals affirming that I lost the case?

A I've already answered that. I don't believe I saw it.

Q You didn't see it because it never existed there?

A I don't know why I didn't see it. I just know I don't -- I -- I'm quite certain I never saw it.

Q Okay. But if it wasn't in the transcript or if it was used as evidence at the protective order trial at circuit court, it would have been there?

A I don't know that.

Q You don't know?

A Well, I'm sorry, maybe. Can you rephrase that

question?

Q If the police report that exonerates me was used --

MR. SIMS: I'm going to object, Your Honor.

BY MR. SEYOUM:

Q -- at the protective order trial --

THE COURT: I'm sorry?

BY MR. SEYOUM:

Q -- would you have found it?

MR. SIMS: I object. He's testifying. He's calling it an exonerating document.

THE COURT: Sustained. You may rephrase, please. And try to just ask the witness a question without adding your own internal thoughts to it, please.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q If there was any police report that would have favored my case, you did not see it, any transcript or it's --

A I don't recall seeing a police report and a transcript.

Q Okay. Thank you. Can you take a look at what it says on the report? Have you looked at it?

A Yes, I've looked at it.

THE COURT: Sir, what number do you have in your hand, please?

MR. SEYOUM: 7-B.

THE COURT: Well, that's the one I said you can't use.

MR. SEYOUM: (Unintelligible 11:16:22).

THE COURT: Give it back to the clerk, please.

BY MR. SEYOUM:

Q    Okay.  So on the top it says incident report, right?

A    It says incident number.

Q    Incident number, sorry.  And the incident date is 2017, 11/22?

A    Yes.

Q    That's the date that Ms. Redae called the police on me?

A    I think so.  I don't recall specifically when it was.

Q    It was a 911 call, and the incident started at 18:08:39, right?

A    That's what it says.

Q    So that's when she called the police?

A    That's what it says.

Q    Okay.

A    That's what it says the incident started.

Q    Right.  And then it says route closed 2017, 11 -- 20:36.  So they spoke to her for two hours?

MR. SIMS:  Now I'm going to object, Your Honor.

THE COURT:  Let me see the document, sir.  Give me a minute.  Just help me, folks, tell me what line --

MR. SEYOUM: First --

THE COURT: -- from the top. Just line number, whatever. Just tell me -- you don't -- no pointing. Which line, please? Just first, second, third. Sir, just help me -- tell me which line I'm looking at.

MR. SEYOUM: The top line.

THE COURT: Okay.

MR. SEYOUM: Okay.

There's a start and a --

THE COURT: No, no. I can read it.

MR. SEYOUM: Okay. That's what I'm trying to point out.

THE COURT: I can read it.

MR. SEYOUM: I'm just reading what's on the record.

THE COURT: I think you're misapprehending what the timestamps mean, so sustained.

MR. SEYOUM: Are you saying that the timestamp is wrong?

THE COURT: No. I'm not --

MR. SEYOUM: So am I misstating the timestamp?

THE COURT: I think you're possibly misunderstanding the meaning of it, but you can ask the witness what he knows about it.

MR. SEYOUM: But you're saying that I'm wrong?

THE COURT: I'm not saying -- I'm saying you have to

phrase a question to this witness and then see if he can answer it. You can't stand in the center of the courtroom and testify about what you think it means. Ask him what he understands it to mean.

MR. SEYOUM: Okay. I object.

THE COURT: Okay.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Am I reading this correct? It says incident started at 2017, 11/22 at 18:08 --

A Mr. Seyoum, my eyes are okay, but --

Q Sure. So she called -- I'm sorry. The incident --

A Well, the answer to your question is, it says on here, incident started November 22nd, 2017, 18:08:39.

Q Right. And then the route closed at 20:36:37, so that's two hours.

A That's route closed time, 11/22/2017, 20:36:37.

Q Right. So incident started at 18:08:39 on the 22nd of November 2017. That's the day I took Aaron to Pennsylvania, correct?

A I don't disbelieve you, Mr. Seyoum. I just don't recall specifically what date and time you took Aaron to Pennsylvania.

Q Okay. And the location is 8710 Cameron Street in Silver Spring, Maryland, apartment 508?

A That is what it says.

Q Creator user ID, creator user Kristen Cesario (phonetic sp.). And then user ID 15869. Initial incite code, domestic. Domestic disturbance. Domestic disturbance. And incident -- inactive incident. Inactive incident. BOMO domestic disturbance.

A Wait. I -- I think you -- I think you skipped something. It says --

Q Domestic disturbance/violence.

A Domestic disturbance/violence.

Q Okay. Now, there is a second copy to this page. Did you see it?

A I have --

THE COURT: Sir, if you're referring to something that I, over your objection, ruled as not admissible, then you can't ask him about it.

MR. SEYOUM: I'm just trying to verify if he's looking at a complete document.

BY MR. SEYOUM:

Q To the best of your knowledge, is that a complete document?

A This two-page document?

Q Right.

A As far as I know. There's a sticky note on here by the way that I -- I don't recognize.

THE COURT: Just don't -- just let it stop there, please.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q So there were two pages to this document, that you agree?

A At the time I saw it a few days ago, yes.

Q Okay. So the one that you are seeing right now in the court is just one page?

A Yes.

Q Do you know why that is?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Yes, because that's what I ruled.

THE WITNESS: That's exactly my answer.

MR. SEYOUM: And I would object. Okay.

THE COURT: Okay.

BY MR. SEYOUM:

Q All right. So let's look at Mr. Rumer's report. Oh, before that, do we have any evidence of any bodycam footage that we've shown you?

A No.

Q Any evidence of 911 call tapes?

A No.

Q In this expert report, your expert report that you hired, and it cost about $14,000?

A     I think that cost included his testimony and deposition of the trial.

Q     Hm?

A     I -- I don't recall the exact charge that Mr. Rumer made, but I think that the figure you just quoted probably included preparing this report and also testifying at deposition and at trial.

Q     Right.  Does Mr. Rumer in his report here say that Mr. Salvado failed to get the police report?

A     No.

Q     He doesn't say that?

A     No.

Q     To the best of your recollection, did Mr. Rumer suggest that a police report be --

A     Well, I take -- I take it back.  Actually, on page 5, I guess he does say something along those lines.  He says prior to the trial, Mr. Salvado failed to subpoena the police department for any 911 calls, fire department records, and/or police reports made (or the absence thereof) by Ms. Redae, so yes, he does make reference to that.

Q     Okay.  So he didn't make a reference that states that Mr. Salvado failed to get the police report?

A     He said what he was going to do.

Q     Right.  Okay.  And basically, he's saying you should get it?

A    Who's saying?

Q    Mr. Rumer.

A    Mr. Rumer --

Q    He's saying that Mr. Salvado failed to get a police report --

A    He said what he wrote.

Q    -- so isn't it -- isn't it logical that he's telling us we should go get the police report --

A    No.

Q    -- and bring it in as evidence, saying like, look, Mr. Salvado screwed up.  He didn't get the police report that was available.

A    Mr. Rumer never said that to me.

Q    Okay.  But did that occur to you, sir --

A    No.

Q    -- that we should get the police report?

A    No.

Q    So we're suing Mr. Salvado for not getting a police report, and you don't think you should get a police report to bring in and show it to them and say like, Mr. Salvado, what happened?  How come you didn't get the police report?

A    You are not suing Mr. Salvado for failure to get the police report.  We were suing Mr. Salvado for the failure to introduce evidence, i.e., the testimony of Sylvia Adams, the accident or the incident that happened in your garage, the

incident with the nanny, the incident with the argument with your mother, the incident with your child going to the hospital. That's what we were suing Mr. Salvado for.

Q Your expert basically said Mr. Salvado messed up because he didn't get the police report, the bodycam footage, and the 911 call tapes, and you did not bother to spend a little bit of the money that I'm paying for to send out a subpoena to see if there's a police report available, bodycam footage available, or a 911 call tape available to show it to Mr. Salvado and say, you messed up, you didn't do your job, and I would have won --

A Correct.

Q -- at the last malpractice case.

A I disagree with that.

Q You don't think that if we had the police report, bodycam footage, and 911 call tapes, that might have proved my innocence, that would not have helped us win?

A No.

MR. SIMS: I'm going to object, Your Honor. It's lack of foundation, other than the --

THE COURT: Sustained as to certain pieces of that. There's a lot --

MR. SEYOUM: I used the word "might". I object.

BY MR. SEYOUM:

Q Would it -- is it your opinion --

THE COURT: Sir, I -- you interrupted me, so I --

MR. SEYOUM: Oh.

THE COURT: -- waited until you were finished talking over me.

MR. SEYOUM: Sorry.

THE COURT: Now that you're done, I'm going to rule, okay?

MR. SEYOUM: Sure.

THE COURT: All right. Objection is sustained, embedded within the question, certain, not all, of the items, there's a lack of evidentiary foundation. Whether they do or don't exist at all, I have no idea. It's also multiply compound. We've also been over it before. But sustained. Rephrase.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q If there was a police report available and you used it as evidence at the protective order trial to prove that Mr. Salvado didn't get it, would that have helped? Would that have helped?

A Not in my opinion.

Q If there was a bodycam footage available at the protective order trial that Mr. Salvado did not bring and use it at the trial of his malpractice, could that have helped?

A I can't tell because I've never seen the bodycam

footage.

Q    All right.  You never seen the bodycam footage because you never got it?

A    Nobody's ever shown me the bodycam footage.  I've never seen the bodycam footage.  I have no idea.  What I do know is it had nothing to do with the theory of our case.

Q    Okay.  Whose responsibility is it to get the bodycam? The expert or the attorney in charge who hired the expert where the expert is recommending that bodycam footage, police report, and 911 call tapes should be retrieved?

A    I don't think it was anyone's responsibility.

Q    So you're saying you're not taking your expert's advice?

A    I didn't say that.

Q    Are you saying the expert didn't say go get the police report?

A    The expert said prior to the trial, Mr. Salvado failed to subpoena the police department for any 911 calls, fire department records, and/or police reports made, or the absence thereof, by Ms. Redae.  That's all he said.

Q    Wait a minute.

A    I pointed it out.

Q    Okay.

A    I'll -- I'll just mention that this is a 15-page report in which he talks very much about the failure to call

Ms. Adams to present this other evidence.

Q    That's not what I asked you, sir.

A    That's one sentence --

Q    Non-responsive, sir.

A    -- in the 15-page report.

THE COURT:  Sir, you need to kindly let him finish his answer.  You can't interrupt his answer, please.

Go ahead, sir, finish your answer.

THE WITNESS:  I -- I think I have finished.

MR. SEYOUM:  I object.

THE COURT:  All right.  Go ahead, please.  Next question, sir.

BY MR. SEYOUM:

Q    Did you just mention something about fire department record?

A    Mr. Rumer mentioned fire department records.

Q    Where?

A    I just read it.  I'll read it a third time.

Q    What page, please?

A    Page 5, last paragraph, first sentence.  Prior to the trial, Mr. Salvado failed to subpoena the police department for any 911 calls, fire department records, and/or police reports made (or the absence thereof) by Ms. Redae.  That's what he --

Q    That's news to me.  I didn't know you could get a fire department record also.

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q   Did you know that you can get --

THE COURT:  Sustained.  Rephrase, sir.

BY MR. SEYOUM:

Q   Did you know you can get a fire department record?

A   I didn't know one way or the other.  I -- I assume you can get any record if you use a subpoena, sure.

Q   Right.  So did you research that there were any fire department records?

A   No.

Q   Did you hire or instruct Ms. Deucher or anybody at your law firm to get any of these reports?

A   No.

Q   Okay.  All right.

THE COURT:  Sir, we've been doing this for two hours. I'm going to give you 15 more minutes, and then we're going to have to move on.  Otherwise, we're not going to finish what you told me we could do today.

MR. SEYOUM:  I'm sorry.  How much more time do I have?

THE COURT:  Fifteen, 20 minutes because he has to have cross-examination, and you have two more witnesses, so we need to move on.

MR. SEYOUM:  But I'm not done yet, sir.

THE COURT:  Well, make it pointed.  Go ahead.

MR. SEYOUM:  Well, there's more because --

THE COURT:  Sir --

MR. SEYOUM:  -- there's the trial coming up also that I need to discuss.

THE COURT:  Time is not unlimited.  I asked you to use it to what you thought would --

MR. SEYOUM:  We have a five-day trial.

THE COURT:  Sir.  But it's not five days of you talking, so I've ruled.  Please abide.

BY MR. SEYOUM:

Q    Is legal malpractice a valid defense for a breach of contract?

MR. SIMS:  I'm going to object, Your Honor. That's --

THE COURT:  Well, I'll allow it.

Go ahead.  Do you know one way or the other?

A    It's a defense.

BY MR. SEYOUM:

Q    It's a defense?

A    I mean, first of all, it depends on what kind of contract we're talking about.  If you're talking about the contract between a client and a lawyer, and the lawyer is suing on the contract to get paid, then the assertion that the lawyer

committed legal malpractice is a recognized defense to that claim.

BY MR. SEYOUM:

Q    Okay.  Have you ever used a legal malpractice in a case for a breach of contract?

A    Yes.

MR. SIMS:  I'm going to object, Your Honor.  I don't see the relevance.

THE COURT:  You may answer, sir.

Overruled.

A    Yes.

BY MR. SEYOUM:

Q    And were you successful?

A    Yes.

Q    So it works?

A    Sometimes.

Q    Okay.  So I could use legal malpractice as a reason for breach of contract in my defense?

A    I'm sorry?

Q    You just said you could use legal malpractice as a defense for a breach of contract, correct?

A    Yes.

Q    And you said you have used in the past breach of contract as a defense and you've been successful?

A    Yes.

Q    Okay.  And you were suing me for breach of contract, and I'm alleging there is malpractice.  So if I can prove that there is legal malpractice, then I would win on the breach of contract claim that you have against me?

A    That's up to these folks.

Q    Right.  And so all I have to do is just prove to them that I have a breach of contract -- I mean, breach of -- I mean, malpractice by you, and then I win the breach of contract claim?

MR. SIMS:  I object, Your Honor.  That's calling for --

THE COURT:  Sustained.

THE WITNESS:  It's normally not that simple.

THE COURT:  I will instruct the jury at the relevant time on the law that applies.  I'll let you take it to what he knows, but in terms of -- that's for me.

MR. SEYOUM:  Okay.  I'm not understanding what the objection is.

THE COURT:  I'm sorry.  Objection's sustained.  Move on.  I've been as clear as I can be.

MR. SEYOUM:  So I can't ask a follow-up?

THE COURT:  You can.  If it draws an objection, I sustain it --

MR. SEYOUM:  Okay.

THE COURT:  -- we'll have spent our time doing that,

but I don't know what you're going to ask him.

MR. SEYOUM: I make an objection.

BY MR. SEYOUM:

Q So Mr. Hoge, let's review here. I hired you. You gave me a contract for $4,000, right?

A Yes.

Q You did. And in the contract, you said you would follow up with another retainer agreement, right?

A Yes. If we filed a formal claim.

Q Okay. We did file a formal claim.

A We did.

Q Okay. But you never gave me a retainer agreement.

A No. What I did, Mr. Seyoum, is that I sent you an email. What had happened was that Mr. Mulquin had just said that he was not going to make any offer of a settlement at all after we had had our two-hour conference that I talked about yesterday, and I wrote you an email, and I basically said the only thing we can do now is to file a lawsuit. I gave you an estimate of how much it would cost. I asked you if you wanted to go along with it. I gave you an additional retainer of $10,000 that I needed to be paid in order to bring that lawsuit, and you agreed to do it.

But I did not -- I have to say that I was very busy at that time, and I did not prepare a second formal retainer agreement. I did send you a detailed email, you agreed to it,

you paid the $10,000, I billed you every single month after that, you never questioned one bill, and that's it.

Q     Okay.  And then when our relationship fell apart, and you said I owed you money, you sent me an email threatening me with interest and penalty per the agreement that we have, right?

A     I sent you an email asking you to pay.  I don't remember about what exactly I said.

Q     So if I bring out an email that says you telling me that if I don't pay you, you're going to sue me for interest and penalty, would that be a mistake?

A     Again, show me the email, I'll be happy to --

Q     Okay.

A     -- comment on it.

Q     So if there is no agreement in place, a retainer agreement, isn't it illegal for you to tell me or demand of me to pay you with interest and penalty when there is no agreement that we would pay for interest or penalty or legal fees?

A     No.

MR. SIMS:  I'm going to object, Your Honor.  It's lack of foundation.

THE COURT:  You can answer it then, sir.

MR. SIMS:  Okay.

A     I believe that getting a -- a penalty of some sort, I would not be entitled to under the circumstances of not having

a second written retainer agreement, so that's why we've not asked for a penalty here. I believe interest, I am entitled to.

BY MR. SEYOUM:

Q    Well, at one point, you threatened me with that.

A    I'd have to see the email, Mr. Seyoum.

Q    Isn't that a violation of ethical rules to threaten a client without having a retainer agreement that does not state anything about interest, penalties, or legal fees, and you make that threat to your client?

A    No.

Q    Isn't that a cause for disbarment?

A    No.

Q    Oh, it's not?

A    No. First -- first of all, I believe the email that you're referring to was an offer that I made to try to compromise your bill. I -- I think it was in the same email, but I'm not sure without looking at it.

Q    So your recollection is coming back; is that correct?

A    No, it never went away.

Q    Okay. A little while ago you were denying it, but now you're admitting that there's a second email.

A    I don't recall denying anything.

Q    Okay. So you're --

THE COURT: Sir, just ask him a question, please.

MR. SEYOUM: Okay.

THE COURT: Don't spar with him.

BY MR. SEYOUM:

Q So you --

MR. SEYOUM: He's being evasive. That's why.

THE COURT: All right. Just ask him a question, please.

BY MR. SEYOUM:

Q Okay. So I don't waste the Court's time and I'm running out of time, can we agree that you did send me an email threatening me with actions that include interest, penalty, when we don't have an agreement?

A I -- I don't want to characterize that and answer that without looking at the email because I frankly don't remember.

Q Okay. Have you ever had any lawsuits where you disputed fees by saying we don't have an agreement, show me the retainer?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained. It's collateral.

Go ahead.

MR. SEYOUM: I object.

THE COURT: Okay.

BY MR. SEYOUM:

Q Have you -- in your line of business as a legal

malpractice attorney, usually legal malpractice issues are bills, right? Overpayment, underpayment, overcharging, and so on. In any of these situations, have you ever used the defense where you said there is no agreement in place, therefore, I don't owe?

MR. SIMS: I object, Your Honor.

MR. SEYOUM: That's a straightforward question, sir.

MR. SIMS: It's -- it may be, but it's irrelevant.

MR. SEYOUM: But he's a malpractice attorney who does this for a living.

THE COURT: Sir, sir, sir. Restate the question. I want to make sure I heard the exact question, please. I'm going to listen additionally --

BY MR. SEYOUM:

Q You are --

THE COURT: -- carefully.

MR. SEYOUM: I'm sorry.

BY MR. SEYOUM:

Q You are a seasoned legal malpractice attorney?

THE COURT: No. Just ask the question. We don't need to do the windup. Just the pitch, please. Just ask it.

MR. SEYOUM: I did ask it, and you overruled me, so I'm trying to figure out what you want, so --

THE COURT: I didn't overrule it. I said I want to make sure I heard -- because it could have been interpreted in

two different ways, so to make sure I make the right ruling, I asked you to kindly repeat it. That's all. And just ask the question without the prelude.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q   Mr. Hoge, in your practice, have you ever used the reason of not having a valid executed agreement as a defense for a breach of contract?

A   I think yes.

Q   Okay. And did you win?

A   I think I've done it more than once. I don't recall which ones I've won and which ones I've lost.

Q   But have you won any?

A   Probably.

Q   Good. So if there is no signed retainer agreement, then there is no breach of contract?

MR. SIMS: I'm going to object, Your Honor.

A   Well, here's --

MR. SIMS: That's calling for a legal conclusion.

THE COURT: Hold on to that. Sustained.

MR. SIMS: Your Honor, he's doing the same thing he did the other day with me.

THE COURT: Well, let's just try to do our best and -- next question, please, and use our time constructively, please.

MR. SEYOUM: Thank you.

BY MR. SEYOUM:

Q All right. So let's go back to the experts now, right? Now, I spent $90,000, we went to trial, and I think you charged another $120,000. That's like $210,000 you billed me with no retainer agreement.

A That's not correct.

Q One retainer agreement?

A We had the initial retainer agreement, and I just want to point that Rule 1.5 of the Rules of Professional Conduct say that you don't necessarily have to have a new retainer agreement where you already have an established relationship with a client.

Q Okay. So now you're citing -- what was the rule number?

A 1.5.

Q Okay. Were there other rules that you were neglecting?

A I don't know what you're talking about.

Q Rules about being forthright with your client, not lying to your client, not misleading your client, being trustworthy?

A I think I scrupulously adhered to all of those requirements.

Q Okay. So if you are in violation of several

professional rule of conducts [sic], is that a basis for a defense for a breach of contract?

MR. SIMS: Your Honor --

THE COURT: Sustained.

MR. SEYOUM: I can't ask him for his opinion?

THE COURT: I said sustained.

MR. SEYOUM: Rephrase?

THE COURT: Actually, move on.

BY MR. SEYOUM:

Q    Okay. So a lot of money spent.

A    Yes.

Q    You have an assistant that is not experienced, was doing a lot of legal work on the case, and she was billing me through the nose, and she's --

A    Billing you 250 an hour.

Q    Okay.

A    The agreed upon rate.

Q    And it did add up?

A    Of course it added up.

Q    Okay.

A    As you were warned.

Q    Okay. But I don't have a contract with her.

A    You don't need one. She's in the contract. Elena Iuga is in the contract.

Q    If I don't have a contract with you, then I don't

have a contract with her, so how is she going to bill me for work that she did if I don't have a contract with you and you didn't put her on the contract?

A You did have a contract with me.

Q I did not have a contract with her.

THE COURT: All right. Move on, sir. We've covered this as much as we can.

BY MR. SEYOUM:

Q On the first contract that you gave me, remember that one? The $4,000 one?

A It's the only --

Q The one that I signed?

A It's the only actual contract.

Q That's the only actual contract we have?

A Correct.

Q Okay. On that contract, is Rebecca Deucher's name on it?

A No.

Q Okay. So then by default, I did not hire Rebecca Deucher to work for me because there is no contract.

A You hired my law firm.

Q But I do not -- we do not have a contract where you said some of the work will be done by Rebecca Deucher?

A That's correct.

Q Thank you.

THE COURT: You've run down most of your time, but if you need another 15 minutes or so, we can do that.

MR. SEYOUM: Well, I have not concluded my --

THE COURT: Sir --

MR. SEYOUM: -- trial, and why am I being put on a clock when I'm not --

THE COURT: Sir --

MR. SEYOUM: -- (unintelligible 11:41:37)?

THE COURT: -- come to bench.

(Bench conference begins)

THE COURT: I know you're not a lawyer and I'm sure you meant nothing by it --

MR. SEYOUM: Never, sir.

THE COURT: -- do not spar with me like that in front of the jury. If you want to take umbrage with any of my rulings, that's your prerogative. But anything more than "I object" or "I disagree", that further conversation cannot be had in front of the jury. In other words, you just can't spout off in front of the jury. Okay?

MR. SEYOUM: I don't mean to spar.

THE COURT: Okay. We're --

MR. SEYOUM: I'm just trying to let you know -- okay. Can I ask for a sidebar when I have some sensitive questions to ask?

THE COURT: You can ask, but --

MR. SEYOUM: Okay. So that's allowed?

THE COURT: Of course you may ask. Remember I said I don't always have a sidebar.

MR. SEYOUM: Okay.

THE COURT: Here's what's going on. You've had the witness on the stand for -- I don't have my timestamps, but for 45 minutes or so yesterday. You've had him on the stand for over two and a half hours today. You told me you had two other witnesses to put on today. If you spend all day with this witness, you're using your time, and you won't get to put on your other witnesses because it's not five days of you talking. I'm trying to steer you toward a successful conclusion.

But listen, if you want to spend all day with this witness, you'll just -- it's your day, use it as you want. I'm not stopping you. But I'm alerting you to the fact that if you then say I need all this other time, I'll say you used it all on this one witness, asking him the same question over and over again. That's your call. I'm not going to stop you from doing it. I wouldn't do it, but that's your decision.

MR. SEYOUM: Okay. May I respond?

THE COURT: No.

MR. SEYOUM: Okay.

THE COURT: You may abide.

MR. SEYOUM: Can I make -- can I -- I still have --

THE COURT: Not now. We're not using --



MR. SEYOUM: Okay.

THE COURT: -- jury time for you to give me a lecture.

MR. SEYOUM: I need three days of trial, sir.

THE COURT: You can -- sir, you can use --

MR. SEYOUM: I object, sir.

THE COURT: Stop, sir. Just please stop. You can ask the witness questions. I'm not going to tell you you can't examine the witness. What I'm alerting you to is if you use all day on this witness, you will not have enough time to do all your other things, so choose your time wisely.

(Bench conference concluded)

THE COURT: Next question. No more --

MR. SEYOUM: I object.

THE COURT: Sir, that's fine. Object, that's your privilege, but you may inquire.

(Discussion off the record.)

BY MR. SEYOUM:

Q    Okay. Mr. Hoge --

MR. SIMS: Your Honor, I just -- I'd like to have a copy of the exhibit.

THE COURT: I'm sorry. Excuse me. Do you have a copy for the other side?

MR. SEYOUM: Sure. I'll give him this one.

THE COURT: Well, let him see it, please.



MR. SEYOUM: It's the same one.

MR. SIMS: I thought that was -- that should go to the witness.

MR. SEYOUM: (Unintelligible 11:44:30) the same? I don't think you need the same document.

THE COURT: Just let him see it. That's all.

MR. SEYOUM: You have these in your discovery.

THE COURT: Just -- you don't have to have a conversation. Just let him see it.

MR. SIMS: What exhibit number is it?

THE COURT: Mr. Clerk, what exhibit number is it?

THE CLERK: It's Number 8 --

MR. SIMS: Oh, I was asking for his exhibit.

THE CLERK: -- and I believe I received a duplicate that was marked as 9.

MR. SIMS: Okay.

MR. SEYOUM: But I think they're the same --

THE COURT: Well, the duplicate, we can take the sticker off.

MR. SEYOUM: Right.

THE COURT: If the duplicate is just Mr. Sims copy, just take the 9 sticker off and let him have that one. Okay. And give Mr. Seyoum back the one with the sticker on it, and Mr. Sims can have the one without the sticker on it.

MR. SEYOUM: Okay.



THE COURT: Okay. Go ahead.

BY MR. SEYOUM:

Q Okay. Can you read that back for me?

A Well, you mind if I just take a look at the whole document to orient myself to what this is?

THE COURT: Yes, you may acquaint yourself with the document.

MR. SEYOUM: Yes. Go ahead.

THE COURT: Is it multiple pages?

THE WITNESS: Yes.

THE COURT: All right. Take a look at it and --

THE WITNESS: It's an email chain.

THE COURT: Fine. Take a look at it --

MR. SEYOUM: You're not trying to run the clock down, are you, sir?

THE COURT: Sir, sir, sir -- let him read it.

THE WITNESS: All right. I've looked at it now. Which one did you want me to read aloud?

BY MR. SEYOUM:

Q Okay. Do you see where it says $35,000 settlement offer from Mr. Mulquin?

A I see an email from myself to Mr. Mulquin, copied to Ms. Deucher, June 13th, 2022, 10:53 a.m. Dave, in response to your recent settlement offer of $35,000, I just received authority for a reduced settlement demand, hyphen, $765,000.

Happy to discuss it with you.  Please let me know your response ASAP.

Q    And he responded with what counter -- what's the offer that we got from them?

A    I don't recall.  It's not on this email chain.  I do recall --

Q    You don't recall --

A    I -- I do recall that at some point we got a $50,000 offer.

Q    But we never got a million dollar offer, right?

A    No.

Q    Okay.  And the reason we never got a million dollar, or 10 million dollar, or a hundred million dollar offer is because you never hired any experts to quantify what the damages are?

A    No, that's not correct.

Q    Did you hire any experts to quantify the damages?

A    Yes.

Q    Okay.  You did?

A    Yes.

Q    Damages expert?

A    Yes.

Q    Who?

A    We hired the person that you wanted me to hire.  I forgot his name, the guy that was ultimately not allowed to

testify. Hertzer, I think was his name. Bill Hertzer, H-E-R-T-Z-E-R, if I'm right.

Q    He's a reputational harm restoration expert, not a damages expert in terms of lost income, other damages --

A    One of your --

Q    -- we were thinking of claiming?

A    One of your claims, Mr. Seyoum, was that you were unemployable as a result of -- and you were not fundable in your business enterprises as a result of what had happened to you.

Q    Right.

A    Mr. Hertzer was hired to come in and testify what it might have cost you to restore your reputation on the internet.

Q    Right.  And we also claimed loss of income, and emotional distress, and all that stuff?

A    Yes.

Q    And you tried to get experts designated at a late time, eight months late, and the judge said, where you been? It's too late, right?

A    No.  No, that's not what happened.

Q    Did the judge deny your motion to designate experts late?  Yes or no.

A    He denied my motion to designate that particular expert, Mr. Hertzer, late, but he didn't specify as to whether or not it was because it was late or because he did not think

that that was a legitimate type of expert testimony. He later clarified that he did not believe that type of expert testimony would be allowed to come in.

Q That is not what I asked you, sir.

A Well, I'm telling you.

Q No, that's not what I asked you. Were you denied when you designated an expert late?

A Yes.

Q Okay. How many experts did you try to designate?

A One.

Q Okay. But you had different --

A Other than Mr. Rumer.

Q Okay.

A Mr. Rumer was designated timely.

Q Right. That's for liability, right?

A Correct.

Q I'm just talking about damages.

A That's correct.

Q So you tried to hire one. It failed. You didn't hire any other --

A No --

Q -- right?

A -- that's not correct.

Q And from what you told me, Mr. Mulquin said you don't have any damages here. This is a nuisance case because if you

can't have damages, what are we paying for?  So here's $50,000, get lost, right?

A    Well, that's a --

Q    Right?

A    That's a mischaracterization.

Q    Isn't that how you explained it to me?  That I don't have a case here because we don't have damages that are quantifiable?

A    I explained to you from the very beginning that establishing damages and establishing approximate causation, in other words, the connection between the alleged errors by Mr. Salvado and damages that you claimed to have suffered, would be a difficult process.  It would be challenging.  It would be all kinds of, you know, things we could claim, things that we were entitled to claim.

Q    Okay.  I think you are taking too long to answer because you are running the clock.

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sir -- sir -- sir, let him finish his answer.

A    And --

MR. SEYOUM:  He's going on and on about --

THE COURT:  Sir -- sir --

MR. SEYOUM:  I just asked him a straightforward question.  He's giving me a long-winded answer.  And you just

instructed me to wrap up, so he's using up the time unfairly and I would object. I would request more time.

THE COURT: Mr. Hoge, could you finish your answer?

THE WITNESS: I think it's answered.

THE COURT: Very good. Next question, please.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q So I explained to you, because of this protective order, my online profile has been ruined. I am labeled as a domestic abuser and stalker. It's number one on Google Search for my name and my employer (unintelligible 11:50:07) --

MR. SIMS: I'm going to object, Your Honor. He's testify --

THE COURT: Sustained based on my prior rulings. Go ahead.

BY MR. SEYOUM:

Q We did say that my reputation was harmed, and we needed to hire an expert, and you failed to hire an expert, correct?

A No. We said that your reputation was harmed. We talked about hiring an expert. We had a lot of discussion about hiring an expert. I didn't really agree with hiring an expert. I didn't think it was a productive way to go. You were very insistent. You had me talk to about four or five different potential experts, one of whom was Mr. Hertzer. I

ultimately reluctantly agreed that we could give it a shot, but I also didn't believe that it was going to work.

Q    Okay.  Eight months before the deadline, I introduced you to experts, I explained to you how social media works, how online profile -- negative -- impacts people.  I have lost my job because of COVID.  I have been applying for jobs and I can't get any jobs and --

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  Sir, that's not a question. Please ask him a question.

BY MR. SEYOUM:

Q    Did I tell you that I am unemployable because of my online profile?

MR. SIMS:  Yes, I'm going to object, Your Honor. He's --

THE COURT:  Sustained.

MR. SIMS:  Okay.

MR. SEYOUM:  I object.

BY MR. SEYOUM:

Q    Did I tell you that I am unfundable because of my online profile?

MR. SIMS:  I object, Your Honor.  Same reason.

THE COURT:  Well --

MR. SEYOUM:  They are two different things.

THE COURT:  No, no, no, no.  One second.  Come to the

bench. I want to make sure I understand something.

(Bench conference begins)

THE COURT: I'm not sure I understand you. The question is, did I tell you that? Why can't you ask him that? "Did I tell you that?"

Why are you objecting?

MR. SIMS: Well, what he's doing is he's trying to come through the back door on how his reputation is harmed. But the judge in the prior case ruled that it wasn't admissible. And this Court has been --

THE COURT: In the case against Mr. Salvado?

MR. SIMS: Yes. And (unintelligible 11:52:07) --

MR. SEYOUM: You never said that. It was late, is what he said.

THE COURT: Mr. Seyoum, I'm going to ask you --

MR. SEYOUM: Oh, I'm sorry. I did it again.

THE COURT: -- yet again, probably for the -- I can't count the number of times, to please not talk over somebody, whether it's me, or the other side, or anyone for any number of reasons.

What I'm trying to understand is it the defendant, is it the law firm's contention that the trial judge in the Salvado malpractice case said I'm excluding the expert because it's not admissible, or excluding the expert because it's late, or what was the reason?

MR. SIMS: He did both. He did both. He said it's not timely. In any event, (unintelligible 11:52:54) because reputational harm is not (unintelligible 11:52:58).

MR. SEYOUM: I was simply asking, sir. If I said that to him, he should be able to respond.

MR. SIMS: And also, I'm not sure what the relevance is because the jury's verdict in the case (unintelligible 11:53:11) liability. It wasn't on that -- (unintelligible 11:53:14).

THE COURT: So the verdict --

MR. SEYOUM: I'm just asking if I said it to him.

THE COURT: Right. But if the jury concluded -- for our purposes which is a legal malpractice, if the jury -- what I'm calling it, case 1, that I call the first malpractice case against Mr. Salvado. If that jury found that Mr. Salvado -- did they answer the breach of the standard of care questions ever?

MR. SIMS: It's the -- they found there's no liability, so then the next question would have been damages.

THE COURT: Okay. So they -- if the jury in case 1 found no liability, then I would be hard pressed to see the relevance of what Mr. Hoge did or didn't do about damages because the jury said there's no liability.

MR. SEYOUM: Well, I'm going to get to that, but I don't want to --

THE COURT: Well, explain it to me.

MR. SEYOUM: Because he --

THE COURT: We're not going to spend a lot of time on it, unless I --

MR. SEYOUM: Okay. But I mean, if I tell you that, are you going to take the wind out of my sail, and I --

THE COURT: I'm not going to take any --

MR. SEYOUM: I'm asking -- I'm asking him --

THE COURT: I'm not going to take any -- sir, if you won't proffer to me the relevance, then I'm not going to let you do it.

MR. SEYOUM: The relevance --

THE COURT: So if you're telling me you're not going to do it, that makes my life easy. Because I'm also telling you I'm willing to listen to you to proffer to me the relevance of what Mr. Hoge didn't do in the case against Mr. Salvado -- in the light of the jury's factual finding was that no breach in the standard of care, thereby obviating any question of damages. That's what I'm trying to get you to tell me.

MR. SEYOUM: I'm --

THE COURT: But if you don't want to tell me, you don't have to.

MR. SEYOUM: I'm trying -- I'm trying to prove to you that he lied to me. And these questions will do it.

THE COURT: He lied about what?



MR. SEYOUM: You'll find out.

THE COURT: I need to find out now.

MR. SEYOUM: Well, sir, I have the right to ask him the questions, that I believe I had the conversation.

THE COURT: Sir, you have the obligation to answer my questions, and if you won't do it, then --

MR. SEYOUM: Do I have to run the questions by you first, Your Honor?

THE COURT: -- then it's objection sustained if you won't do it. I'm going to give you one more chance to proffer to me the relevance.

MR. SEYOUM: The relevance is I'm going to prove to you the reason he lost my case is because he didn't hire the experts, and that's what I'm going to get to, and that's relevant.

THE COURT: How would a damages expert, whether he was hired or not, timely designated or not, change the result in case number 1 where the jury said there's no liability? That's what I'm grappling with.

MR. SEYOUM: I'm going to prove to you that he had a conflict of interest in me winning on liability because he didn't have the right damages. That's my point and that's my case. And if he's going to take that away from me, then I'm not having a fair trial.

MR. SIMS: (Unintelligible 11:56:02) --

THE COURT: Sir, I'm going to ask you to stop telling me I'm not giving you a fair trial because I've held my silence on it. I am. You may not think so and I'm okay with that in a sense that that's your perception. I am giving you more latitude, frankly, than I ought to. But I'm doing it because I want to give you some latitude.

MR. SEYOUM: What is the harm of me asking that? That's my theory in this case.

THE COURT: That's not how the rules of evidence work, so.

MR. SEYOUM: So I cannot present my theory?

THE COURT: If that's your -- your theory is that he intentionally lost the liability case?

MR. SEYOUM: I want to ask him that.

THE COURT: Well, you can ask him that.

MR. SEYOUM: Yes.

THE COURT: Ask him that.

(Bench conference concluded)

THE COURT: Ask him that.

MR. SEYOUM: Thank you.

BY MR. SEYOUM:

Q Mr. Hoge --

THE COURT: And we've now burned two and half hours of time, so go ahead.

BY MR. SEYOUM:

Q Mr. Hoge, did at any time give you any reports about my previous income, the properties I owe, the net worth I have, and as a result of Mr. Salvado's botched protective order and my online profile that I am unfundable, I am unemployable? I gave you lists of employments that I applied to that I never got employed, I showed you if I -- the money I spent, how much it would be worth in the future.

And I asked you to hire an economic expert who would say per Salvado's malpractice, Mr. Seyoum's unemployed, unfundable, and as a result, his future income has diminished by X amount of dollars. 50,000, 100,000, a million dollars. I asked you to hire those experts, but you failed, and without those experts getting hired and quantifying the damages, Mr. Mulquin said you don't have any damages, you haven't quantified any, and he gave us a $50,000 offer.

MR. SIMS: Yes, I'm going to object, Your Honor, just because how long that question was.

THE COURT: Sustained.

MR. SIMS: A lot of facts in there.

THE COURT: Rephrase it. You asked to do a certain thing and you may do that --

MR. SEYOUM: Okay.

THE COURT: -- but what you just did, sustained.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q    Did I provide you financials of my previous income, and that I said I am unemployable, and of proof that I'd been applying and never got any job offers?

A    You certainly supplied me some financials.  You supplied me some tax records and returns.  You certainly supplied me some information about some properties that you owned.

Q    Right.

A    You certainly told me that you felt that you were unemployable as a result of what had -- of what had happened in the protective order.

Q    Right.  And I asked you, I begged you, I pleaded with you to hire experts to quantify and justify those?

A    I don't agree with that.

Q    Okay.  But I did tell you about all this stuff?

A    What do you mean this stuff?

Q    Correct?  I mean, you just said -- I mean, what you just said.

A    That you were unemployable, that you were unfundable, that you had had good income and now you weren't having good income anymore.

Q    Right.  And I showed you that I had income before, and now I don't have income before -- income later, right?

A    Correct.

Q    Okay.  So then the next question is --

MR. SEYOUM: Can I ask now?

THE COURT: Hm? I don't know what you want.

MR. SEYOUM: Sidebar?

THE COURT: Okay. Come to the bench, please. Give him the chance to come up here and don't lean over the witness.

(Bench conference begins)

THE COURT: Yes?

MR. SEYOUM: I think that one of jurors is asleep. One of the jurors --

THE COURT: Which juror?

MR. SEYOUM: Right corner. Can we just wake her up.

THE COURT: One of the alternates? All right.

(Bench conference concluded)

THE COURT: Let's take a five-minute recess, folks. Let's stretch our legs, five minutes. Do not discuss this case with anyone. Do not let anyone discuss it with you. Do not even discuss it amongst yourselves. Keep an open mind. Get a drink of water. Stretch your legs. Take five.

Sir, you may step down.

And counsel, remain, please.

(The jury exits the courtroom.)

(Discussion off the record.)

THE COURT: Okay. Mr. Seyoum is right, the juror did not look to be paying rapt attention, and that's why I asked them to take a break. What I didn't want to do is embarrass

the juror. And I will keep a watch on it.

So thank you for bringing it to my attention.

But that's what I did and that's why I did it. Okay?

So how do you want to spend the rest of the day? It's your day. I'm serious. If you want to do this with this witness all day, no problem.

MR. SEYOUM: Sir --

THE COURT: But we have a week for this trial. I've made that clear. Just so you know, I'm starting another trial in another jurisdiction this coming Monday, so I just can't be here and I can't sit here, and when we planned this case on May 2nd, we put in the schedule. So use your time wisely. He gets to cross-examine the witness.

How much time do you need with him?

MR. SIMS: I think it's --

THE COURT: What I would tell you is less is more.

MR. SIMS: I agree, but I'm going to go through a number of documents, so that just takes some time.

THE COURT: But don't -- well, do what you got to do --

MR. SIMS: Okay.

THE COURT: -- but don't --

MR. SIMS: I understand.

THE COURT: You're not paid by the document.

MR. SIMS: (Unintelligible 12:01:41), I'm going to

try to be efficient. I'm going to try to be efficient.

THE COURT: Okay. And then who's the next witness?

MR. SEYOUM: I'm not done with my case. We have a five-day trial, and per the Court --

THE COURT: But it's not -- let me just be clear, and I'm not going to tell you again, I'm going to start being more clipped, it's not five days of you talking, and it's not five days of you telling me you disagree with me or asking the same question over and over again. That's what we've been doing. We're not going to do that anymore. I am okay with some latitude, and I'm okay with giving you leave to rephrase and all that, but this is not a filibuster. And it's also not five days of me. We have five days for all of us.

MR. SEYOUM: Right. What I'm trying to explain is your clerk sent me an email saying --

THE COURT: No, no, no.

MR. SEYOUM: -- how many days do you need? I said we need between 5 to 10 days.

THE COURT: Sir, I said --

MR. SEYOUM: I replied --

THE COURT: Stop. I set the trial schedule. The clerks don't do it. I do it. I've been clear about this. The only thing that matters is my decisions. So you can't backdoor me by sending messages to my clerks and -- stop. I'm simply saying it's a five-day trial, everybody's been on notice,

there's plenty of time, you are not using it wisely. That's your choice.

MR. SEYOUM: I would -- I would like to object.

THE COURT: So no more -- no more argument about it. I tell you what, if you have additional argument about it, put it in writing, I will file it -- I will read it, and I will file it. I don't want to take up our jury time just so you can spar with me. It's not productive.

MR. SEYOUM: Okay. I --

THE COURT: But you can put it in writing, and I'll read it.

MR. SEYOUM: I'm just trying to explain my situation.

THE COURT: I understand.

MR. SEYOUM: I was led to believe, based on the clerk's question -- they said how much time do you need? You think we're going to go further than five days? I said give us 5 to 10 days. And because they asked me, I replied --

THE COURT: Fine.

MR. SEYOUM: -- (unintelligible 12:03:30) --

THE COURT: Every time --

MR. SEYOUM: -- that I should be afforded more time to do this because they asked me if I needed more time, and I responded to them saying, yes, some of the witnesses are not coming in until next week, so I need more time.

THE COURT: I'm going to separate fiction from

reality. This case was set on May 2nd for a five-day trial. Everybody agreed it would be a five-day trial. I went round and round with everybody. Can we get it done? Do we need more? I was told repeatedly it's a five-day trial. That was before you and Mr. Lawrence parted ways, I understand. I am being flexible with you because you're being self-represented. But your being self-represented does not give you leave to double the time of the trial. I've already ruled on that. I'm not ruling on it anymore. Noted, preserved, and overruled. New topic.

MR. SEYOUM: Okay. I have three more witnesses that are coming in this week. Do I have time --

THE COURT: Well, you better put them on today and tomorrow.

MR. SEYOUM: Today and tomorrow only?

THE COURT: Yes.

MR. SEYOUM: But I went first.

THE COURT: I know.

MR. SEYOUM: So I should get more time.

THE COURT: No. Stop. No more of this conversation. This is not productive. Next topic.

Who's the next witness --

MR. SEYOUM: So how many days do I have more?

THE COURT: Sir --

MR. SEYOUM: Two more?

THE COURT: Sir, I've already answered the question. I'm not --

MR. SEYOUM: I --

THE COURT: Sir, I am not --

MR. SEYOUM: I'm stressed out.

THE COURT: Sir --

MR. SEYOUM: I'm just trying to clarify. How many days do I have, sir?

THE COURT: I'm not going to channel my inner Judge Ryan (phonetic sp.). I'm not answering that question again.

MR. SEYOUM: Who can I ask about that, then? The clerks?

THE COURT: I'm the only one, and I've given you the only answer that is out there, and I understand that you are not sanguine with it, and I'm sorry about that, but that's sort of where we are.

MR. SEYOUM: So do I have until Thursday or Wednesday?

THE COURT: If we need to take witnesses out of turn, I'm willing to be flexible.

Can you call somebody tomorrow?

MR. SIMS: Well, yes, we can. It would be our standard of care expert.

THE COURT: Fine.

MR. SIMS: We would be kind of a --

THE COURT: Well --

MR. SIMS: I will tell you, I have to check with him, because I talked with him --

THE COURT: Well, let's show some flexibility. What I don't want to do is try this case two times because I couldn't be flexible with the time allotted for trial because that's how it could be misinterpreted. But I want to be flexible, so why don't you look into it?

MR. SIMS: I'll have to --

THE COURT: There's got to be things you can do.

MR. SIMS: Right. I mean, he has witnesses subpoenaed for today and tomorrow.

THE COURT: I know.

MR. SIMS: Okay.

MR. SEYOUM: And Thursday.

THE COURT: Who's Thursday?

MR. SEYOUM: I think Mr. Sean R. Day.

THE COURT: Sean Day?

MR. SEYOUM: Yes.

MR. SIMS: Yes, I don't see how that witness is relevant to this case, Your Honor.

THE COURT: Well, that's a --

MR. SIMS: We can address that --

THE COURT: That's a separate --

MR. SEYOUM: But that would be my decision.

THE COURT:  That's --

MR. SIMS:  No.

THE COURT:  Hold on, folks.  That's a separate question.

MR. SIMS:  Because that was --

THE COURT:  And it may be that the witness has nothing relevant to say, and then it will be a very short piece of testimony, but without hearing the questions, I can't --

MR. SIMS:  Well, he's his prior counsel.  He was counsel of record in this case.

THE COURT:  In this case?

MR. SIMS:  In this case.  Mr. Day was counsel of record.  That's --

THE COURT:  Like Mr. Lawrence was?

MR. SIMS:  Exactly.  He --

MR. SEYOUM:  So I'm waiving my rights.

THE COURT:  Well --

MR. SIMS:  That's having your advocate on the witness stand.

MR. SEYOUM:  If I waive my rights, that's my ability.

THE COURT:  Hold --

MR. SEYOUM:  That's my right.

THE COURT:  Gentlemen, one at a time.

So help me understand, Mr. Seyoum, what Mr. Day would tell us that's admissible and helpful to the factual questions

this jury needs to resolve.

MR. SEYOUM: Mr. Day will explain that he's the one who educated me as to why I lost the appeal, and that it was --

THE COURT: Was he designated in this case as an expert?

MR. SEYOUM: Yes. He was subpoenaed. Yes.

MR. SIMS: No, he was not --

MR. SEYOUM: Yes, he was.

MR. SIMS: Excuse me.

THE COURT: See, now you're talking over each other again.

And then, Mr. Seyoum, you are having a difficult time with impulse control. So --

MR. SIMS: So in response to your --

THE COURT: -- there's an easy way to find out. Let me see the witness lists that were filed timely, and we can see whether Mr. Day's name is on there and whether he was designated.

MR. SIMS: He wasn't.

THE COURT: It's easy to find out.

MR. SIMS: That's right. He was not designated as a witness. He was never designated as an expert in this case.

THE COURT: Mr. Seyoum, are either or both of those things correct? He was not designated as an expert?

MR. SEYOUM: He was listed as a -- he was listed in

the discovery, wasn't he?

MR. SIMS: He was your counsel. So --

THE COURT: Was he -- look. Gentlemen, it's simple. My question to both of you is, was Mr. Day listed as a witness for this trial?

MR. SIMS: No.

THE COURT: If so, when? And if so, what type of an expert was he listed to be, fact --

MR. SEYOUM: We did not list him as an --

THE COURT: Hold on. Fact, expert, or hybrid? That's all I'm trying to find out right now.

MR. SIMS: Okay. So he was not listed in the exhibit list that was submitted to the Court, and I provided that list to the Court earlier that was used. That was the exhibit list. He was not listed as a witness. The experts were listed as Mr. Lazzaro, Mr. Hertzer, Mr. Sameer (phonetic sp.), and there was no expert report for Mr. Day --

THE COURT: Well, there doesn't need -- in fairness, if someone is timely designated as an expert in Maryland and listed timely, our rules do not require a report, so don't --

MR. SIMS: Well, he --

THE COURT: That's something to trip over later --

MR. SIMS: Well, we had --

THE COURT: -- and my silence isn't because I agree with you. It's like no, we don't -- if he's timely designated

and disclosed, he doesn't have to give us a report.

MR. SIMS: He wasn't timely designated or disclosed. That's the bottom line.

THE COURT: That's the question. Show me where he was designated or disclosed, please.

MR. SEYOUM: Okay.

THE COURT: Show me.

MR. SEYOUM: I don't have it right now, but we can --

THE COURT: Well, you can -- I'll tell you -- that's fine.

MR. SEYOUM: Let's take the --

THE COURT: You don't have to do it right now, but --

MR. SEYOUM: Fine. Mr. -- yes, I'll get back to you --

THE COURT: Is there a piece of -- is there --

MR. SEYOUM: -- but as of right now, we can remove him.

THE COURT: Can somebody at their convenience please provide me with -- I know I can go look it up on MDEC, but I'm asking for some help. Let me have a copy of the expert designations in this case by both sides, and let me please have a copy of the witness disclosures and designations, and then I can -- not have to guess. But I don't need it this minute. Mr. Day is not till Thursday. There's plenty of time between now and then to straighten that out. Okay? Okay.

Great.  So what else do you want to do today?  You want to keep him on for the rest of the day or you want to do somebody else?

MR. SEYOUM:  Well, I have two witnesses out there, so --

THE COURT:  Okay.  Well, did we --

MR. SEYOUM:  -- I think I just need an hour of both and --

THE COURT:  Okay.

MR. SEYOUM:  -- and then I --

THE COURT:  I think if you -- if you try to do two things, and this is only a modest suggestion.  If you try to shorten the question a little bit, I think you'll draw fewer objections.  And I know asking questions is not easy.  I get that.  It's -- it takes effort.  I think also you would benefit, if you want, by not asking the same or similar question over and over again.

Because for two reasons:  One, it uses a lot of time.  But probably more importantly, I don't think it helps the jury obtain information.  And the goal that one has in trials, regardless of which side they're on, is providing the jury with factual information that's relevant to the issues they need to decide.  So if you are ready, we'll bring the jury back and we'll -- how much more time do you need with Mr. Hoge in the morning?

MR. SEYOUM: In the morning?

THE COURT: Or at all? How about that? You said you had two other witnesses out there.

MR. SEYOUM: Right, but you asked me about Mr. Hoge in the morning.

THE COURT: Well, it's still technically the morning, although it's 15 after noon. I'm just trying to plan our day.

MR. SEYOUM: Oh, are you talking about today? This morning?

THE COURT: Yes.

MR. SEYOUM: Oh, okay. I thought you were talking about tomorrow.

THE COURT: Not tomorrow.

MR. SEYOUM: All right. Just trying to verify. Okay. Another 15 minutes. In all, probably just --

THE COURT: Okay. Great. Let's see if we can do that.

Okay. Bring --

MR. SEYOUM: I'm trying to work with you, sir.

THE COURT: All right. I appreciate it. Bring the jury --

MR. SEYOUM: I'm a quick learner. Okay.

THE COURT: Okay. That's great. I appreciate that.

MR. SEYOUM: And next time I'll do better.

THE COURT: Mr. Seyoum, you are highly intelligent,

very smart.  I know that.  And that's fine.  And I respect that.  You're a very bright man.

So Mr. Hoge, please take the stand.

MR. SEYOUM:  I learned from the best, sir.

THE COURT:  I don't know.  But you are -- lest anybody have any doubt, you are an extremely bright individual.

MR. SEYOUM:  Thank you, sir.  That means a lot.

THE COURT:  You're welcome.

(The jury enters the courtroom.)

THE COURT:  Folks, thank you very much.  Please take your seats.

Folks, thank you for your patience.  We are ready to continue.

Sir, would you ask the next question, please?

MR. SEYOUM:  Yes.

How do I operate this?

(Discussion off the record.)

THE COURT:  If you want to move around so you can see the screen, you may.

MR. SIMS:  Thank you.

THE WITNESS:  These don't have the exhibit stickers. I don't know if that's --

THE COURT:  You need to use the one with the sticker for the witness, please, if you don't mind.

(Discussion off the record.)

MR. SEYOUM: Okay.

MR. SIMS: Mr. Seyoum, can you give me a copy, too?

MR. SEYOUM: Sure.

RESUMED DIRECT EXAMINATION

BY MR. SEYOUM:

Q Okay. Do these names on the email -- do you know who they are? Amy McCann Roller and Andy Phillips of Clare Locke LLP? That's a very famous law firm. That's the law firm that sued Fox News.

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained.

You can ask him a question without commentary, please.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Do you know these attorneys, Amy Roller and Andy Phillips?

A First of all, you've given me two documents, Plaintiff's Exhibit 8 and Plaintiff's Exhibit 10. I think you're referring to Plaintiff's Exhibit 10 which has reference to Amy Roller.

Q Sure.

A The answer is I don't know, I did not know, I do not know Amy Roller other than through our brief email exchange that we had back in June of 2022.

Q   Only email exchanged?

A   Yes, this is an email exchange between you, me, and Ms. Roller, and Ms. Deucher, dated June 14th, 2022.

Q   Right.  And here's another one that has Andy Phillips in the email, right?  So these are two --

A   But you've just handed me Exhibit Number 9, and you've handed me an email that's also from June 14th, and --

Q   Do you see the name Andy?

A   -- it looks like Ms. Roller --

THE COURT:  Sir, you have to let him finish his testimony, please.

A   On June 14th, you were introducing me to Ms. Roller or [Rah-ler]; I don't know how it's pronounced.

BY MR. SEYOUM:

Q   Okay.

MR. SIMS:  Can I get a copy of that email?

BY MR. SEYOUM:

Q   So --

THE COURT:  Can you give --

MR. SEYOUM:  Sure.

THE COURT:  -- Mr. Sims a copy, please?  Thank you.

(Discussion off the record.)

BY MR. SEYOUM:

Q   So Mr. Hoge, you recollect that when we had a little bit of an issue regarding you not hiring the experts, and the

experts that I wanted you to hire, you talked to them and they were not going to be used as an expert because they were not designated as an expert, me and you had a falling out.

So the experts I wanted to hire introduced me to Amy and Andy, and I set up a four-way call between me, you, Andy, and (unintelligible 12:18:38) -- what's her name? To come in and take over the case, would be second chair because, at that point, I was saying like, there's something wrong here.

And my advisors, I shared with you, are concerning as to how this case is going. They're kind of confused as to why they won't be able to testify. When I told them there's no expert, they got shocked and recommended me to this very popular defamation law firm, and these guys reviewed your work, and they said we want to come in and have a talk with you. And (unintelligible 12:19:10) --

MR. SIMS: Your Honor, I object. He's testifying.

THE COURT: Objection sustained. That's not even a question. That's a speech.

BY MR. SEYOUM:

Q Did we --

THE COURT: Ask -- Mr. Seyoum, objection sustained. Ask him a question.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Did I set up a four-way call between you, Andy, and

Amy, and Ms. Deucher asking them to join the legal team because I was concerned with your performance, and I gave you a way out, and for them to take over, and then we had a meeting, and then you got on the phone and told them --

MR. SIMS: I, again, object, Your Honor. He's testifying.

THE COURT: Sustained. But let's practice -- Mr. Hoge, did there come a time when Mr. Seyoum arranged for you to have a conference call with some other lawyers?

THE WITNESS: Yes.

THE COURT: What happened?

THE WITNESS: I talked to them.

THE COURT: About?

THE WITNESS: About whether they would like to come in and assist with the preparation for the trial. This was about one month before the trial, which was scheduled for July of 2022.

THE COURT: Thank you.

Go ahead, sir.

BY MR. SEYOUM:

Q    And in that conversation with them, did you tell them I got this covered? I don't need any help. If you come in, you're just going to cost Joe more money, and I don't need second chair. We're having some issues with the damages, but we will get them in on the backdoor; did you say that to them?

A     No.

Q     But you did tell them they're not needed?

A     No.

Q     And I did insist that they join, and you refused?

A     No.  That's not correct.

Q     Okay.  Did I give you the option for you to exit and then for them to take over?

A     No.

Q     Okay.  Did the conversation come where they said they will join, but you asked for an extension?

A     No.

Q     Did you say to them what I said, I want them to join, asked for an extension, and you were adamant that the trial date will not change?

A     I'm sure I told them it was unlikely that the trial date would change.

Q     Because you didn't want it to?

A     No.  Because the trial had been scheduled for a long time.  Case had been pending for about a year and a half.

Q     Okay.  Isn't it true that you did not want experienced attorneys to come and join my legal team because you messed up the case and you don't want anybody else to look over your mistakes?

A     That's absolutely untrue, Mr. Seyoum.

Q     And did that infuriate you that I got -- I went

behind your back and brought in additional attorneys?

A    No.  In fact, I told you I was happy to talk to Ms. Roller, and I did talk to Ms. Roller.

Q    Right.  So if you had experienced lawyers, that second chair, during the trial where Ms. Deucher was saying she was giving notes about making objections, making a record like I've been doing when something goes wrong, I make a record of it, she couldn't do it because she was not a Maryland licensed attorney.  So when you missed something else, if there was a licensed Maryland attorney assisting you, they could have got up and made objections?

A    Only if they had entered their appearance in the case.

Q    They would have entered, right?

A    If they had entered their appearance in the case, yes, they could make objections.

Q    Right.  And Ms. Deucher could not make an appearance because she's not licensed as a Maryland attorney?

A    She could not enter her appearance in the case, but what she could do is to tell me if she thought that I should make an objection.

Q    Okay.  And she did make some suggestions, but you forgot to make objections?

A    No, I didn't forget.

Q    Okay.  All right.

A     Just chose not to do it.

Q     Chose not to do it.  All right.

A     Correct.

Q     All right.  So the conversation ended, and you kind of basically told me they're not coming in.

A     No.

Q     And I asked you to move on, and you said I'm not moving on.  I'm staying.

A     Not correct.

Q     Okay.  But you do admit that if they had joined, I would have had a better chance of succeeding.

(Discussion off the record.)

A     That's a very difficult question to answer, Mr. Seyoum.  Many, many, many different factors go into whether you had a good chance to succeed.

Q     Right.

A     If Ms. Roller had entered her appearance in the case, and sat with me during the trial, and participated and assisted, would it have made a difference?  Maybe.  I don't know.

Q     Well, Mr. Hoge, isn't it true because you did not hire all the experts necessary that if I won on liability and I only made $35,000, I could come back and sue you for millions of dollars, and you had decided to throw my case, so if I lost on liability, then the question of not having experts is moot

because, first, you have to win on liability, which means you have to prove that Mr. Salvado committed malpractice, and then you would get the damages. So you don't get to the damages unless you prove Mr. Salvado committed malpractice.

A    Mr. Seyoum, I did not throw your case.

Q    But you refused to have additional attorneys to come on board?

A    Incorrect.

Q    Okay. You --

A    I was happy an additional -- but we certainly talked about the cost. This law firm that Ms. Roller is with, Clare Locke, is a very, very expensive law firm.

Q    Oh, so you were worried about the cost for me?

A    You were worried about the cost. Yes, I was worried -- I was absolutely worried for you about the cost.

Q    Okay.

A    And you were worried about the cost.

Q    So you charged me $90,000 and then $120,000, and I want to bring in a very seasoned, very successful law firm, and you're worried about the cost?

A    Which probably would have doubled the cost.

Q    But I could have won?

A    I don't know.

Q    But we lost.

A    You lost.

Q   Okay.  And you didn't hire the experts.  You didn't call the witnesses.  You didn't get the 911 calls.  You hired a rookie out of law school who was not licensed to Maryland, right?  And then towards --

A   Well --

Q   -- the end when everything went south, you decided to throw me under the bus?

A   I did not throw you under the bus.

Q   All right.  So --

A   I wanted you to win, Mr. Seyoum.

Q   Sure.  Sure.  Of course.  And then fast forward, after all this -- you dissolved your corporation, right?  You just packed up the tent and moved on, right?

A   Two years later.

Q   Right.  Is it because you thought that I might come back and sue you for millions, so you had to hide your assets by getting rid of the company?

A   My decision to semi-retire and close my firm had absolutely zero to do with you or your case.

Q   Did this case ruin your reputation amongst your friends?

A   No.

Q   Okay.  Are you embarrassed that I'm suing you for legal malpractice?

A   No.

Q    You remember I asked Mr. Salvado to play some videos of my family during Thanksgiving?

A    Yes.

Q    And I showed you those videos, right?

A    You did.

Q    Multiple times.

A    Multiple times.

Q    And I asked you to show them at the protective order -- I mean, at the Salvado malpractice case to show that if Salvado had shown what kind of family I have that it would have helped me --

A    That video had no relevance to the case.

Q    It would have humanized me in front of the judge, and the judge would have said, like, he took them to Pennsylvania with family, and his mom wanted to keep them in Silver Spring with no turkey, he did the right thing.  You don't think that would have helped?

A    No.  I thought it was irrelevant.

MR. SEYOUM:  Okay.  I want to play this video, please.  (Unintelligible 12:26:22).

THE COURT:  Of what, sir?

MR. SEYOUM:  Of Aaron at Thanksgiving having turkey.

THE COURT:  Any objection?

MR. SIMS:  I'm not going to object, Your Honor.

THE COURT:  Then play the video of you at

Thanksgiving.

MR. SEYOUM: Is the volume up or --

THE COURT: I have no idea.

THE CLERK: It's your computer's (unintelligible 12:26:35).

MR. SEYOUM: On my computer.

BY MR. SEYOUM:

Q    Do you recognize this video, sir?

A    Yes.

Q    Okay. This is me and Aaron, my son, with my family.

A    I'm not sure I see you there, Mr. Seyoum, but --

Q    Well, I'll show --

A    -- I think I see your son. I met your son once.

Q    Right. So this is what we did in November of 2017, Thanksgiving. So because of this, she called the cops on me.

MR. SIMS: I'm going to object, Your Honor. He's --

THE COURT: Well, I -- you can play the video --

MR. SEYOUM: Oh, okay.

THE COURT: -- but the running commentary is what you -- is drawing the objection.

MR. SEYOUM: Okay.

THE COURT: If you want to play the video, go ahead, sir.

MR. SEYOUM: All right.

BY MR. SEYOUM:

Q   Mr. Hoge, I wanted you to present this at the Salvado malpractice case because Salvado was supposed to show this video, and he got me sitting at the chair, and I told you he told me -- I mean, I asked him to show this video, and I had my phone with me, and I sat down, and we went through all the protective order trial, and he never asked me to show it.  And then after the trial was over, I said, what the hell, man?  You were supposed to ask me to show the video --

MR. SIMS:  I'm going to object, Your Honor.  He's --

THE COURT:  Sustained.

MR. SEYOUM:  And --

THE COURT:  That's his --

MR. SEYOUM:  Okay.

THE COURT:  If you want to ask the witness a question --

BY MR. SEYOUM:

Q   Did I --

THE COURT:  -- you may do so, but you really need to excise the editorial comment, please.

MR. SEYOUM:  Sure.

BY MR. SEYOUM:

Q   Did I tell you that I had asked Mr. Salvado to play this video at my protective order trial?

THE COURT:  Well, let him answer that, and let's see where we go.

A     I think the answer is yes, but I really don't recall.

BY MR. SEYOUM:

Q     Did I ask you to play this video at the malpractice trial against Salvado accusing him of not playing this video at the protective order trial?

A     I do not recall that, Mr. Seyoum.  But I do know that I felt that it was a totally irrelevant piece of evidence.

Q     You don't think this video was relevant?

A     No.

Q     You don't think that if this video played at the protective order --

THE COURT:  Sir, it's asked and answered.  I've given you latitude.  He said no.  You have to take the witness' answer --

MR. SEYOUM:  All right.

THE COURT:  -- as it is.

BY MR. SEYOUM:

Q     I asked you to play and you vetoed me, right?

A     I told you I thought it would not be admitted because it was irrelevant.

Q     Okay.  But you did not proffer it, though?  You did not try it?

A     I don't believe I did.

Q     Okay.  But here, I tried it, and he didn't object, and the judge allowed it, so what makes you think that would

not have been allowed?

A    Different circumstances.

Q    You just didn't want it, did you?

A    I thought it was going to be a waste of time that -- with nothing relevant to the case at -- at hand, which is the failure of Mr. Salvado to introduce certain evidence, not this evidence.  This evidence was not going to make any difference in your protective order matter.

Q    Are you telling me if I showed a video of Aaron having fun with his whole family, a turkey, having a dinner, and singing that the judge would have said, he took him to the right place while his mother was saying he's going to stay home and I don't have any turkey?  Wouldn't that justify me taking him to Pennsylvania?

A    No, because the protective order was not based on that.  The protective order was based on Ms. Redae's allegation that you had thrown a remote control at her, that you had threatened her with her life, that you had planted surveillance cameras in her apartment.  That's what -- were in your apartment.  That's what Judge Callahan said was the basis for the protective order.  Nothing to do with this.

Q    Okay.  So Ms. Redae is coming in and saying I'm violent, I threw a remote control at her, I said I could make her -- arrange her death, all that stuff, and she's accusing me of all this, and I'm saying, I'm not that kind of guy.  She's

lying. I took him to Pennsylvania because I had advice of counsel by Sylvia Adams. Why I took her car, I got it repaired. I am not a violent guy. She's the one who's creating drama, and she wanted to punish Aaron by keeping him home, and I said to you to tell the jury and the judge to watch this video, and you vetoed it.

A I told you that a video of a nice family gathering that seems to be a situation where everybody was having a very nice time, your son was having a very nice time, that has nothing to do with the basis of the protective order.

Q Isn't it true that in your deposition when he referred to me taking Aaron to Pennsylvania, you called it abduction?

A You'd have to show me. I don't remember using that word particularly.

Q Okay.

A You'd want to show me the page and line where I said that.

Q Okay. If I showed -- so you're saying you didn't say that?

A No. I'm saying --

Q Okay.

A -- show me the -- I -- I don't remember if I said that.

Q Okay. You don't --

A    Please show me --

Q    Okay.

A    -- where I said it.

Q    You don't remember it?

A    I -- sitting here today, I do not recall using that word.

Q    Okay.  And after the trial was over, right, we were outside waiting for the jury to deliberate, me, Ms. [sic] Hoge and Mr. [sic] Deucher, and you were sitting outside, and I'm nervous.  I don't know if the jury's going to come in in my favor or not.

MR. SIMS:  I object again, Your Honor.

THE COURT:  Sustained.  Sir, that's -- you really need to do the following:  Please just ask the witness a question --

MR. SEYOUM:  Okay.

THE COURT:  -- and please leave out any testimonial aspects by you.

BY MR. SEYOUM:

Q    After the trial was over, did we go outside to the cafeteria, outside here, and did we sit down and have a couple of drinks and a meal?

A    We went to a restaurant about a block and a half away while we were waiting for the jury verdict.

Q    Right.  And at that point, was I very nervous?

A     Yes.

Q     Okay.

A     We were all nervous.

Q     And at that point, did you say to me, oh, my god, this case is like a toilet bowl full of shit that I can't wait to flush?

A     No.

Q     Then I got offended?

A     I'm really glad you asked this because you keep coming back to this, Mr. Seyoum.

THE WITNESS:  May I explain what I did say?

THE COURT:  Yes.

THE WITNESS:  We were having a nice conversation.  We didn't know what the jury was going to do.  We were hopeful you were going to win.  We were talking about my profession, my legal profession, and how lawyers think and how they operate. And one of the things I said to you, and I've said this to a number of people.  It's a little crude, but what I said is that lawyers, when they get very involved in a case, like I've gotten involved in yours, Mr. Seyoum, you have a huge amount of facts and data that fill up your head.  You have transcripts, you have hearing notes, you have interviews with witnesses, you have motions.  You -- I go around thinking about your case and other cases all day long.  It's filling my head.  And at the end of the case, when the trial's all over, it's like somebody

just takes a flusher and just flushes it out of your brain, and all of a sudden, you know, it's all gone because you've moved onto the next case.

Q    Right.

A    Which is what I was trying to tell you needs to be done.

Q    Right.  Thank you.  Because in the past, you never admitted as to where you said it.  You said it, but you never said it was right before the verdict came in.  So thank you for admitting that.  And I would just want to let you know, that was the coldest thing that you ever did to me.

THE COURT:  Sir, could you stop with the finger pointing, please?  Please?

BY MR. SEYOUM:

Q    Was it appropriate for you to --

THE COURT:  Sir, you're doing it again.  I'm asking you kindly to stop pointing with the finger at people.

BY MR. SEYOUM:

Q    Was it appropriate of you --

THE COURT:  Just ask him a question.

BY MR. SEYOUM:

Q    -- to describe my case, where I've spent $90,000 paying you, as a toilet bowl full of shit before the verdict comes in?

A    Mr. Seyoum, you're obviously choosing to

misunderstand what I said. What I said is that in any case, not just yours, but in any case, that is the mental process that lawyers tend to go through. Just like you're studying for a final exam in college, and all of sudden, your head is full of trigonometry, and you take the exam, and you're done, and you know what? A week later, you've kind of forgotten a lot of the trigonometry. Or at least I did. I -- I never remembered too much trigonometry. That was the point I was trying to make. I was talking about the lawyer's mental process in general. I was not -- I never, ever one time came close to saying that your case was anything other than a case that I wanted to win.

Q    Okay. Thank you for that explanation. So you just admitted that you are ready to flush the case down the toilet before the jury renders a verdict, which means you have no plan on appealing because you already know what the outcome is?

A    That's not -- not accurate in the slightest.

Q    Okay. Then why would you want to flush the toilet full of shit, which is my case, or my life, or my money, before the verdict comes in?

A    I didn't say I wanted to flush it. I said that normally what happens is that when I'm finished with a case, all of the vast amount of detail and information that I have received about the case tends to evaporate out of my head, usually with a flush.

THE COURT: How much longer are we going to be before the lunch break, Mr. Seyoum?

MR. SEYOUM: We're almost done, sir.

THE COURT: All right.

BY MR. SEYOUM:

Q   Mr. Hoge, please. You took a lot from me.

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained. Sir, you may ask a question, but --

MR. SEYOUM: Okay.

THE COURT: -- again, and hopefully for the last time, you can't testify from the well of the courtroom, please. Ask a question.

BY MR. SEYOUM:

Q   After the trial was over, was I devastated?

A   You seemed to be very upset.

Q   Would it be logical because I knew you had set me up and made it fail?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sus --

BY MR. SEYOUM:

Q   And I had a valid reason when you started calling it a toilet bowl full of shit that it hit me --

THE COURT: The objection is sustained.

BY MR. SEYOUM:

Q -- saying like, shit, you have really set me up --

THE COURT: Sir, move on.

MR. SEYOUM: Okay.

THE COURT: The jury will disregard your commentary, but you may ask the witness a question.

BY MR. SEYOUM:

Q So during the trial, were you intentionally provoking me to get a reaction out of me to label me like as the angry black man?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained. Move on, sir.

BY MR. SEYOUM:

Q During the trial, you were supposed to call Mr. Girmay, a witness to testify, remember that?

A I -- I -- I subpoenaed Mr. Girmay.

Q Yes. But you subpoenaed him, and he showed up on the wrong date, right?

A No, he showed up.

Q But he showed up on the wrong date?

A Well, I don't remember -- I mean, the trial was a multiple-day trial. He showed up one day. I spoke to him. I've spoken to Mr. Girmay a couple of times. I always knew that his testimony would be not only not helpful but would be actually damaging to you. The only reason I subpoenaed him is because you insisted that I do it. When he appeared, I talked

to him. Nothing had changed. He was going to say things that would be damaging to you, and I chose to let him go.

Q    Okay. I'm confused here. So you called him to testify even though you thought he was going to be bad witness?

A    I called -- I put a subpoena on him because you insisted that I subpoena him.

Q    Okay. So here, when I insist something gets done, you approve, right? I've asked you to call Mr. Girmay, against your wish, you called him, right?

A    I'm sorry. I didn't follow that.

Q    You're telling me that you --

THE COURT: Sir, you're doing it again with the finger.

MR. SEYOUM: Sorry.

THE COURT: Could you please stop doing that?

BY MR. SEYOUM:

Q    You called Mr. Girmay to testify because I insisted, right?

A    I subpoenaed Mr. Girmay to come to court because you insisted.

Q    Right. Good. So when I insisted that Amy and Andy from that big law firm join, you vetoed me?

A    You didn't insist --

Q    So you did not follow my instructions then?

A    You did not insist on that.

Q What was the point of calling them to have a meeting with -- to joining?

A To discuss the possibility.

Q The possibility to join?

A Yes.

Q And did I want them to join?

A My recollection is that after we talked to her, we agreed that, A, it was too -- I mean, I believe Ms. Roller said, hey, wait a second, this is a trial a month away. You want us to come in and get up to speed. There had been maybe 10 depositions. There had been all this pre-trial stuff. And she said I don't think it's practical, and I think it would be incredibly expensive, and I think we all agreed we were not going to go in that direction.

Q You sure that's the way it went down?

A That's what I recall.

Q Didn't I insist that they come in, and you kind of talked us out of it, and you basically said it's too late, I don't need you, it's going to take too much time, and they asked you to extend the deadline, and you refused?

A I don't recall that.

Q You don't recall that?

A No.

Q Are you lying to me when you say I don't recall?

A I'm under oath, Mr. Seyoum.

Q    Yes or no?

THE COURT:  Sir, I know there's no objection, but if I don't step in, it's going to --

MR. SEYOUM:  Okay.

THE COURT:  -- you can't ask any -- no questioner can ask any witness, this trial, any other trial, if they're lying. It's prohibited.  Don't do it.

MR. SEYOUM:  Okay.  All right.

BY MR. SEYOUM:

Q    So the case is over.  I immediately say I want to file an appeal.  You had told me --

MR. SIMS:  I'm --

BY MR. SEYOUM:

Q    Is that correct that I said I wanted to file an appeal?

MR. SIMS:  I'm going to object, Your Honor.  There's no relevance to the --

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    Did I tell you that I wanted to appeal?

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    Did you help me appeal?

MR. SIMS:  I, again, object, Your Honor.

THE COURT: Sustained.

BY MR. SEYOUM:

Q    What happened at the --

THE COURT: Do you have any more questions factually about the case for the witness, sir?

MR. SEYOUM: I'm sorry. Say that again?

THE COURT: Do you have any additional questions -- factual questions about --

MR. SEYOUM: Yes.

THE COURT: Then please ask them because you're --

BY MR. SEYOUM:

Q    Did I file an appeal?

A    Did you file an appeal?

Q    Are you aware that I filed an appeal?

A    I think I am. I think you filed one pro se, by yourself.

Q    Okay. Pro se, right?

A    Yes.

Q    Okay. You didn't help me with that?

A    No.

Q    Okay. And after the trial was over, I said preserve all communications and documents.

MR. SIMS: Your Honor, this has been --

THE COURT: Sustained.

BY MR. SEYOUM:

Q Did I ask you to preserve --

THE COURT: Sir, I've sustained the objection on the subject matter. Move on, please.

BY MR. SEYOUM:

Q Did you destroy any notes or communications after the trial was over?

MR. SIMS: I object, Your Honor. We went into this yesterday.

BY MR. SEYOUM:

Q Do you know what the outcome of the -- do you know what the outcome of the appeal was?

A You lost.

Q Right. And do you know why I lost?

A I think I read the opinion, but I don't remember what it said.

Q Right. Would it be correct if I said the opinion said my attorney, Mr. Hoge, failed to preserve errors?

A Oh, yes. You were making some arguments that there was some evidentiary hearers during the course of the trial, and the Court of Appeals -- Court of Special Appeals, I think at the time, said that we did not adequately preserve those issues.

Q Okay. And isn't it true that they blamed you for not protecting Ms. Sylvia Adams, which they're claiming she was untrustworthy because some evidence that should not have been

allowed was allowed?

A   No.   What I recall happening, Mr. Seyoum -- it's been a while since I've read that opinion, but I had made a strategic decision.   We had filed, as you know, a motion in limine, which is a motion to try to eliminate evidence that you think is improper.   And I had filed a motion in limine to try to prevent Mr. Mulquin, the lawyer for Mr. Salvado, from talking about the fact that Ms. Adams had been disbarred.   And the theory of my motion in limine was that her disbarment came after Ms. Adams had given you some advice.

THE COURT:   Sir, I'm going to give you five more minutes.

MR. SEYOUM:   Okay.

THE COURT:   It's now a quarter of one, and we're just --

MR. SEYOUM:   (Unintelligible 12:42:21).

THE WITNESS:   May I complete -- I -- I hadn't quite completed --

THE COURT:   Yes, sir.

THE WITNESS:   I made -- I'm sorry, Mr. Seyoum, are you listening?

THE COURT:   Go ahead.

MR. SEYOUM:   Hold on.

(Discussion off the record.)

THE WITNESS:   I -- I -- it's a little hard to talk

when somebody else is talking.

THE COURT: I'm sorry, folks. I can only do -- I'll hold onto this. Why don't you finish --

MR. SEYOUM: Can I show --

THE COURT: No, no. He's going to finish his answer first --

MR. SEYOUM: Okay.

THE COURT: -- and then we're going to --

MR. SEYOUM: Sorry.

THE COURT: -- have something else.

Go ahead, sir.

THE WITNESS: I filed a motion in limine asking that Mr. Mulquin not be allowed to cross-examine Ms. Adams about the fact that she had been disbarred subsequent to giving you the advice about your son. The judge disagreed with it, and denied my motion in limine, and said that Mr. Mulquin would be allowed to cross-examine it because the basis for her disbarment had to do with her honesty and credibility.

I then knowing that Mr. Mulquin was going to ask those questions, I did what trial lawyers do very commonly, and it's a recognized strategic procedure or -- or -- or idea, and that is I wanted to ask Ms. Adams to testify herself on my examination about what happened because there were some extenuating circumstances. Ms. Adams --

BY MR. SEYOUM:

Q    Can you please get to the point, sir?

A    -- had gotten into a financial situation --

Q    I know you're taking up my time.

THE COURT:  Sir --

A    You want the answer or not?

THE COURT:  -- you asked him a question.  He gets to answer it.

MR. SEYOUM:  He's going on and on, sir.  I object.

THE COURT:  Do you have any additional information to provide the jury that's germane?

THE WITNESS:  Yes.

THE COURT:  Go ahead.  You may.

THE WITNESS:  Mr. Seyoum mentioned in his opening statement that Ms. Adams had handed me a note of information about what had happened to her when she got disbarred.  It had to do with financial problems, inability to take -- file for tax returns, and then she got in trouble with the bar authorities essentially.  And she had a number of extenuating circumstances.

I took that note and I essentially incorporated it into my outline of questions that I was going to ask Ms. Adams because I wanted to take the sting out of it.  I figured if she was asked by a friendly examiner, namely myself, that was on her side, that we'd show the jury that we were being candid and forthcoming about it.  We were not trying to cover anything up.

Whereas if I didn't ask her about it and Mr. Mulquin did, then it would like -- look like we were trying to cover it up. So my strategic decision was to bring it out on direct examination after I had made the effort to keep it out altogether.

MR. SEYOUM: Okay.

THE COURT: Sir, I'm going to excuse the jury for lunch.

MR. SEYOUM: Oh. Just --

THE COURT: They've been sitting there patiently.

MR. SEYOUM: There's two -- no, no. (Unintelligible 12:45:04).

THE COURT: Okay.

MR. SEYOUM: Can I show that to him?

THE COURT: Any objection?

MR. SIMS: Yes, Your Honor.

THE COURT: Sustained.

MR. SEYOUM: Okay. All right. So --

THE COURT: This is number 12. Just hold onto it.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Thank you for that explanation. Ms. Sylvia will be here to --

A Sure.

Q -- correct you. Okay. So --

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained. Sir, do you have any additional questions for the witness?

BY MR. SEYOUM:

Q This is the video I asked you to play for me. This is the video I asked Salvado to play for me. None of you did. Took my money. (Unintelligible 12:45:40) --

MR. SIMS: I'm going to object, Your Honor. I --

THE COURT: Sustained. We've had ample opportunity to do this. It's now -- we're just not making any progress. Do you have any new matter you want to ask the gentleman about before we break for lunch?

Sir, I asked you a question.

MR. SEYOUM: Oh, I'm sorry.

THE COURT: I asked you if you had any new material you needed to ask this witness about before we break for lunch. I had sustained the prior objection.

MR. SEYOUM: Yes.

THE COURT: So I'm looking for guidance from you --

MR. SEYOUM: Yes. I have a few documents that I'm going to submit. Let me just --

THE COURT: Well, let's get to it, please.

MR. SEYOUM: Okay. I'm having a technical problem here.

THE COURT: No. I'm going to send the jury out for lunch.

You've been sitting patiently.

MR. SEYOUM: Okay. I --

THE COURT: No, no, no.

MR. SEYOUM: I have pictures (unintelligible 12:46:30).

THE COURT: No, no. I'm going to give you the luncheon time to --

MR. SEYOUM: Fix this.

THE COURT: -- to organize yourself.

Folks, we'll see you in a bit. Can you come back at 1:35? Does that give you enough time? So between now and then, do not discuss this case with anyone. Do not let anyone discuss it with you. Do not even discuss it amongst yourselves. Keep an open mind. Please leave your pads on your chairs. Thank you, folks. Go take a break.

You all stay here.

Mr. Hoge, you can stand down, sir.

(The jury exits the courtroom.)

(Discussion off the record.)

THE COURT: So how much more time do you need with the witness on direct? We've spent 3 hours and 20 minutes so far.

MR. SEYOUM: Yes, sir.

THE COURT: How much more do you need?

MR. SEYOUM: A few more minutes. But --



THE COURT: How many is a few? Because you keep telling me that, and then I keep looking at the clock, and the time goes by. How much time do you need?

MR. SEYOUM: It depends on how his answers are, sir.

THE COURT: How much time do you need?

MR. SEYOUM: He's giving me long-winded answers.

THE COURT: I'll try it again. How much time do you need?

MR. SEYOUM: And then I'm going to bring in my two other witnesses?

THE COURT: I don't know. It depends if you use up all your time --

MR. SEYOUM: We're here until --

THE COURT: -- on something else, then I don't know. We'll have to see.

MR. SEYOUM: So we're here until 4:30?

THE COURT: I've told you what the schedule is.

MR. SEYOUM: Okay. I mean, based on what you told me yesterday, I may not (unintelligible 12:48:32) today --

THE COURT: That would be my hope.

MR. SEYOUM: -- so that I don't get yelled at, and I (unintelligible 12:48:35) --

THE COURT: I'm not going to -- I've never yelled at you.

MR. SEYOUM: Admonished.

THE COURT: I've not yelled at you.

MR. SEYOUM: Admonished.

THE COURT: I've corrected what I thought was errant behavior, but I certainly haven't yelled at you.

MR. SEYOUM: Okay. But sir, it's your job and I understand it. And --

THE COURT: I'm sorry?

MR. SEYOUM: It's your job and I understand it, and you got to keep the control of the courtroom. And I understand that, and I understand the process.

THE COURT: Okay.

MR. SEYOUM: And I'm not doing anything to irritate you or to (unintelligible 12:49:04).

THE COURT: I'm not irritated at all.

MR. SEYOUM: Right. Because it doesn't help me to irritate the judge. It's a foolish endeavor.

THE COURT: Okay. So my question is, how much more time do you need with this witness?

MR. SEYOUM: If I can get this thing to work, maybe 5, 10 minutes.

THE COURT: No. Pick a number. It can't be a variable.

MR. SEYOUM: Ten minutes.

THE COURT: You shall have 10 minutes, and then you will have your cross, and then we'll move on to the next

witness. I'm urging you to make it compact. But that's your call. I'm -- so take a break, folks. 1:35, we're going to start again, and thank you. Thank you, folks. Thank you, Mr. Clerk.

(Recess)

THE CLERK: All rise.

THE COURT: Folks, good afternoon. Please be seated.

Mr. Clerk, would you recall this matter for trial?

THE CLERK: Certainly. Recalling Civil Case C-15-CV-22-4124, Crowley, Hoge, and Fein, P.C. v. Yoseph Seyoum.

THE COURT: All right. Folks, good afternoon. Are we ready to proceed?

MR. SIMS: We are, Your Honor.

MR. SEYOUM: Yes.

THE COURT: Would you check that we have all our jurors?

THE CLERK: I will. If we have them all, you want me to bring them in?

THE COURT: All right. If they're all here, kindly bring them in.

THE CLERK: Okay.

THE COURT: If not, let me know.

Did you all -- I know you had a short lunch and I'm fine if the answer is I'll get to it later -- have a chance to find those expert designations --

MR. SIMS: Yes, Your Honor.

THE COURT: -- and pre-trials? I could take a look at them.

See if I can resolve any of that business.

THE CLERK: Just waiting on two, Your Honor. (Unintelligible 1:31:52) --

THE COURT: Okay. It's a little earlier and that's fine. I'd rather -- sir, you can stand up if you want to. It might be another couple, three minutes.

THE WITNESS: All right. Thank you.

THE COURT: I'm a little early, but I --

THE WITNESS: Certainly not the most comfortable chairs, I have to say.

THE COURT: They're not, and they're not adjustable, and they're probably original.

(Discussion off the record.)

THE COURT: So may I see them, please? Thank you.

Okay. I'm looking at --

MR. SEYOUM: Sorry, sir. You took away the pre-trial statement before I could see it. Can I just take a look?

THE COURT: I'm sorry?

MR. SEYOUM: You took that away from me before I could see it.

THE COURT: You with the pointing.

MR. SIMS: That's the document I handed to you.

MR. SEYOUM: I didn't see it. He took it away before I saw it.

THE COURT: I'm going to hand them back to you in a minute.

All right. I'm looking at Mr. Seyoum's witness list that was filed on April 24th. Okay.

I don't see -- is it Mr. Day?

MR. SIMS: Yes.

THE COURT: I don't see Mr. Day listed on your witness list. And on the expert designations, which were filed June 23rd of 2023 -- let's see.

You wanted to see these?

MR. SEYOUM: (Unintelligible 1:33:31).

THE COURT: Sure. Mr. Day is not on either of the lists. Either the witness list or the expert disclosures, more importantly the expert disclosure.

THE CLERK: I have them, Your Honor.

THE COURT: All right. So why don't we table that for now. I don't want to hold this up. Bring in the jury and we'll circle back to that later.

Sir, Mr. Seyoum, could you -- I'll hold onto those, and we'll circle back to it.

MR. SEYOUM: Okay.

THE COURT: I'll circle back, but --

MR. SEYOUM: I'm holding Gary Diamond as a witness.

THE COURT: No, just -- let's finish with this witness, and we'll go from there, and we'll come back to this.

(The jury enters the courtroom.)

THE COURT: Folks, I hope you all -- thank you very much. I hope you had a chance to grab something to eat or drink or both, and I apologize for keeping you long this morning, and I apologize for truncating your lunch. I'm just trying to get this done. So if you'll kindly have a seat. Thank you very much.

So sir, conclude your direct of the witness, and then we'll tender him for cross.

MR. SEYOUM: Okay.

THE COURT: Go ahead, sir.

MR. SEYOUM: Yes, sir.

THE COURT: Any objection?

MR. SIMS: No objection, Your Honor.

THE COURT: Okay. Then proceed.

Sir, here you go.

MR. SEYOUM: Okay.

THE COURT: Please proceed.

MR. SEYOUM: Okay. Thank you.

RESUMED DIRECT EXAMINATION

BY MR. SEYOUM:

Q    Can you please briefly take a look at the first part of this? It's an email between me and you regarding on how

we're going to quantify our damages, and by this point, I'm trying to explain to you who you need to talk to, how an online reputation works, how you quantify damages --

THE COURT: Sir, give him a chance to review the document for a --

MR. SEYOUM: Sure.

THE COURT: -- second, please.

A     So this Exhibit Number 13 is obviously a multiple page document with a long chain of emails. It seems like you're directing my attention to just the first page, an email that you sent to me on Monday, March 8th, 2021, at 9:31.

Hi, Mr. Hoge. Please review the attached Excel document. I prepared a presentation for your review with the intention of quantifying our claim. I'll explain in detail during our 10:00 a.m. meeting today. And I wrote back received. Talk to you at 10:00.

BY MR. SEYOUM:

Q     Okay. And did I provide you with an Excel sheet of my previous income, the properties I own, how many mortgages I have, how much my mortgage totals are, with the idea of explaining to you if I can't get a job, if I can't get funded, I could lose all of these properties if I can't make mortgage payments? Did I explain that to you?

A     I don't remember those kind of details, Mr. Seyoum. You certainly gave me some financial information. You

certainly told me that you had become financially distressed as a result of what had happened to you at the protective order hearing.

Q Right.

A I certainly knew that you had properties. My understanding is that those properties were owned free and clear, but there may have been some mortgages. I just don't remember the details.

Q Okay. And I also introduced you to my investors?

A You introduced me to Jonathan Gordon.

Q Right. And my investor clearly explained to you, Joe is --

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sustained. This is covered by my pre-trial rulings, and it's about to go over the edge, so stop here on that piece, please.

MR. SEYOUM: Okay.

THE COURT: And you know that.

BY MR. SEYOUM:

Q Did the people that I introduced you tell you that my online reputation --

THE COURT: Sir --

MR. SIMS: I'm going to object, Your Honor.

MR. SIMS: That's hearsay --

THE COURT: It's precluded respectfully by my pre-

trial rulings --

MR. SIMS: Uh-huh.

THE COURT: -- and I know you know what they are, so abide.

MR. SEYOUM: I can't ask him about the damages regarding --

THE COURT: I have made certain pre-trial rulings. I'm asking you to abide by them, please.

MR. SEYOUM: I would like to make a record. I'm objecting. Okay.

THE COURT: Very good.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Did I provide you with ample financial reputational information for you to hire experts to quantify the damages?

A I'm not sure how to answer that, Mr. Seyoum. You gave me information. I talked to experts. We hired one expert in the damages area.

Q Okay. How many experts did you talk to?

A I'm going to say three, four, five.

Q Okay. In what category?

A Damages.

Q What -- which -- I mean, we had several categories of damages.

A It mostly had to do with the cost of trying to repair

escribers
www.escribers.net | 800-257-0885

your online reputation.

Q   Okay.  And who found those experts?

A   You did.

Q   Okay.  Thank you.

THE COURT:  Mr. Hoge?

MR. SIMS:  I'm objecting, Your Honor.

THE COURT:  No.

Great.  Go ahead.

MR. SEYOUM:  Can I borrow that for a sec?

Okay.

BY MR. SEYOUM:

Q   In this email, on the first paragraph, did you vouch to me saying I am 100 percent on your side and always have been?

A   I did say those words.

Q   Do you think your actions towards me have been a hundred percent on my side?

A   Very much so.  Yes.

Q   After the trial was over, I tried to come and sit down and have a talk with you, and you refused to give me the time to sit down and talk.

A   What happened, Mr. Seyoum, is that you asked me for an appointment to talk about what had happened at the trial. You'd already indicated to me that you were not prepared to pay me.  You owed me a lot of money.  I knew from previous

experience with you, when you say that you're going to come in and want to talk to me for an hour or so, that almost always extends it to two, three, four hours. And I felt that we had already said what needed to be said, and I was not willing to invest more of my time uncompensated to try to explain things that we'd already discussed.

Q    Did you just testify that me and you have had meetings face-to-face for hours --

A    Yes.

Q    -- multiple times?

A    Yes.

Q    Face-to-face --

A    I mean, Zoom.

Q    -- multiple times --

A    Well, before the trial, I don't -- actually, I don't know that you and I actually -- actually met in person prior to the trial, but we had lots of Zoom conversations, and we had lots and lots of telephone conversations, and lots and lots of emails.

Q    Okay. So what was different about this time? I mean, I lost, I owe you money, so I'm saying I need to find out what happened. Can you please -- I mean, after a trial is over, you're supposed to sit down with your lawyer and say, like, what happened? And the lawyer is supposed to console you, say, like, oh, we tried our best and that -- but you

refused.

A     No --

Q     You refused to let me come and talk to you.  Why?

A     We had that conversation very shortly after the trial, Mr. Seyoum.  I didn't think there was anything new to talk about.  You'd already made it clear that you were not happy with what happened in my performance, and I thought that I'd invested enough in this case of uncompensated time just to talk, you know, repeat myself, things we'd already discussed.

Q     Okay.  Did we have a sit down and go over as to what happened during the trial?

A     You were there, Mr. Seyoum.

MR. SIMS:  Yes, I'm going to object, Your Honor.

THE COURT:  Sustained.  Move on, sir.  This is not productive.

BY MR. SEYOUM:

Q     So -- okay.  Right off the bat, you just send me an email saying I'm sorry what happened to you.  I'm not going to help you with the appeal.  Find somebody else.  If you appeal, you're throwing money -- with money (unintelligible 1:45:05), right?  And you said if you -- to help you out, I'm going to give you a 50 percent discount --

MR. SIMS:  Your Honor, I'm going to --

BY MR. SEYOUM:

Q     -- you owe me 120,000.  Pay me 60 and we'll call it

(unintelligible 1:45:15).

THE COURT: Sustained.

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Sir, that's not a question. That's a speech.

BY MR. SEYOUM:

Q    Did you give me a discount?

THE COURT: Sir -- sir. You're supposed to wrap up, so this is your time.

MR. SEYOUM: This is my last --

THE COURT: Use it wisely, please.

MR. SEYOUM: Okay.

A    I sent you an email, Mr. Seyoum. And it said --

BY MR. SEYOUM:

Q    Okay. And you made me an offer --

A    -- something like what you just said. Not exactly.

Q    Giving me a 60 percent discount?

A    Some substantial discount, yes.

Q    Okay. And on the --

A    On the assumption that you would pay me within a reasonable amount of time.

Q    Okay. And before that, you said you owe me a lot of money and I need some collateral. And you asked me to put one of my properties as collateral to cover your expenses, right?

A    Yes, indeed.

Q    Okay.  But I didn't do that.  I came up with the cash and paid you.

A    You came up with a significant amount of money shortly before the trial --

Q    Okay.

A    -- and I decided to not insist on getting the collateral.

Q    I took $42,000 out of my retirement and paid you.

A    I don't know where you got it from, but you paid me $40,000.

Q    That's a lot of money, right?

A    That's a lot of money.

Q    So that got me up to $90,000?

A    I think that's right.

Q    And after that, you billed me another $120,000?

A    Yes, because that $90,000 carried you up until maybe two, three months before the trial, and all the major work that needed to be done on the case was that summer of 2022 when I essentially spent the entire summer working on your case.

Q    Okay.  Thank you.

A    You're welcome.

Q    All right.  So I'm going to finish up right now.  Thank you for your time.

THE COURT:  Thank you.

BY MR. SEYOUM:

Q    I've been asking for this for a long time.  This is the video I wanted Salvado to play for me when I asked him --

THE COURT:  Sir, you're doing the pointing thing again.

MR. SEYOUM:  Okay.  Sorry.

THE COURT:  Please don't do that.

BY MR. SEYOUM:

Q    This is the video I wanted you to play for me and I asked Salvado to play for me.

(Whereupon, the video referred to was played.)

(Whereupon, the video was concluded.)

BY MR. SEYOUM:

Q    So Mr. Hoge, you didn't think that was going to help me at the protective order trial?

A    No.

MR. SEYOUM:  Thank you.

THE COURT:  All right.  Thank you.

Ready for the cross-examination, please?

MR. SIMS:  Yes, Your Honor.  We're ready.

THE COURT:  Thank you.

(Discussion off the record.)

THE COURT:  All right.  Go ahead, folks.

(Discussion off the record.)

THE COURT:  I'm going to move you along, too.

MR. SIMS:  Well, I previously provided him with our

exhibits, but he didn't bring them, so I'm going to give him these.

THE COURT: Okay. All right. Very good. Okay.

MR. SIMS: All right.

CROSS-EXAMINATION

BY MR. SIMS:

Q Good afternoon, Mr. Hoge. I'm going to try to go quickly through here, but I want to cover some ground. But first of all, I know you've said this, but with respect to the video that was just shown, did the issue as far as you understood it at the protective order hearing, did it involve any claim for purposes of the judge's ruling that Mr. Seyoum was an unfit father, that he -- any finding that he was abusive toward his child and didn't love his child?

A No. It was very clear Mr. Seyoum was very attached to his child.

Q So what did you understand were the issues at stake in that protective order hearing?

A Whether Mr. Seyoum threw a remote control at Ms. Redae, whether Mr. Seyoum threatened Ms. Redae saying that there was somebody who could easily take her life, whether or not he installed surveillance cameras at the -- well, in where they were living. Those were the issues that Judge Callahan based the protective order on.

Q And was it also the issue of him speaking to Ms.

Redae's divorce counsel?

A    That came up.  I would say that sort of came up also as this trip to Harrisburg came up.  It was part of the surrounding circumstances.  It certainly didn't help, but that was not the specific basis for the protective order.

Q    And with respect to your -- very early in the case, when you first spoke with Mr. Seyoum, I think you testified earlier that you'd taken a look at the protective order hearing.  So you understood what those issues were early on in the case; did you not?

A    Oh, yes.

Q    And that -- nothing changed all the way through to the point you went to trial, and your claim -- and pursuing Mr. Seyoum's claim against Mr. Salvado?

A    That's correct.

Q    Okay.  Now, you were shown your engagement letter that you initially had with Mr. Seyoum.  I'm going to pull that up.  That's Defense Exhibits [sic] 18.

THE COURT:  Do you have these marked as they need to be marked?

MR. SIMS:  You can just give him the notebook if you want to, and he can pull them out.

THE CLERK:  I just need the notebook to mark them all in.

THE WITNESS:  I'm going to tell you, Mr. Sims, right

now, I'm not really going to be able to read it up there.  Do you have a --

MR. SIMS:  He's going to hand it to you.

THE WITNESS:  Okay.

THE CLERK:  (Unintelligible 1:52:29) marked as Defense (unintelligible 1:52:30) --

MR. SIMS:  Yes.

THE COURT:  Can the jury read that?  I can't.  And --

UNIDENTIFIED SPEAKER:  No.

THE COURT:  But my vision is --

MR. SIMS:  Is there any way to tighten that up?

THE COURT:  Yes, unless you can enlarge that, it's not going to be helpful to the jury because they -- I can't read it, they can't read it.

THE CLERK:  You may be able to manually --

THE COURT:  There you go.

THE CLERK:  Oh.

MR. SIMS:  Does that help?

BY MR. SIMS:

Q    Okay.  So you have before you Defendant's Exhibit 18?

A    I do.

Q    And this is the engagement letter you had with Mr. Seyoum?

A    Yes.

MR. SIMS:  And Your Honor, I'd move to have this



admitted into evidence.

THE COURT:  Any objection?

MR. SEYOUM:  No.  No objection.

THE COURT:  Received.

(The document marked for identification as Defendant's Exhibit No. 18 was received in evidence.)

MR. SIMS:  Okay.

BY MR. SIMS:

Q     Now, you were asked about this, and if you see here on the payment terms on paragraph 3 where I, and "I" is defined as Mr. Seyoum, agrees to pay an advance fee to CHF -- that's your firm, correct?

A     Correct.

Q     All right.  Of $4,000 for the above services.  That was an advance fee, correct?

A     Yes.

Q     Okay.  And so what you would do is you billed your time, you would credit that $4,000 toward the time you were billing?

A     Yes.  Mr. Sims, what we do is we put the $4,000 into an escrow account, and then we send out bills every month, and as we had earned the money, we draw it out of the escrow account.

Q Okay. And then further on in that same paragraph, you see the line where it says CHF agrees that no fees or expenses in excess of $4,000 will be incurred without my specific permission? "My" is referring to Mr. Seyoum, correct?

A Yes.

Q Okay. And so did Mr. Seyoum agree to the continued representation by your firm of him in terms of doing the investigation and subsequently pursuing the case --

A Yes.

Q -- against Mr. Salvado?

A Yes, in an email.

Q Okay. Now, prior to signing -- having this -- this retainer agreement makes mention of this $4,000 investigation fee. Why is it that you do an initial investigation when a potential legal malpractice claim comes into your office?

A Because legal malpractice cases tend to be rather complicated. People come to me with a complaint about what their previous lawyer did, and it could be in various types of cases. It could be a divorce case. Could be an estate and probate case. Could be a contract case. Could be a legal malpractice case.

Typically, they come to me with many, many documents. I -- used to be bankers boxes of documents. Now it tends to be thumb drives, but -- so a voluminous amount of documents. They tell me the story. Usually takes me a good two or three hours

just to interview the client to find out what the problem is or what they believe the problem to have been.

And then I need to do analysis. I need to review the documents. I need to talk to witnesses. In this case, there were two people who I thought it was important to talk to. One of whom was Ms. Adams, one of whom was Mr. Stein. And I wanted to do some research. Sometimes I need to do legal research. Sometimes I don't. I don't think in this case I really needed to do much legal research to do my initial assessment. And then I give myself 10 hours to do that. That's why I charge -- I charge $400 an hour. I thought -- I think that's a reasonable amount of time to try to figure if there's a case there.

If I don't use it all up, frequently, it may only take me $1,500 worth of time or $2,000 worth of time, in which case, I refund the remainder of the fee if -- if it turns out I don't believe there's a case. And very frequently, after I do this initial assessment, I decide that there is not a viable case, and I refund any unused portion of the $4,000.

If I decide there is a viable case, then we talk about, well, where do we go from here? And I explain about what's going to be involved. I explain the process. I explain how long it takes. I explain how expensive it is. And then the client and I have to come to an agreement as to whether or not they want to continue down that road.

Q Okay. So following this -- signing the engagement letter, then you proceeded with your initial investigation of the potential against Mr. Salvado?

A Yes.

Q Okay. And did you have a conversation with Mr. Seyoum on October 16, 2020?

A Mr. Seyoum's -- I'm not going to remember the date sitting here, but I know you have some notes that I took --

Q Okay.

A -- that have that date on it, so.

Q Let me -- let me --

A If you show me the note, that would refresh my recollection.

MR. SIMS: All right. I'd like to show what we've marked as Defendant's Exhibit -- right now, it's Defendant's Exhibit 19.

THE CLERK: Your Honor, may I assist on taking the exhibits to the witness as they're called?

THE COURT: Please.

THE CLERK: Thank you very much.

THE WITNESS: Thank you.

BY MR. SIMS:

Q So Mr. Hoge, I've handed you what we have -- I guess it's now marked as Defendant's Exhibit 2.

UNIDENTIFIED SPEAKER: 19.

MR. SIMS: Or is it Defendant -- okay. It's Defendant's Exhibit 19. We're used to saying "number".

BY MR. SIMS:

Q So Defendant's Exhibit 19, are these your notes of your conversation or discussions with Mr. Seyoum following the initial engagement agreement?

A These are notes of a telephone conversation I had with Mr. Seyoum on October 16th, 2020, which would be nine days after the date of the engagement agreement, which is October the 7th. And I always write down the starting time and the ending time of the telephone conversation. Whenever I have a telephone conversation, I always -- because I'm charging by the hour, I want to be careful about that, so I wrote down that this was a conversation that went from 4:05 in the afternoon to 5:05, just an hour.

MR. SIMS: Your Honor, I'd move to admit Defendant's Exhibit 19.

THE COURT: Any objection?

MR. SEYOUM: No.

THE COURT: Received.

(The document marked for identification as Defendant's Exhibit No. 19 was received in evidence.)

BY MR. SIMS:

Q All right. We'll blow up at the very top part. All right. The first line says discussed malpractice claims. Yes.

A You want me to just read that? I --

Q Yes. Go ahead and --

A I don't have good handwriting.

Q Go ahead and read what you write there.

A I can read it fine, but other people have a hard time reading it. There you go. So phone -- little pound sign, that means phone call client, my shorthand -- discussed malpractice claim. CGH, those are my initials. Conclusion, not viable, paragraph -- or I'm sorry, hyphen, causation.

Q Okay. So what were you conveying in that note in terms of your discussions with Mr. Seyoum?

A Well, in any legal malpractice case, there are two fundamental components. The first component is what we call the liability component, having to do with whether or not the lawyer made an error. For example, if the lawyer missed a statute of limitations deadline, if the lawyer failed to interview a witness, if the lawyer failed to do discovery, whatever it is that the lawyer should have done and didn't do.

The second part of a legal malpractice case is -- very frankly, this is where most of the battles are really fought in legal malpractice litigation -- is -- okay, if there was an error made, did that make a difference in how the case ultimately turned out? In other words, did Mr. Seyoum's loss

of the protective order proceeding result from errors that Mr. Salvado had -- had made?

And I recognized immediately that causation would be an issue because we were talking about the testimony of Sylvia Adams not having been presented. We were talking about the evidence about -- you've now heard about the garage -- driving through the garage wall incident. You've heard about the nanny going down the stairs incident. You've heard about the argument with Mr. Seyoum's mother incident. You've heard about the hospital incident. These were the incidents that Mr. Seyoum was coming to me and saying had Mr. Salvado put this evidence in, then I would have won the case.

And I remember telling Mr. Seyoum early on, well, I have a few issues with that. Number one, we'd have to try the case all over again with those witnesses and with that evidence because it's called a case within a case. A legal malpractice -- in order to prove causation, you do what's known as a case within the case. In other words, you then go and do the trial with the evidence that was not presented the first time to see whether or not that would have convinced a jury or a judge that there was no basis for a protective order. And I said, you know, one never knows with a jury. We folks like to think we know what you all are thinking, but we really don't. It's very unpredictable. So that's number one.

Number two, I told you I had fairly limited

experience with protective orders, but I have handled a couple of protective orders. And what I knew about protective orders from my own experience is that judges tend to err on the side of issuing protective orders rather than not issuing protective orders. Why? Because they're afraid that somebody might get hurt, and if they don't issue a protective order, they might get blamed for the fact that somebody got hurt. So judges tend to have -- excuse me, I'm sorry. I don't mean to presume that I know what Judge Rubin here is thinking, but --

THE COURT: You just shared what you did and why you did it. I have no feelings. Don't worry about it.

A Well, my experience is that judges would rather err on the side of issuing a protective order because they don't want to be in a situation where three days later, there's a Washington Post article saying this guy just beat his wife up. You know?

BY MR. SIMS:

Q Right.

A If there's a protective order, then the judge can say, well, I did what I could to make sure that that didn't happen. And you know, I have to say that I have some concerns about that, and I expressed that to Mr. Seyoum, that that, you know -- it's certainly understandable why a judge would feel that way, but it doesn't really take into account the consequences for the person who's on the receiving end of the

protective order because it can have serious consequences for the person who has the order issued against them.

Q    Okay.  So I'm not going to go through, but if you look through your notes, we don't -- blow it up if you want, but there are three pages.  In this discussion you had with Mr. Seyoum, are there references by Mr. Seyoum in his conversation with you about the -- and I'll call it the incidents that we've heard so much about.  What were the points --

A    Sure.

Q    -- that he was raising with you?

A    Well, I'll just sort of go down the page here on each one.  Seyoum told Salvado about -- I wrote down the word -- the -- the letter W's.  That usually stands for "wife".  Here it's not a wife; it's the mother of his child.  But that's my shorthand for the complaining witness essentially.

Prior trial, Ms. Redae cruelly lied about her first husband, forced an abortion, et cetera.  Asked Mr. Salvado to use the transcript from the first trial which would show that Ms. Redae had lied.  Sylvia knew the whole story.  2015 incident, drove car through garage door when upset.  Testified to incidents with Mr. Stein.  Also issue of assault on nanny.  Incident at children's hospital.  Called 911 for false alarm.  Meningitis.  Discussed this case with Stein.  He supports malpractice.

Later on, defendant Salvado didn't call Sylvia or the

ex-husband, that would be Mr. Girmay, but did call his brother, who had nothing relevant.

Q    Okay.  So that gives a basic gist of what -- I'm going to move this along.  Now, you later talked to him on October 21.  Let me show you the notes of Defendant's Exhibit 20.

And these are your notes of your conversation with Mr. Seyoum at 4:45 to 5:00 p.m.; is that right?

A    Yes, followed right after by notes of a conversation with Sylvia Adams --

Q    Okay.

A    -- from 5:05 to 6:25.

MR. SIMS:  I'd move to admit Defendant's Exhibit 20.

THE COURT:  Any objection?

MR. SEYOUM:  No.

THE COURT:  Received.

(The document marked for identification as Defendant's Exhibit No. 20 was received in evidence.)

MR. SIMS:  All right.

BY MR. SIMS:

Q    Yesterday, you were asked by Mr. Seyoum about having permission to talk to Mr. Stein.  And these notes reveal that when you spoke to Mr. Seyoum on October 21, he authorized you

to speak to Mr. Stein; did he not?

A    My notes specifically say phone call client, spoke to Stein, he will speak to me.

Q    Okay.  So did you understand him to authorize you to speak to his lawyer, Mr. Stein?

A    Not only did he authorize it, but he wanted me to talk to Mr. Stein.

Q    Okay.  At that point in time, what role did you know Mr. Stein was playing in?

A    After the protective order was lost, he took over the domestic relations litigation involving the custody of the child, and he handled a joint custody hearing in front of a judge, I believe, by the name of Cho, C-H-O.

Q    Okay.  And then a little bit further down in those notes, there's notes that you had -- of a conversation you had with Ms. Adams; is that correct?

A    Yes, for an hour and 20 minutes.

Q    Okay.  And just briefly, what do you recall discussing with her?

A    Can I go through my notes?  I --

Q    Well --

A    -- I -- I mean, if -- if you want the really short version, I don't need to look at my notes, but --

Q    Yes, just give us the short version.

A    The short version is, Ms. Adams, did Mr. Salvado ever

contact you? What did you have to say? And what would you have said if you had testified? I wanted to know that.

Q Okay. And then subsequently on October 22nd, 2020, you did speak to Mr. Stein; did you not?

A Yes, but that's not these notes.

Q Okay. Let's -- Defendant's Exhibit 21.

A So the answer to your question is yes, October 22nd, I spoke to Mr. Stein from 4:35 to 5:05.

MR. SIMS: All right. I'd move to admit Defendant's Exhibit 21.

THE COURT: Any objection, sir?

MR. SEYOUM: No.

THE COURT: Thank you. Received.

(The document marked for identification as Defendant's Exhibit No. 21 was received in evidence.)

MR. SIMS: All right.

BY MR. SIMS:

Q Let's highlight about a third of the way down, the top third. All right. Hard to see there, but there's the word -- about three lines down, it starts with the word "difficult".

A Yes.

Q What did he indicate to you when you spoke to Mr.

Stein?

A   Going to the previous sentence, difficult client to direct or -- and advise, has his own game plan, Sylvia's advice was correct.

Q   Okay.  And then what else did he say -- we'll go down a little bit further -- in the conversation with you?

A   Mr. Seyoum wanted Ms. Redae's ex-husband to be -- have -- have been called at the protective order hearing --

Q   Okay.  Let me stop you on that.  That ex-husband, what was his name?

A   I think that was Mr. Girmay.

Q   Okay.  Mr. Girmay.  That's the person you ended up speaking to later on that Mr. Seyoum asked you to subpoena, correct?

A   Yes.

Q   Okay.  So Mr. Stein had told you that he -- again, Mr. Seyoum wanted him to -- Girmay to testify at the custody hearing, and Mr. Stein had declined to do that?

A   What I wrote is that Mr. Stein had the ex-husband at court presumably through a subpoena, like I did, and he did not testify.

Q   All right.  And then what else did he say to you?  We'll go down to the last bottom third.

A   So you want me to skip about -- the next line about the ex-husband at court?

Q    Well, you --

A    It's got a number.

Q    You had already testified that.

A    Well, I'm not sure I did.

Q    Okay.  Go ahead then.

A    He told me that Mr. Seyoum owed $57,000 to Stein Sperling for a legal fee --

MR. SEYOUM:  Objection.

THE COURT:  Sustained.

A    That Mr. Stein refused to take on the malpractice case and told Mr. Seyoum that he needed to get an expert.  Not a coachable client, can be a hothead.  If I need experts, can come up with recommendation.  Sylvia not that strong a witness. House of Blues attorney -- I think she had done some work for the House of Blues.  Dealing with the protective order, (unintelligible 2:10:19) increase -- I think you obliterated a word with a -- an evidence sticker here.

BY MR. SIMS:

Q    Okay.

A    I think -- what -- what -- what I remember, I was trying to ask Mr. Stein so, because you had this protective order you had to deal with, how much did that, if at all --

MR. SEYOUM:  Objection.

A    -- increase your legal fee?

THE COURT:  What is your objection?

MR. SEYOUM: Hearsay.

THE COURT: Overruled.

Go ahead.

A    I was asking him to quantify -- I knew that we had this issue of damages right from the beginning. In fact, you can see in the very first paragraph at -- up top, it says can't speak to damages, doesn't know what happened to his business. But one of the damages I was looking at is whether or not Mr. Stein's fee had gone up as a result of having to deal with the -- the problem of the protective order, and he said he couldn't say that dealing with the protective order -- he said dealing with protective order didn't increase, and the word is obliterated, but I think he meant the -- the word is "fee".

Q    Okay. All right. Now, after the conversations with Mr. Stein and Ms. Adams --

THE COURT: Ladies and gentlemen, I'm going to allow that last piece of testimony, not for the truth of what Mr. Stein said, but simply to explain what this witness did, why he did it, and what, if any, information acted on, not that what the speaker said was or wasn't true. That, you can't use it for, but you can use it if you find it to be important to explain why this witness did what he did.

MR. SIMS: Okay. Thank you, Your Honor.

BY MR. SIMS:

Q    Then after having this conversation, what further

investigation did you do in determining potential viability of the malpractice claim against Mr. Salvado?

A    Well, I know I read the transcripts of the protective order hearing, which is a relatively short transcript. It was about a two- or three-hour hearing. I had also read the transcript of the custody hearing, which was a several-day hearing. And I also read a number of the different legal pleadings that had been filed in connection with both those matters.

Q    And then did you ultimately conclude that there was a viable claim?

A    Yes. As I told Mr. Seyoum very consistently, I thought it was a viable claim. I thought that there was a theory of the case that we could advocate that Mr. Salvado had failed to do some things that needed to be done. But I also told him that I did not think that it was a clear winner of the case. And in fact, that came up in the context of would I handle this case on a contingency fee.

Q    And why would you not handle it on a contingency fee?

A    Because I've been burned too many times.

Q    Okay.

A    Contingency fees mean the lawyer --

MR. SEYOUM:  Objection.

THE COURT:  What is the object --

MR. SEYOUM:  He was not asked a question, and he's

editorializing.

BY MR. SIMS:

Q What are contingency fees?

THE COURT: Overruled.

You may answer.

A When we -- lawyer takes a case on a contingency fee, the lawyer is taking a gamble. Contingency fee simply means a percentage of whatever you win. So if had won a million dollars for Mr. Seyoum, and I was taking the typical one-third contingency, my fee would be $333,000, which is a nice fee. The problem is I need to be confident that I'm going to be able to win that, and I was not confident that I was going to be able to win that.

So I told Mr. Seyoum very clearly, this is not a contingency fee type of case. If you want me to pursue it, you're going to have to pay me by the hour. It's going to be very expensive. I'm going to try the best I can to see if I can get you a settlement early on. It will not cost you a lot of money, and that's why we set up the meeting with Mr. Mulquin and Mr. Salvado.

Q Okay. Let me show you what we've previously marked as Defendant's Exhibit 25.

THE COURT: Oh, folks, I apologize. I going to take a brief recess now. You can either take a recess with me or wait where you are. I'm only going to be about four minutes or

eScribers
www.escribers.net | 800-257-0885

three minutes. I'll leave it entirely up to you. If you want to stretch your legs, get a drink of water. Just got to return a quick message to somebody. I'll leave it to you. Do you want to stay where you are? I'll be right back.

THE CLERK: All rise.

(Recess)

THE COURT: Apologies for the delay. I am so sorry. Please continue.

MR. SIMS: Mr. Hoge had to go to the bathroom.

THE COURT: Okay.

MR. SIMS: He just ran real quick. He'll be right back.

THE COURT: All right. Well, no -- well, that's life. No problem.

THE WITNESS: Excuse me, Your Honor.

THE COURT: No problem. It's life. Thank you.

Please continue.

BY MR. SIMS:

Q So Mr. Hoge, I have in front you, we've marked as Defendant's Exhibit 25, is a chain of emails, the last of which is from Mr. -- it's Joe Scott. You recognize Joe Scott as being Mr. Seyoum?

A Yes, that was the name he was using.

Q Okay. So it's the last of which is an email from Mr. Scott to you.

MR. SIMS: And I move to have this admitted, Your Honor.

THE COURT: Any objection, sir?

MR. SEYOUM: No.

THE COURT: Received.

(The document marked for identification as Defendant's Exhibit No. 25 was received in evidence.)

BY MR. SIMS:

Q I just want to draw your attention real quick to the second page where there's an email dated November 12, 2020. And this is from you to Mr. Seyoum, and in the second paragraph, you state I re-read your long email to Salvado on December 8, three days before the hearing. Do you see that?

A Yes.

Q All right. Now I want to show you Defendant's Exhibit 8.

Sir, Defendant Exhibit 8 is an email from Mr. Seyoum to you. It's dated February 7th, 2022, and it's forwarding his email to Mr. Salvado of December 8, 2017. You recall this document?

A Yes, it's not in detail, but I recall I got --

Q And this is the document you're referring to in the prior email that you had read, the long email that he had

written to Mr. Salvado on December 8th.  You see that?

A    Yes.

MR. SIMS:  Okay.  I'd move to admit Defendant's Exhibit 8.

THE COURT:  Any objection?

MR. SEYOUM:  No.

THE COURT:  Received.

(The document marked for identification as Defendant's Exhibit No. 8 was received in evidence.)

BY MR. SIMS:

Q    All right.  This email -- the December 8 email to Mr. Salvado is an email where Mr. Seyoum is raising the major points that ultimately you raised at trial, correct?

A    Yes.

Q    All right.  If you look at the first page of this Defendant's Exhibit 8, under number 4 -- and I'm going just -- for clarity, you recognize that the blacked-out portions of this email were references to Mr. Seyoum's son's name?

A    Correct.

Q    Okay.  And you did that -- we've done that for privacy purposes only?

A    Yes.

Q    Okay.  So here in number 4, what he's talking about

is his consultation with Sylvia Adams, that he thought that that should have been presented at the protective order hearing, correct?

A    Yes.

Q    All right. And if you turn the page over, we've now got the incidents, right? So number 1, that's the allegation that Ms. Redae pushed the nanny down the stairs. Do you see that?

A    Yes. That allegation actually changed later on, but yes.

Q    Right. And then number 2 is the allegation that Ms. Redae made up the fact that her son had a seizure?

A    Essentially, it was a false alarm is what he was claiming.

Q    False alarm. And then number 3, could you blow that up? That's the garage incident, driving the car into the garage?

A    Yes.

Q    And then number 4, is the vacation incident.

A    The argument with Mr. Seyoum's mother.

Q    Okay. Now, let's go back to Defense Exhibit 25.

A    Yes.

Q    And you see here in the -- actually, it's the third and the fourth paragraphs. Again, Mr. Seyoum is reiterating to you these incidents and his insistence that Mr. Salvado tell

his story --

A     Yes.

Q     -- and use all the missing evidence?

A     Correct.

Q     Okay.

There was a discussion about this.  We'll take a look at Exhibit 24.  Defense Exhibit 24, which is --

A     We're done with these, Mr. Sims?

Q     We're done with that.

THE CLERK:  I'll put these back for you.

A     I'm sorry.  Defense 24?

BY MR. SIMS:

Q     Yes, sir.  Defendant's Exhibit 24.

A     Yes.

Q     Okay.  And you recognize this?  This is the November 12, 2020, letter that you sent to Mr. Salvado putting him on notice of the potential claim?

A     Yes.  This is what I referred to previously as a notice letter.

MR. SIMS:  Right.  I'd move to admit Exhibit 24 -- Defense --

THE COURT:  Any objection, sir?

MR. SEYOUM:  No.

THE COURT:  Received.

(The document marked for

identification as Defendant's Exhibit No. 24 was received in evidence.)

MR. SIMS: All right.

BY MR. SIMS:

Q And what are the main points that you're raising to Mr. Salvado in this letter?

A Well, I think it's in the second paragraph of the letter, right? If I assume that I'm representing Mr. Seyoum in a claim against his law firm or a potential claim against the law firm, and I say briefly the gist of this claim is that you mishandled the December 11th, 2017, hearing on Ms. Redae's request for a permanent protective order and failed to present available evidence that more likely than not would have changed the outcome of that proceeding.

A major error was the failure to call Sylvia Adams, Esquire, as a witness to corroborate that she had advised Mr. Seyoum that he could take his son to Philadelphia for a Thanksgiving holiday event and that he had a legal right to place surveillance cameras in the marital home. This testimony would have provided Mr. Seyoum with a "advice of counsel" defense to two of the major allegations that led to the protective order.

In addition, Mr. Seyoum provided you with a number of other items of evidence that could have been used to discredit

Ms. Redae's testimony but were not utilized by you at the hearing.

Q    All right.  Now, this letter also -- if you turn the page over, you make a request to Mr. Salvado if he would like to discuss this issue and attempt to try to settle the case, right?

A    Yes.

Q    Okay.  And I think you testified earlier that Mr. Salvado did, through retained counsel, Mr. Mulquin, reach out to you?

A    Yes.

Q    All right.  And so then what happened briefly in terms of your discussions with Mr. Mulquin?

A    Well, first of all, Mr. Mulquin and I know each other.  I've had several cases against Mr. Mulquin previously.  So typically, he calls up and says, okay, I got your letter that you addressed to Mr. Salvado.  What's this really all about?  And we would have had a conversation about my understanding of the claim and explaining to him why we were making the claim.

It would have been discussion -- I don't recall all the specifics, but I do know that there was a discussion of is there some way we can get this resolved without having to go to court.  And that's when I came up with the idea of having a -- what they call an off-the-record settlement conference with Mr.

Mulquin and Mr. Salvado. There is a particular rule -- it's a federal rule that is also applicable in the state court called 408 that allows people to have settlement conferences so they can discuss candidly about the case, see if they can resolve it without having statements being made, you know, and used in -- in a trial subsequently.

And so we arranged to have this two-hour conference call that I discussed with Mr. Seyoum earlier where it was a Zoom call. Mr. Seyoum essentially had the opportunity for two hours to explain to Mr. Mulquin and to Mr. Salvado why he was upset about what had happened, and what he felt that Mr. Salvado had failed to do.

Q    Okay. so before we get to that, had you had -- in this early 2021 time period, had you had discussions with Mr. Seyoum regarding -- about settlement -- a framework for settlement of the case?

A    Well, I explained to him that we had to, first of all, convince the other side, namely -- really Mr. Mulquin, that there was a viable claim here. To -- there's something that, you know, he should be concerned about if I were to actually file a lawsuit against Mr. Salvado.

And then we talked about the fact that when you have such discussions, you always need to start out with a demand. Insurance companies and defendants in these situations are not in the habit of simply offering you money just because you say,

hey, I think you did something wrong.  The conversation always goes, all right, Chris, I understand what it is you're saying Mr. Salvado did wrong.  What are you asking for?  How much we looking at?  And that's when I would have gone to Mr. Seyoum and said, Mr. Seyoum, we got to come up with a demand amount because I can't get the conversation going if I don't have that.

Q   Okay.  Let me show you what we marked as Defendant's Exhibit 31.  This is a chain of emails, the last of which is from you to Mr. Seyoum, dated April 6th, 2021.  You recognize this email chain?

A   So -- well, yes.  I'm not sure which one you're asking me to look at first.

Q   I just -- right now, you recognize this email exchange?

A   Yes, I do.

MR. SIMS:  Okay.  I'd move to admit this into evidence.

THE COURT:  Any objection?

MR. SEYOUM:  No.

THE COURT:  Received.

(The document marked for identification as Defendant's Exhibit No. 31 was received in evidence.)

MR. SIMS: All right.

BY MR. SIMS:

Q So if you -- I'll tell you where I want to draw your attention to is at the bottom of the first page, Bates 186. There's an email from Mr. Seyoum to you dated March 26th; do you see that?

A Yes.

Q And if you flip the page over, we'll go to that. At the very top, Mr. Seyoum writes to you about a realistic settlement demand, and he says, please indulge me for a few minutes to express my thoughts and rationality. Do you see that?

A I do.

Q And I'm not going to show the whole jury, but how many pages is this email from Mr. Seyoum to you as he explains his settlement position?

A Ten pages.

Q Okay. And if you go down about the third paragraph, it says, I thank you for listening.

A Third -- third paragraph of the first --

Q On the -- and that's going back to that page we were on regarding the realistic.

A Yes.

Q All right. He says, I thank you for listening, for taking my case, and for managing my expectations to the best of



your ability based on the law, precedence, your professional and personal experiences. What did you understand -- what was he talking about in terms of managing his expectations? What had you done?

A What I do with every client, and I certainly do with Mr. Seyoum, which is a -- you know, these are difficult cases. They're expensive cases. There's no guarantee you're going to win. There's certainly a good chance you could lose. You could spend a whole lot of money. And I have concerns about our ability to get you a successful result.

Q Okay. And then if you go down three more -- actually, two more paragraphs, it's the one that says, it is not lost on me. You see that paragraph?

A It is also not lost on me that the "legal malpractice statute/laws" for compensatory damages and evidentiary procedures favor the defendants who are "lawyers".

Q And then he says at the very end -- what does he say at the very end of that paragraph?

A I now understand why you poured so much cold water on my case/claim. I get it.

Q Okay. And notwithstanding that statement to you and following the sit-down -- I guess the Zoom meeting that you had with Mr. Seyoum, Mr. Mulquin, and Mr. Salvado, that settlement discussion, what settlement demand did Mr. Seyoum make in that case?

A     I'd said yesterday that I thought it was a million, but I think I just saw a note more recently that it was -- it was $2,000,000.

Q     Okay.

A     Although, I'm not sure which one I actually transmitted to Mr. Mulquin.  I -- I -- I know that I tried to talk Mr. Seyoum down significantly from what he was asking for as just being not realistic.  I do not -- what I do recall is Mr. Mulquin sending me a very terse email after I made whatever the demand was, saying in light of Mr. Seyoum's demand, we offer you nothing.

Q     Okay.  So let me do this.  Let me show you what we've marked as Defendant's Exhibit 34.

You recognize these as notes of a call you had with Mr. Seyoum for about almost an hour on May 11, 2021?

A     Yes.  From 4:30 to 5:20.

MR. SIMS:  All right.  I'd move to have this admitted.

THE COURT:  Any objection?

MR. SEYOUM:  No.

THE COURT:  Received.

(The document marked for identification as Defendant's Exhibit No. 34 was received in evidence.)

MR. SIMS: All right.

BY MR. SIMS:

Q    And in these notes, you reflect no way you'll get an offer -- or get over $500,000?

A    Yes.

Q    And what was Mr. Seyoum talking about in terms of a settlement demand at that point in time?

A    I wrote down wants to ask for two million, something between one and $2,000,000.

Q    Okay.

Let me show you what's -- we've marked as Defendant's Exhibit 36, which is an email from yourself to Mr. Seyoum, dated May 12th, 2021.  You recognize this as your email to him?

A    Yes.

Q    Okay.  And this email involves settlement, correct?

A    Yes.

MR. SIMS: All right.  I'm -- move to admit Defendant's Exhibit 36.

THE COURT: Any objection?

MR. SEYOUM: No.

THE COURT: Received.

(The document marked for identification as Defendant's Exhibit No. 36 was received in evidence.)

MR. SIMS: Okay.

BY MR. SIMS:

Q    I want to highlight at the very -- okay.  On that second to last paragraph that starts "on another note".  What I really want to focus on is the very end of that.

So you had indicated earlier, I think, in testimony with Mr. Seyoum that as this settlement -- right after this -- at this time period, you had indicated to him, in order to go forward with the case, he would need to make a $10,000 payment to continue work -- for you to continue working on the case?

A    Yes.

Q    Okay.  And this is your email communicating that to him, correct?

A    Yes.

Q    And he did make that payment of $10,000?

A    I think so, yes.

Q    Okay.  And then you also indicated in this email to him what you thought it might cost --

A    Yes.

Q    -- if the case went to trial?

A    Yes.

Q    All right.  Now, ultimately, the case ended up costing a whole lot more than $100,000; did it not?

A    Well, what I estimated was a total fees of 100,000, plus the cost of an expert witness, deposition, and filing

fees. Expert witnesses, you've heard about $14,000 to Mr. Rumer. Depositions, I think we took about 8 or 10 depositions. The deposition, you got to pay the court reporter typically a thousand, $2,000 or more. In fact, with Mr. Seyoum, Mr. Seyoum always insisted on depositions being videotaped, which increased the cost of the depositions by a significant amount.

Q   Let me ask you on that one. Did you advise him not to take the videotape deposition?

A   Both orally and in writing, I told him I thought it was a waste of money.

Q   Were videotaped depositions used at the Salvado trial?

A   No.

Q   So the transcript itself -- was the transcripts themselves used?

A   Yes. Of course.

Q   Okay.

A   But -- but to answer your question, just to go back, did it go over $100,000? Yes, it did. This is a before-filing-suit estimate. Estimates are extremely difficult to do because you don't know a lot of things. You don't know how hard the other side's going to fight. You don't know how many different things might come up. You don't know how Mr. Seyoum is going to demand a huge amount of time, which he absolutely did.

Q    Okay.  And then in the last paragraph there, you indicate to him that you don't believe a demand over $500,000 will be -- well, actually, that it will result in no response or a de minimis response.

A    Well, what I said exactly is, I believe the amount you were thinking of demanding, 1.5 million, is unrealistic and will quickly result in a breakdown on negotiations.  I frankly believe that any demand over 500,000 would likely have the same result.  I say this based on over 35 years of handling these kinds of cases.

Q    Okay.  I'm going to show what we've marked as Defendant's Exhibit 37.

All right.  This is a chain of emails from your -- last of which is from yourself to Mr. Seyoum on May 17, 2021.  You recognize this document?

A    Yes.

MR. SIMS:  Okay.  I'm going to move to admit Defendant's Exhibit 37.

THE COURT:  Any objection?

MR. SEYOUM:  No.

THE COURT:  Received.

(The document marked for identification as Defendant's Exhibit No. 37 was received in evidence.)

MR. SIMS: All right.

BY MR. SIMS:

Q    Now, at the bottom email, bottom -- which is the May 16 email from Mr. Seyoum to you, Mr. Seyoum says thank you for all the frank discussions and emails. You see that?

A    Yes.

Q    And if you scroll through this email, he's providing you, is he not, with his explanation as to why he thinks that the settlement offer that he wants to make should be a million dollars?

A    Yes. To boil it down, he believed that he could persuade Mr. Mulquin that a million dollars was a reasonable amount.

Q    Okay. So he was the one who was making the decision on what amount of a settlement offer to make, notwithstanding your advice to the contrary?

A    Always, and so was the client decision.

Q    Okay. And so in the top email that was your response to him on May 17, is you state that you will communicate the one-million-dollar demand, and then you go on -- maybe you should read that paragraph that you --

A    I'm sorry. Which one?

Q    Yes, so it's the third paragraph --

A    "I will communicate"?

Q    Yes, "I will communicate".

A    Okay.  I will communicate a one-million-dollar demand to Mulquin tomorrow and I will make the best argument I can to justify it.  Please understand that just because I am brutally realistic with you about this case, that does not mean I communicate the same things to Mr. Mulquin.  I will, of course, come up with every persuasive tactic I can to get him to make you the best possible offer.  However, just between you and me, I believe his response may be to not make an offer at all or to make a "lowball" offer.  In that event, you need to be prepared to get me the $10,000 we discussed so I can file your lawsuit by May 26th.

Q    Okay.  And then I want to show you Defense Exhibit 38.

MR. SIMS:  And the only thing I'm -- well, this is another email chain that I'd move to have admitted.

THE COURT:  Any --

MR. SEYOUM:  No.

THE COURT:  Okay.

(The document marked for identification as Defendant's Exhibit No. 38 was received in evidence.)

MR. SEYOUM:  Sorry.

BY MR. SIMS:

Q    So I just want to focus your -- first in the email

chain is an email from Mr. Mulquin to you, dated May 20.

A    Yes.

Q    And you see that?  It's the last email.

MR. SIMS:  Yes, last page, thanks.

BY MR. SIMS:

Q    And what does he say to you?

A    Chris, in response to your client's one-million-dollar demand, there is no settlement offer.

Q    Okay.  And so then what did that -- what position did that leave you in at this stage?

A    We either had to bail, give it up, or proceed with the lawsuit.

Q    All right.  And if you take a look at Defendant's Exhibit 39, these are your notes of your conversation with Mr. Seyoum following receipt of that email on 5/24/21, correct?

A    Yes.

Q    Okay.

A    It's a little hard even for me to read because the copy is bad, but I can read most of it.

MR. SIMS:  I'll move to admit Defendant's Exhibit 39.

THE COURT:  Any objection, sir?

MR. SEYOUM:  Go ahead.

THE COURT:  Received.

(The document marked for identification as Defendant's

Exhibit No. 39 was received in evidence.)

MR. SIMS: All right.

BY MR. SIMS:

Q And again, in this conversation with you from Mr. Seyoum, he's focused on the missing evidence that he thought should have been submitted at the trial of the protective order?

A Yes. Not calling Sylvia. Talking about car crash. Hospitalization. Summer vacation. Prior -- prior divorce.

Q It's at the very top. You see that missing evidence? Okay. Now, prior to filing the complaint with Mr. Seyoum, you shared with him a copy of the complaint, right?

A I always send drafts to my clients so they can read them and comment on them.

Q Okay. And let me -- one of the issues -- and I'm going to skip a document here and try to move -- but one of the issues that Mr. Seyoum raised with you that he wanted in the complaint was this issue with Ms. Redae and their child's seizure within about five months of his birth, right?

A Yes.

Q That was one of the -- and did you raise an issue or concern about that -- making that one of the elements of the case?

A Yes. I didn't think that would have really been very

helpful to him because I thought that if that testimony had come out at the protective order hearing, the judge may well have said, well, you know, you had a very young child, you had a very concerned mother, and it was a natural thing for a mother to want to get immediate medical attention when she thought that the child might be having a seizure.

Q    Okay.

A    I thought it might make her more sympathetic, not less sympathetic.

Q    Now, let me show you Defendant's Exhibit 42.

And this is a chain of email, the last of which is from you to Mr. Seyoum, dated May 26, and it has attached the complaint that was filed against Mr. Salvado.  You recognize this?

A    Yes.

MR. SIMS:  All right.  I move to admit Exhibit 42.

MR. SEYOUM:  Okay.

THE COURT:  Received.

(The Email chain marked for identification as Defendant's Exhibit No. 42 was received in evidence.)

BY MR. SIMS:

Q    I want to focus on the complaint that was filed.  And again, if we go to paragraph 14 of the complaint, which is on

page 4 of the attachment.  Do you see that?

A    The -- the complaint being an attachment --

Q    Yes, sir.

A    -- to Exhibit 42?

Q    Yes.

A    I'm there.

Q    All right.  Now, paragraph 14 --

MR. SEYOUM:  I'm sorry.  Where are we?

THE COURT:  I'm sorry, sir?

MR. SEYOUM:  42?

MR. SIMS:  Yes.

THE COURT:  Sir, if you need to, you can direct it to me.  Can I help you with something?

MR. SEYOUM:  I just want to know where we were.

THE COURT:  Very good.  Please -- paragraph 14.  Thank you, sir.

MR. SEYOUM:  Which exhibit?

MR. SIMS:  42.

MR. SEYOUM:  Okay.

Okay.

MR. SIMS:  You there?

MR. SEYOUM:  Yes.  Thank you.  Thank you.

BY MR. SIMS:

Q    So paragraph 42 [sic] lays out the various incidents that Mr. Seyoum should have thought should have been presented

at the protective order hearing, right?

A     Paragraph 14.

Q     And that goes through A through F, right?

A     Yes.

Q     And in part of that, you went ahead and included the evidence or the incident regarding Ms. Redae supposedly falsely claiming that the son had suffered a seizure.  You see that?

A     I did.

Q     All right.  I want to kind of go through that because let me -- after you filed a complaint, can you just tell briefly to the jury what happens in the case of a lawsuit once a complaint is filed?

A     All right.  Well, again, there's maybe a short answer and a long answer to that.

Q     Yes, just give us the short about the discovery process.

A     Sure.  Basically, filing a lawsuit, a complaint, starts you down on a path that's about a year and a half to two years up to getting to trial.  During that year and a half to two years, I usually liken it to a sort of a conveyer belt going through the system.  There are different operations that need to be done on a conveyor belt.  So the initial operation, typically there's a -- a -- an initial motion to dismiss saying that the complaint is flawed in some way or there's some reason why the case should not go any further.  And there was such a

motion to dismiss. We had to oppose the motion. We survived that. We won.

Then you move into the discovery process. That's a very time consuming and onerous process. It involves interrogatories. Those are written questions that each side can ask the other side, and the answers have to be given in writing under oath. Document requests, that's usually something that's extremely time consuming. Each side has the right, basically, to ask, you know, they're -- to see all these documents on these various tables, to produce all the documents that are relevant for litigation.

Then you have depositions. That's also part of the discovery process where you actually take testimony from the witnesses, from the parties, from the fact witnesses, from the expert witnesses prior to the trial with a private court reporter, who charges you for the transcript. That whole discovery process typically takes four to six months or more just to get through that process.

Once you get through the end of the discovery process, typically there are more motions that are filed. Typically a motion for summary judgment, which was also filed in this case, basically saying, okay, Judge, we have now done all the discovery. We've got all the facts out. We've got all the documents. We've got all the deposition testimony. And we look at it, it doesn't make a case. It's not a viable case.

It should be thrown out. Mr. Mulquin filed a summary judgment motion. He opposed the summary judgment motion. We won that. We got the right to go to trial.

Then you go through a process called the pre-trial process where you work out the logistics with the judge of the trial. You set a date for the trial. You talk about how long the trial is going to be. How many witnesses there are going to be. You submit proposed jury instructions, proposed voir dire questions, a whole lot of material that needs to be submitted in advance of the pre-trial hearing.

Then ultimately -- oh, you also have court-ordered mediation. Although, I have to say, I was trying to remember if there was court-ordered mediation in this case and I do not remember there being one. But normally, there is a court-ordered mediation.

And then once you get through all of that, then you have the trial. And as I said, that entire process that I just laid out for you in shorthand typically takes about a year and a half to two years.

Q     Okay. So initially, when a lawyer's filing a complaint, it's true, is it not, that the lawyer just simply needs a good faith basis to make a factual allegation?

A     That's correct.

Q     Okay. And then through that discovery process, the lawyer then learns how the facts are really coming out, right,

in terms of what the witnesses are saying in a deposition and what the documents show, correct?

A    Absolutely.  It's a learning process.

Q    So ultimately, the case that a lawyer may think he or she has at the beginning is different than the case he or she may see that the evidence will support going into trial?

A    Many things can change, and -- and new facts regularly come to light even up to the day of trial.

MR. SEYOUM:  Objection.

THE COURT:  Basis?

MR. SEYOUM:  He was not asked a question.

MR. SIMS:  No, I think he was answering that.

THE COURT:  Overruled.

MR. SIMS:  Yes.

THE COURT:  Go ahead, sir.  You may finish your answer.

THE WITNESS:  I think I did.

MR. SIMS:  I think he did.

THE COURT:  All right.  Very good.

MR. SIMS:  I think he did.

THE COURT:  Please continue.

BY MR. SIMS:

Q    Okay.  So at this stage of the proceedings, when you're making these claims in here about the missing evidence, you're relying primarily on what Mr. Seyoum has told you?

A    Yes, in my --

Q    Okay.

A    -- own sense that at least some of what he was saying should have been included.  It made sense to me that that should have been included.

Q    And Mr. Seyoum had looked at these allegations and approved them before they were made in this complaint, correct?

A    Yes.

Q    All right.

A    And -- and there were things that I didn't know about the allegations, for example, about the garage incident --

Q    All right.

A    -- which we'll get into later on if you want.

Q    All right.  Well, let's take a look at 14-A.

A    About the throwing the nanny down a flight of stairs?

Q    Yes.  The allegation here is that shortly after the birth of A.S., Ms. Redae had thrown his nanny down a flight of stairs.  Ultimately, did the evidence support that claim?

A    Mr. Seyoum changed -- that's what Mr. Seyoum told me that was reflected in an email that Mr. Seyoum -- I think we went over it before, Mr. Seyoum used those words that he had thrown the nanny down the stairs.  He'd later tell me that that was incorrect, and in fact, what had happened was that Ms. Redae had asked the nanny to help carry a piece of heavy equipment, like a washing machine or something, down the

stairs, and she had fallen by accident --

Q And in fact --

A -- that it was not being thrown down.

Q And in fact, the evidence came out that he wasn't even there when it happened, correct?

A That's correct.

Q Okay. Now, the second allegation in here is that Ms. Redae intentionally drove the family car in a fit of anger through the back of their garage and into the family home. Did the evidence in discovery ultimately support the allegation that she had intentionally done that act?

A No, because Mr. Seyoum put in a claim to his insurance company for the damage to the house claiming that it'd been an accident.

Q Okay. And then C is the allegation that while on a family beach vacation, Ms. Redae intentionally locked plaintiff, the child, and the plaintiff's mother out of the hotel room. Was that allegation supported in the discovery process?

A Well, it was supported by Mr. Seyoum's testimony, but Ms. Redae testified that locking them out of the room was not intentional. It was an accident.

Q Okay. And then with respect to D, the evidence that Ms. Redae had falsely claimed that A.S. had suffered a seizure, was there any evidence uncovered through the discovery process

to indicate that Ms. Redae was falsely claiming the seizure?

A    No, we got the hospital records and there was no indication like that.

Q    All right.  And then with respect to the evidence during her divorce trial with her previous husband, Mr. Girmay, was there any evidence that she had lied about Ms. [sic] Girmay having kidnapped her?

A    No.  That was the whole point of Mr. Seyoum asking me to subpoena Mr. Girmay.  Mr. Seyoum had this belief that if I subpoenaed Mr. Girmay to the trial that Mr. Girmay would come in and say, oh, I lied about that.  Of course, I spoke to Mr. Girmay, and he was not going to say anything to the sort.

Q    Okay.  Now, with respect to the fifth allegation, you did offer into evidence at the trial his cell phone logs; did you not?

A    I did.

Q    Okay.

I'm not going to get into all of the discovery process with the trial.  Keep it moving along here.  But there was discussion with you or testimony by you regarding Mr. Rumer.  So give me a little --

A    I'm sorry -- I'm sorry.

Q    Mr. Rumer, the expert.

A    Mr. Rumer, Yes.

Q    Okay.  Give me a little background on that.  How was

it that you chose Mr. Rumer to provide expert testimony in this case?

A     Well, I knew I needed an expert.  In any legal malpractice case and any medical, professional malpractice case of any sort, when you're claiming that a professional person, like a lawyer, has failed to do something or made a mistake, you are required by law to have an expert to come in and say what the mistake was, and why that would have changed the outcome if that mistake had not been made.

So I knew I needed an expert, and I looked around, and I'd actually known Mr. Rumer.  Mr. Rumer and I had worked together on some other cases.  And so I contacted Mr. Rumer and asked him if he was willing to take a look at it.  I asked him how experienced he was specifically with protective order cases.  I didn't actually know this but turns out that he was doing a whole lot of them.  I think he said 10 of them a year, and I don't think there are many people who do more than that. So he said he's happy to take a look at it.

Q     Okay.  And you were shown his expert report.  I don't think it was admitted into evidence.  That's Defendant's Exhibit 69, his amended opinion --

A     Yes.

Q     -- and report.

MR. SIMS:  I'd move to have Defendant's Exhibit 69 admitted into evidence.

THE COURT: Any objection, sir?

MR. SEYOUM: No, sir.

THE COURT: Thank you. Received.

(The Amended expert opinion marked for identification as Defendant's Exhibit No. 69 was received in evidence.)

BY MR. SIMS:

Q Now, explain to the jury a little bit about this. You get an expert report, okay? Do you utilize all the information that the expert has within a report?

A I'm not sure you can generalize like that, Mr. Sims. Sometimes, yes. Sometimes, no. It depends on how germane what the expert has said as to what your theory on the case is.

Q Okay. So what I want to get into, in this process where you're moving through the discovery phase and getting into the (unintelligible 2:55:55) stage, do lawyers have to use their professional judgment to make kind of tactical decisions on what to use, what to present as evidence at trial?

A All the time.

Q Okay. And in determining how to utilize Mr. Rumer's expert report, did you utilize your professional judgment to determine what you wanted to offer at trial that would best advance Mr. Seyoum's claim against Mr. Salvado?

A Yes. And not to be too technical about it, Mr. Sims,

you don't actually use the report itself.

Q I understand.

A You actually have the witness testify.

Q Right.

A The report itself is not admissible into evidence, but yes, I have to exercise professional judgment as to what I think is useful and will essentially advance the ball.

Q Okay. So what I'm trying to get to is in terms of what an expert may have put into an expert report, that's only the starting point for what the lawyer may decide to utilize through the expert and is offering the testimony at trial, correct?

A Sure. Yes.

Q Okay. Now, in the conduct of the pre-trial preparation, I think you'd indicated various people's testimony were taken by deposition --

A Yes.

Q -- right? And just -- jury probably knows this, but what is a deposition?

A So as I said, it's -- it's taking testimony typically in a lawyer's office or a court reporter's conference room prior to the trial. You want to know what, for example, Mr. Salvado's going to say. So I have the right to demand that Mr. Salvado appear for a deposition prior to the trial, and I get to ask him all kinds of questions about what he did, what he

didn't do, and why and why not. So I did that.

I wanted to know what his expert, Mr. Murphy, was going to say. So I took Mr. Murphy's deposition. I wanted to know -- I don't remember -- I think most of the depositions were taken by Mr. Mulquin because we were the ones who identified most of the witnesses. For example, we had Mr. Stein. He was deposed. We had the investor, Mr. --

Q    Mr. Gordon.

A    -- Mr. Jonathan Gordon, take his testimony. There was Ms. Safiya (phonetic sp.), who was a real estate agent type person, who was a colleague of Mr. Seyoum's. There was Ms. Adams. Mulquin takes -- took Mr. -- Ms. Adams's testimony. So I think most of the depositions were actually taken by Mr. Mulquin, but of course I had to be there.

Q    Right. So Mr. Seyoum's deposition and Ms. Sarris' deposition?

A    Right. And of course, when -- and Michele Sarris, who was a social worker who was involved in the custody case, that's right. And -- and when you're defending a deposition, for example, it's your witness, let's say Mr. Seyoum or Mr. Rumer, who's being deposed, you need to sit down with the witness prior to the deposition to go over what they're going to say.

Q    And you did that, right?

A    Of course I did.

Q   Okay.  Now, you didn't take the deposition of Mr. Girmay, correct?

A   No.  I talked to Mr. Girmay.

Q   Okay.  And you didn't take the deposition of Ms. Redae, right?

A   No, I did not.

Q   And why didn't you take her deposition?

A   I didn't think that I wanted Ms. Redae anywhere close to the courtroom.  I didn't think I wanted Mr. Girmay anywhere close to the courtroom because I thought that their testimony would be very damaging to Mr. Seyoum.

Q   And did you have transcripts of her testimony at the protective order hearing, and at the custody hearing, and her deposition --

A   Yes.

Q   -- that was taken in the custody proceeding?

A   I knew very well what Ms. Redae had said previously, and I assumed she was going to not perjure herself and say something inconsistent under oath.

Q   Okay.  Now, as this case is moving closer toward trial, in March of 2022, did you then again suggest to Mr. Seyoum that he consider making another settlement offer in that case?

A   I think so.  If you show me a document, that'll refresh my recollection.

Q    We'll show you Defendant's Exhibit 46.

A    46?

Q    Yes.

A    Yes.

Q    All right.  Exhibit 46 is an email chain, the last of which is from you to Mr. Seyoum, dated March 15th, 2022.

MR. SIMS:  I'd move to have this admitted into evidence.

THE COURT:  Any objection, sir?

MR. SEYOUM:  No, sir.

THE COURT:  Received.

MR. SIMS:  Okay.

MR. SEYOUM:  What number?

THE COURT:  Thank you.

MR. SIMS:  46.

MR. SEYOUM:  Thank you.

BY MR. SIMS:

Q    Now, interestingly, in this email, you can look down, but Mr. Seyoum is making the accusation that Mr. Salvado had intentionally tried to lose the case?

A    He asked me in an email but Carlos, meaning Carlos Salvado, he helped intentionally or was he just negligent?  A lack of preparedness was intentional as he admitted that I had asked him to be prepared over and over and over again.  I even had all of the evidence he had with -- he -- he needed with me

at the PO trial, and he ignored it, ignored Sylvia's testimony, and yet he chose not to save me. Yes, I think he was accusing Mr. Salvado, as he just did with me earlier, of intentionally throwing him under the bus.

Q Okay. And you told him in your email that you didn't think that was the case, right?

A For what it's worth, this is my response. I don't think Mr. Salvado was trying to intentionally lose your case. I just think he was lazy, and non-caring, and was trying to take shortcuts since he charged such a low fee.

Q Okay. And then you also, again, reiterate what you think the cost of going to trial's going to be, and you make a recommendation that he lower his demand at least 500,000; is that right?

A Yes.

Q And did Mr. Seyoum take your recommendation?

A To take my recommendation for a settlement offer?

Q Yes.

A Yes. I -- I -- I talked about reducing his demand to $500,000, and he did not take that recommendation.

Q Okay. What ultimately did Mr. Seyoum authorize you to convey, if you recall?

A The last number, I actually don't recall, Mr. Sims.

Q Okay.

A If you show me something, it may refresh my

recollection.

Q   Well, take a look at Exhibit 50.  Just the first line there.

MR. SIMS:  I'm not going to introduce this one.  Just --

THE COURT:  How much longer do you have?  Because I know we have other things to get to today.

MR. SIMS:  I've only got -- I've probably got maybe 45 minutes.  40 minutes.

THE COURT:  See if you can tighten that up a little bit.

MR. SIMS:  I thought -- okay.

BY MR. SIMS:

Q   What was the offer?

A   Oh, I -- I see an $800,000 demand that I -- well, except this is an email from myself, talking about Exhibit 50, from myself to Mr. Seyoum, April 13th, 2022, which is roughly three months before the trial.  I spoke to Mulquin and conveyed the reduced $800,000 demand, so that's what obviously Mr. Seyoum authorized me to do.

Q   Okay.  And what was the response to that demand, if you know -- if you recall?

A   He responded rather curtly that he did not think it would change the response, i.e., no offer, but he would discuss it.

Q     Okay.  And let's take a look at Defendant's Exhibit 56, which is your notes of a call you have with Mr. Seyoum for about an hour on June 2nd, 2022.

A     Yes.

Q     In this note about midway down, Mr. Seyoum's requesting that you call Ms. Redae and Mr. Diamond as witnesses to the trial; do you see that?

A     My note says Lemlem and G. Diamond as witnesses at trial, CGH, bad idea.

Q     Okay.  Is that what you conveyed to Mr. Seyoum?  And why is that -- why did you think -- we've already heard about Ms. Redae.  But Mr. Diamond was Ms. Redae's lawyer, correct?

A     I knew from Mr. Mulquin that Mr. Diamond -- and -- and of course, Mr. Diamond had also testified, I believe, at the protective order hearing, that he thought that Mr. Seyoum essentially was trying to do something improper by calling Mr. Diamond and listing Mr. Diamond to be his lawyer for a sham purpose, and by doing that, disqualifying Mr. Diamond as Ms. Redae's lawyer.

Q     Okay.

All right.  I am going to cut to the chase here.  So prior to the trial, okay -- I know we talked about that you did a mock -- a semi-mock jury with Rebecca's sister, right?

A     It's called a mini mock trial.

Q     Mini mocks.  I don't want to get into that.  We

already talked about it. But just again, in terms of your preparation, what else did you do in terms of developing how you were going to present Mr. Seyoum's case to the jury?

A    A lot. I mean, I had to talk to all the witnesses to make sure that they would be there and to go over what I was going to ask them because those witnesses had been through depositions. They needed to know what I planned to ask them. I needed to write out scripts. I'm somebody who writes out scripts for when I'm questioning witnesses at a trial. I needed to know what went into that script. I needed to go through all the depositions to figure out what testimony was going to be helpful to Mr. Seyoum to make sure that I included questions that would bring out that testimony at the trial.

We had to put together all of our exhibits. We had to go through, you know, thousands and thousands of documents to try to figure out what would actually be relevant and helpful, and we picked, you know, dozens of exhibits -- I don't remember exactly how many -- and selected them. You had to put them into exhibit binders like this, prepare for that.

We had motions that were -- motions in limine that had to be, you know, filed and -- and dealt with. Mulquin filed one. I filed one at least. We had to do all that. I had to go through the pre-trial hearing to do all the scheduling with the judge. So there's much, much work that's involved in getting ready for a trial.

Q    Right.  And so at the trial, you called Mr. Seyoum as a witness?

A    I did.

Q    Okay.  And what was the purpose?  What were you trying -- objective -- the strategic objective you were trying to achieve in letting Mr. Seyoum go first as a witness at that trial?

A    Well, I think that the jury needed to hear what this case was all about from Mr. Seyoum.  Why was he bringing a claim against Mr. Salvado?  What was his -- what was his beef?  What was his argument?  In -- you know, in my view, the first step on that logically is to hear from the client who feels aggrieved and why he feels aggrieved.

Q    And did Mr. Seyoum testify to all of the incidents that he felt should have been presented to the jury -- or excuse me, to the court at the protective order hearing?

A    Yes.

Q    Okay.  And did he also explain to the jury the impact in terms of his expenses or whatever else had incurred as a result of the loss of the protective order?

A    To the extent that he was allowed to, of course, Judge Storm by that point had ruled certain evidence of damages as not admissible, such as damage to reputation, so I don't remember specifically, Mr. Sims, but I think if Mr. Seyoum got into the area of my reputation's been damaged, I think maybe

Judge Storm cut him off on that.

Q    Okay.  And then you called Ms. Adams to testify, correct?

A    I did.

Q    And what was the purpose of her testimony?

A    To show that she had given advice of counsel, and that Mr. Salvado had not interviewed her, and that she had testified at the custody case, and that there had been a better result of the custody case than at the protective order.  Now, one couldn't say for sure that the better result of the custody case was as a result of Sylvia Adams's testimony, but certainly she testified, and he did have a better result, so I wanted that to come out.

Q    Uh-huh.

A    And I thought that the jury -- and that's the case within the case.  This -- it was really about the case within the case.  You'd have to show the evidence that should have been presented that was not presented to see whether or not that convinced the jury that the protective order should not have been granted.

Q    Okay.  Now, Ms. Adams at the trial testified that when Mr. Seyoum first spoke with her before the Thanksgiving that he was angry and upset.

A    Yes.

Q    Do you recall that?  And she also testified that she

didn't refer Mr. Seyoum to Mr. Diamond?

A     Yes.   That was a problem.   She contradicted Mr. Seyoum's testimony on that point.

Q     Okay.   And then you called Mr. Stein as a witness as well?

A     I did.

Q     Okay.   And again, what was the purpose of that?

A     Well, to show that having now called Ms. Adams as a witness at the custody hearing that he had a better result, and that he felt that the protective order had been a hurdle that needed to be overcome at the custody trial, that he had successfully done so.   I had also hoped that he could quantify how much more money in his -- terms of his fee it costs to have to deal with that protective order problem because I thought that would be an element of damages we can claim. Unfortunately, Mr. Stein was unable to say a specific amount more that it cost as a result of the protective order.

Q     Okay.   And then you call Ms. Sarris and Ms. Asethia (phonetic sp.) as witnesses, right?

A     Yes.  Asefiya (phonetic sp.).

Q     Yes, Asefiya may have --

A     Yes.   And then Ms. Sarris, yes.

Q     And then you called your expert --

A     Mr. Rumer, yes.

Q     -- Mr. Rumer, right?   Okay.   And then in rebuttal,

Mr. Salvado testified, Mr. Diamond testified, and Mr. Murphy testified as the expert for Mr. Salvado, correct?

A    I think that was defense, not rebuttal, but --

Q    As a defense side.  Yes.  All right.  And then what was the jury's verdict?

A    It was in favor of Mr. Salvado, that Mr. Salvado was not liable.

Q    Okay.  In presenting the evidence at trial, did you believe that you had presented all of the evidence that would be necessary in order for the jury to render a verdict in favor of Mr. Seyoum?

A    Yes.  I think I presented all the evidence that I had available to me that had any chance of persuading a jury that a different approach by Mr. Salvado would have resulted in a better result.

Q    And in fact, during that trial, after you put on your evidence, the plaintiff's evidence, did the other side make a motion to have the judgment entered in favor of the defense?

A    Yes.

Q    And did the court grant that motion?

A    No.

Q    And why was that?

A    Well, I mean, a motion for judgment at the close of a plaintiff's case is a simple way of going to the trial judge, like Judge Rubin in this case, and saying, all right.  We've

heard everything that the plaintiff has to say, we've heard all of the evidence, it's not enough. It should not go to the jury. It's not a case that really deserves to get to a jury. And if the judge agrees with that, he grants the motion for a judgment, and you don't go to the jury.

Q Okay.

A But in that case, Judge Storm denied the motion for a judgment, and we did go to the jury.

Q Okay. And in terms of making the decisions at trial, whether to object to any evidence or to focus your cross-examination, for example, on Mr. Salvado about whether or not he had actually advised Mr. Seyoum about the de novo, did you exercise your professional judgment to do that?

A Of course, yes.

Q Okay. Let me talk about that just a little bit. With Mr. Salvado, I think you testified there was some testimony about the fact that this case was moved from the district court to the circuit court.

A Yes.

Q And that testimony was offered by Mr. Rumer --

A Yes.

Q -- the expert?

A He had talked about it.

Q Okay. Now, did you decide whether or not to cross-examine Mr. Salvado whether he had complied with his ethical

obligation to confer with Mr. Seyoum?

A Now, first of all, I don't think I was aware that he had not or that there was an allegation that he had not conferred with Mr. Seyoum, so that would be one reason.

But secondly, legal malpractice is different from ethics, okay? Just because a lawyer may commit an ethical violation by not, for example, communicating something important to a client, that's not necessarily malpractice per se. It's something you can go to the Attorney Grievance Commission up in Baltimore and complain that there was an ethical violation, but that's not something that gets you money. That's just -- it has to do with whether the lawyer has committed an ethical violation that could possibly lead to the suspension or the loss of the lawyer's license.

So I didn't think it was particularly helpful. I don't think I knew that Mr. Seyoum was saying he didn't know about that. I thought he did know about it actually.

Q Well, in the communications that Mr. Salvado had with Mr. Seyoum, he indicates that he had advised --

A Yes.

Q -- Mr. Seyoum --

A Isn't that -- we looked at an email --

Q Let me --

A -- an hour or two ago --

Q Let's show you Defendant's Exhibit 7.

MR. SIMS: I'd move to have this admitted into evidence, Your Honor.

THE COURT: Sir, any objection?

MR. SEYOUM: No.

THE COURT: Received.

(The Email marked for identification as Defendant's Exhibit No. 7 was received in evidence.)

BY MR. SIMS:

Q And so if you look at the second paragraph from the bottom, second sentence --

A And just to be clear, we're just looking at it, December 6th, 2017, letter to Mr. Seyoum from Mr. Salvado?

Q That's correct.

A And you want me to look at the first page, second to last paragraph?

Q Right. Where he writes to Mr. Seyoum, as I had advised, since we had filed a custody complaint on your behalf on November 30, 2017, the matter was going to be transferred to the circuit court to be heard on Monday, December 11th at 9:00 a.m., right? But even -- irrespective of that, I want to go back on the issue of the ethics versus the legal malpractice, right? But in an ethics complaint, you don't have to have proximate cause, doesn't have to lead to damages, correct?

A    Yes.  It -- it's not about money.  An ethics complaint is not about money, and you don't need to prove that if a lawyer lied, if a lawyer had a conflict of interest -- whatever the ethical violation might be, you don't need to prove to the Attorney Grievance Commission that the client suffered damage.  It was just enough to lie or to have a conflict of interest, and the consequence for the lawyer might be that the lawyer gets suspended, gets censured, get disbarred, whatever.  But has nothing to do with an award of money to the client.

Q    And so your focus was to focus -- at the Salvado trial, was to focus on those issues that you thought where there could be approximate cause that would lead to a different result at the trial?

A    I thought that was my burden of proof.

Q    Okay.  And had the case gone from then tried in the district court as you understood it, and then retried in the circuit court, Mr. Seyoum's testimony would still be -- he couldn't change his testimony because he testified under oath, correct?

A    That's correct.

MR. SIMS:  All right.  I have no further questions.

THE COURT:  All right.  Let's take a recess.

Sir, step down.

Ladies and gentlemen, let's take 10.  Do not discuss

this case with anyone. Do not let anyone discuss it with you. Do not even discuss it as amongst yourselves. Please keep an open mind. Don't speak with any parties, counsel, witnesses.

Sir, if you have exhibits, you can give them to me.

MR. SEYOUM: Quick question, sir.

THE COURT: Just wait for the jury to leave the room.

(The jury exits the courtroom.)

(Discussion off the record.)

THE COURT: Yes, sir. What was your question?

MR. SEYOUM: Yes. Since I'm pro se and I'm doing this first time, do I get to cross him?

THE COURT: Well, here is what I was going to suggest. This witness has now been on the stand all of today. You can do the arithmetic on the number of hours, plus a good 45 minutes yesterday. Let's see where we go. Enough of this right now. Call the other witnesses you've had standing around all day, and we'll see where we go. I have the power to control the order of proof based on my sense of where things are

And there's a couple reasons. One, being on a jury or a witness stand is not sort of punishment. It's not we'll keep you there till -- it's not like a congressional hearing. And also, I think it's time for something new. I'm watching you. I'm watching the jury. We're kind of going over the same thing all over again. You had him on direct for hours, so not

right now. We'll see. When the jury comes back, you'll put on a new witness.

MR. SEYOUM: I object. And please --

THE COURT: Okay.

MR. SEYOUM: -- as a pro se, okay --

THE COURT: I understand.

MR. SEYOUM: -- I have my questions ready for today.

THE COURT: I know. But you can put --

MR. SEYOUM: I'm not a trained attorney to save this until tomorrow. You should give me a little bit of exception here as a pro se to do the cross today before I forget, and you're prejudicing my case if you do not allow me to go right now while I am fresh and I can clear up what he's saying. But --

THE COURT: Thank you. I've ruled.

MR. SEYOUM: -- this decision is going to prejudice my case.

THE COURT: My ruling stands. I hear you. I disagree. But that's how we're going to do it. Thank you, sir.

So in light of that, understanding it's not something with which you would agree, who's your next witness?

MR. SEYOUM: Sylvia Adams.

THE COURT: Great. So make sure she's around and available. I want to get her in and out. Is she from out of

state?

MR. SEYOUM: No.

THE COURT: Well, still, she's been sitting around all day. It's now 3:20. She's presumably been sort of waiting around since 9:30. In fairness to her, let's have her testimony and see if we can -- how much time do you need with her? On direct?

MR. SEYOUM: I don't know, sir.

THE COURT: Well, I can't -- I don't know -- it's difficult for me because what I don't want to do is just pick a number. You have been living with this case for a long time. You've known Ms. Adams for a long time. You have seen her testify at least once before. I mean, maybe more times. So I need an estimate. "I don't know" is not going to cut it.

MR. SEYOUM: I'm being honest with you. I don't know how long it's going to take because based on her answer, and based on objections, and based on how you rule, I don't know how long it's going to take. Maybe an hour?

THE COURT: Well --

MR. SEYOUM: An hour and a half?

THE COURT: -- I'm going to ask you to try to tighten it up a little bit. We are now in day two, and what I don't want to have is a bunch of A, repetitive questions, and B, a majority of the, quote, unquote, question is not a question but it's a speech. So if you cut out some of that business, I

think it'll be more sooth.

So take five, and then we'll come back.  You'll put her on the stand, and we'll see where we go.

THE CLERK:  All rise.  Court stands in recess.

(Recess)

THE COURT:  Invite the gentleman to join us.

UNIDENTIFIED SPEAKER:  Your Honor, I can go -- I can go get them.

THE COURT:  Okay.  Thank you.  If you don't mind.  Thank you.  So -- and if you need to come back, feel free to.

UNIDENTIFIED SPEAKER:  Thanks.

(The jury enters the courtroom.)

THE COURT:  Yes.  Good afternoon, ma'am.  How are you?

MS. ADAMS:  I'm fine.

THE COURT:  Thank you for being patient with us.  Could you come over and be sworn, if you don't mind?  Thank you very much.

MS. ADAMS:  Uh-huh.

THE COURT:  Please face the Court and raise your right hand.  Thank you.

SYLVIA ADAMS

called as a witness on behalf of the plaintiff, having been first duly sworn, was examined and testified as follows:

THE COURT:  Please have a seat.  Thank you very much.

And again, thank you for your patience with us.

THE WITNESS:  No problem.

THE COURT:  It doesn't adjust.

THE WITNESS:  Oh, okay.

THE COURT:  Everybody tries.

THE WITNESS:  Okay.

THE COURT:  It's vintage 1965.

THE WITNESS:  Oh, okay.  1960s babies so it works.

THE COURT:  There we go.  Okay.  Sir, go ahead.

DIRECT EXAMINATION

BY MR. SEYOUM:

Q    Good evening -- oh, good afternoon.

A    Hello.

Q    Thank you for coming here.

A    Uh-huh.

Q    Can you please introduce yourself?

A    My name is Sylvia L Adams.

Q    And where do you reside?

A    I reside at 11411 Lake Arbor Way, Apartment 602.

THE COURT:  Well, we just need city and state.  We don't need --

THE WITNESS:  Oh this is --

THE COURT:  -- this much --

THE WITNESS:  -- Mitchellville, Maryland.

THE COURT:  -- detail.

BY MR. SEYOUM:

Q    Okay.  And what did you do for a living?  And how did we meet?

A    All right.  I used to be an attorney, and now I'm on disability.

Q    Okay.  How did we meet?

A    We met years and years ago when you were interested in a property that -- in district -- in the District of Columbia.  And I was acting as -- not only as a lawyer, but as a real estate agent.

Q    Right.  And over the years -- it's been over, what, 10, 15 years that we've known each other?

A    Longer than that, I think.

Q    Yes, maybe longer.  And we go way back, and we met as a real estate investor.  You used to help me buy properties.  You used to help me with leases.  You used to help me with the tenant issues.  You used to help me with business litigation, with business advice regarding laws and contracts and so on, right?

A    Correct.

Q    Right.  So we go way back, and we've grown to be friends over the years.

A    Yes, we have.

Q    All right.  And are you married?

A    No.

Q    Okay.  Do you have any children?

A    Yes, I do.  I have a 16-year-old son.

Q    And he's a adopted child?

A    Yes, he is adopted.

Q    All right.  And you adopted him when he was a baby, right?

A    When he was -- he came to live with me when he was less than 2.  And I adopted him when he was 3.

Q    Okay.  And you're raising him by yourself?

A    Yes, I am.

Q    Okay.  And I recall that you also were taking care of your mother.

A    Yes.

Q    And your mother lived to be how old?

A    101.

Q    And have I met her?

A    I don't remember.  Have you?

Q    Yes, I've come to her house a couple of times. I even showed --

A    Oh, that's right.

Q    -- up to her -- at her funeral.

A    Yes.

Q    Yes, so.

A    But she's deceased now.  She --

Q    Right.

A     -- died in 2018.

Q     Okay.  So you were taking care of your mother, who lived to be what, how many years?

A     101.

Q     101?

A     Uh-huh.

Q     And you're also taking care of your adopted child?

A     Yes.

Q     Right.  And you had a solo practitioner?

A     Yes, I did, out of my home.

Q     Right.  And then when COVID hit, what happened?

A     Well --

Q     Did you get sick?

A     Well, I actually got sick prior to COVID.  In 2019, I was diagnosed with autoimmune hepatitis.

Q     Okay.

A     And COVID came after that.

Q     And did that illness cause you problems?

A     Extreme problems.  I lost my home.  I could not work. It's a liver issue, and it's chronic.  And so I'll always have autoimmune hepatitis, and I'm on medication for it.  And for -- for that, I was on medication, a steroid, prednisone, on a high dose.  And it impacted my ability to remember things, to think properly, to -- I wasn't sharp, and I still have not -- that's why I'm on disability, because I can't practice law anymore.

Because I can't think as fast, I can't process as quickly. My short-term memory has been impacted.

Q This is after your illness?

A Yes, since 2019.

Q But in 2017 --

A Uh-huh.

Q -- were you healthy, well-adjusted, functioning attorney?

A Yes, basically.

Q Sorry.

A Uh-huh.

Q All right. So if you recall, I was in a relationship and I had a son. And once in a while --

MR. SIMS: Your Honor, at this point now that we're kind of of getting more in the substance, I would ask him not to --

THE COURT: Yes --

MR. SIMS: -- lead the witness.

THE COURT: -- please omit the narrative from the question. Just ask the witness a question, please.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Around the time 2016/2017, was I confiding with you about my personal issues, my home issues?

MR. SIMS: That's what my issue is. I don't want

them leading at this stage.  You need to ask an open-ended --

THE COURT:  Just ask her a non-leading question, please.

Did the gentleman confide in you about his home life?

THE WITNESS:  Yes.

THE COURT:  Very good.  So that's sort of an example.

MR. SEYOUM:  All right.  Thanks.  Thank you, Your Honor.  Sorry.

BY MR. SEYOUM:

Q    Yes.  So I confided in you about my home issues, and you gave me, as a friend, pointers --

THE COURT:  Well, the next question would be, did you give me any advice?

BY MR. SEYOUM:

Q    Did you give me any pointers about my life and my relationship?

A    Yes, I did.

Q    All right.  And --

THE COURT:  The next question would be, what did you tell him?  I'm trying to move through it.  I know you've been sitting here all day.  So what did you tell him about it?

THE WITNESS:  All right.  Well, depending on what part of it -- there are times when I just advised him, in connection with his relationship on the way that he and his son's mother and him were interacting.  I would share my

opinion on things that were happening, and you know, just give my opinion on a variety of things. But in November of 2017, which I think is where we're trying to get to --

THE COURT: Yes, ma'am.

THE WITNESS: -- which was around Thanksgiving, Joe called me upset one day, and was saying that he wanted to take Aaron (phonetic sp.), that's his son, to Pennsylvania, to his family's house for Thanksgiving. They basically did it every year, and Lemlem had decided that she just didn't want to go, and she wasn't going to allow Aaron to go. And Joe was upset about it, and he called me up and he was just, you know, talking about it.

And so I asked him, I said, well, do you have a custody agreement? Or there's a court order saying that, you know, Lemlem gets to make all the decisions on this, and -- because otherwise, you have just as many rights as she has. So you know, if you want to take him, I don't see anything that could stop you from doing it, because unless there's some kind of a custody arrangement or there's some kind of a court order saying -- prohibiting you from doing it.

BY MR. SEYOUM:

Q Okay.

A And then he called down.

Q Okay. And based on your advice, we had a discussion on how I would proceed to go to Pennsylvania --

MR. SIMS: Yes, I'm going to object, Your Honor.

THE COURT: Sustained. Ask her a non-leading direct question that doesn't involve you either testifying or asking her to read your mind.

MR. SEYOUM: Okay.

BY MR. SEYOUM:

Q Did I seek your advice on how to take Aaron to Pennsylvania without causing any drama with Lemlem?

A We discussed it, and it was about not having any drama for Aaron, mainly, that would be caused by you having another discussion with Lemlem. And I mean, I think we brainstormed and came up with just pick Aaron up at school and, and then just make sure you -- because Lemlem is his mom and you know, and she's concerned about her child, make sure you let her know that -- what you've done, that you've taken him to Pennsylvania for the family gathering.

Q Correct. And with the discussion I had with you, did I come up with a communication method to honor Ms. Redae?

A You had been texting back and forth with Lemlem, and I had -- you know, you were showing me the texts. And so there were times when you were about to send a response back that I thought would not be well-received, whatever. So I would give you advice on you need to soften this, or you don't need to say that, you know, or you know, just, you know, because you were asking her to come along, but she had refused.

And so I said, you know, explain to her why you want him to go. And so we discussed, you know, those things. And then I did some tweaks -- or I made recommendations on things to put in or take out.

Q Right. Was my concern at that time -- was I worried about her? Was I afraid of what she's taking --

MR. SIMS: I'm going to object.

THE COURT: Sustained. You can't ask that question of this witness in that form.

BY MR. SEYOUM:

Q What was my concern, as far as you're concerned, for me asking you to help me craft clean, proper, text messages?

A Well, initially you were trying to persuade her to come and go with you, you know, so you can go as a family. And I remember you -- one thing I remember is you saying that, you know, okay, you know, we go for Thanksgiving now. You have family here, we would go see your family, but you don't. So if, you know, if we go for Thanksgiving, you do what you want to do for Christmas or something like that. But I'm not quite -- I don't quite remember. I know you mentioned something as a bargaining tool. Christmas, we can do what you want, you know, but we already had told them that we were coming. And we told Aaron that he was coming.

Q Right. And based on a three-point assessment, was that acting in the best interests of Aaron?

MR. SIMS: Yes, I'm going to object, Your Honor.

THE COURT: Sustained. It's not a question she can answer in this courtroom. I'm sorry, I know that's not for her to say.

BY MR. SEYOUM:

Q   Did you give me permission to go to Pennsylvania?

A   Well, I couldn't give you permission. I didn't -- I couldn't control you. And --

Q   But did you endorse my proposal --

A   I encouraged --

Q   -- to go?

A    -- I encouraged you to go. Because, from what you told me, how he enjoy -- Aaron enjoys being with his cousins, and -- and that's the only family that you have over here, you know, in this area. You know, I -- when you told me that there was no custody agreement or any type of a court order or anything formal that said who has to make the final decision, you know, you were upset. You wanted to see your family, you wanted Aaron to see his family, I encouraged you to go.

Q   Okay.

A   But make sure you let Lemlem know.

MR. SIMS: Do you have copies? I need them. Okay. I'm going to look at these, if you don't mind. Okay.

THE COURT: Folks, do you need my intercession?

(Counsel conferred.)

BY MR. SEYOUM:

Q    Okay.  Are you familiar with these text messages between me and you, where I would send you text messages.  You would review them.  You would make changes --

MR. SIMS:  Yes, I'm going to object to --

MR. SEYOUM:  -- and send them back to me?

MR. SIMS:  I'm going to object --

THE COURT:  Just --

MR. SIMS:  -- to that.

THE COURT:  Just give me the word.

MR. SIMS:  Okay.

THE COURT:  The basis.

MR. SIMS:  It's a lack of foundation.  He just needs to ask the question, is she familiar with the documents?

THE COURT:  Have you seen those before?

THE WITNESS:  I'll just --

THE COURT:  If you need a moment, take your time.

THE WITNESS:  Oh, okay.  Thank you.

THE COURT:  Take your time.  Let her -- sir, let her peruse and be comfortable with what you're asking her to look at.

MR. SIMS:  Can you give me a copy?

MR. SEYOUM:  Sure.

THE COURT:  Ma'am, have you had enough time to take a look?

THE WITNESS: Yes, I -- I -- I recall this. This is --

THE COURT: You've seen it before?

THE WITNESS: Yes, I have.

THE COURT: Very good. Sir, go ahead. Thank you.

MR. SEYOUM: Thank you.

THE WITNESS: Uh-huh.

BY MR. SEYOUM:

Q    To the best of your recollection, did I call you and let you know that the police had contacted me?

A    Yes, you did.

Q    Did I also communicate with you that I followed your instructions and picked up Aaron and sent the text messages to Lemlem as we discussed?

A    Yes, you did.

Q    All right. And were you surprised when I told you that she called the police?

A    Based on some of the things you had told me about in the past, I wasn't, you know, shocked, but --

Q    But you were surprised?

A    I was surprised that since she knew where he was, because you left a text message telling her specifically, yes, you know? So I guess you might say I was surprised.

Q    After she called the police, and I communicated with you that she did, did I ask your advice to contact the police

and find out why they're reaching out to me?

A    I believe you did, yes.

Q    And you called them, and they wouldn't let you -- they wouldn't talk to you; is that right?

A    Right.  They said they couldn't share the information with me.

Q    And based on that information, I got concerned; is that correct?

MR. SIMS:  I'm going to --

THE COURT:  Sustained.  Rephrase.  She can't -- rephrase the question in a way --

MR. SEYOUM:  Based --

THE COURT:  -- that she, as a lay witness --

MR. SEYOUM:  Sure.

THE COURT:  -- could answer it.

BY MR. SEYOUM:

Q    Based on that information, did I convey to you that I was concerned?

A    Yes.

Q    And based on that information, did I become nervous?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    Based on that information --

THE COURT:  Sir, you asked -- come to the bench.



Excuse me one second.

(Bench conference begins)

THE COURT: Please ask the witness what she knows about the who, what, when, and where. You're just using her as a sounding board to testify, so please don't do that.

(Bench conference concludes)

THE COURT: Step back. Thank you, ma'am, for your patience.

THE WITNESS: Okay.

THE COURT: Please continue.

BY MR. SEYOUM:

Q So after I informed you I called the police --

A Uh-huh.

Q -- what advice did you give me?

A Were you talking about, she had called the police in Maryland?

Q Well, yes, actually, she called the police twice, right? You're right. So the first time is she called the police when I was on the way to Pennsylvania, and I let you know about it the next day, correct?

A I don't recall exactly the timing, but --

Q Okay. And afterwards, you helped me craft some text messages. Do you remember me asking her to move out and I'll pay for it? Do you remember --

A I remember that.

Q   -- those text messages?

A   Yes.

Q   Okay.

A   Yes.

Q   And at this point, what was our intention between me and you in terms of appeasing Ms. Redae --

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  Rephrase please.  Wait for him to restate the question, ma'am.

MR. SEYOUM:  Okay.

THE COURT:  Thank you.

BY MR. SEYOUM:

Q   Between me and you, what strategy did we deploy in response to the police call?

MR. SIMS:  I think, Your Honor, he's --

THE COURT:  Sustained.  Rephrase.  You need to ask her --

MR. SIMS:  What she said.

THE COURT:  -- a proper question.

BY MR. SEYOUM:

Q   Okay.  Did I ask you for advice as to what to do when I go back?

A   From what I recall, you felt that the relationship was at an end because she had called the police on you.  And so you didn't want to live with her anymore.  So you wanted to

send something to her to let her know, okay, everything's over. And you made a proposal that -- I can't remember the details of it too much, but I know that you were going to pay for her to live in another property, I think, that you owned and not have to pay rent or something like that. But you wanted her to -- to move out.

Q Okay. And after that, I got back to Pennsylvania and dropped off Aaron, correct?

A You mean you got back to Maryland?

Q I'm sorry, yes. Got back to Maryland and dropped off Aaron?

A After you -- yes. It was after you had sent the text.

Q Right.

A Uh-huh.

Q And did I convey to you that when I go home that I am concerned something bad --

THE COURT: Sustained.

MR. SEYOUM: -- might happen?

MR. SIMS: I'm going to object.

THE COURT: Rephrase.

BY MR. SEYOUM:

Q Did I ask you --

THE COURT: You can't testify through the witness by saying something like did I tell you that. I know we do it in

everyday parlance, but respectfully, we can't do it here.

BY MR. SEYOUM:

Q Did I seek advice from you about protecting me when I got back to Pennsylvania -- or Maryland?

A You were concerned that she might be vindictive, from what I recall. And that she might -- at that time, you both were living -- I mean, you were living, like, separate lives, from what I understood. And she was sleeping in one bedroom, and usually -- she was sleeping in one bedroom with Aaron, and you were sleeping in another bedroom, and all of your things were in your room. And she basically never went in there. And you, I think, expressed some concern that she might get angry and go in and damage some of your stuff. I remember you doing that.

Q Right. And did I propose installing these kind of security measures?

MR. SIMS: I'm going to object, Your Honor.

THE COURT: Basis?

MR. SIMS: It's leading. And it's also not --

THE COURT: Sustained.

BY MR. SEYOUM:

Q Did I seek permission from you to install cameras?

A No. You didn't seek permission again, okay? You told me that you wanted to, to install cameras to -- so that you would be able to have something if she damaged any of your

stuff in your room or did anything. And you asked me my opinion, and on that I said, I -- I -- I said, in light of the fact that you've not picked up whatever you had to pick up in Maryland from the police, and you don't know -- there's nothing in place that you know of, you -- you -- you know, you basically -- it's your home and if you want to install a camera, I guess you can.

But I mean -- and that's basically where, you know, it was. But my understanding is that you wanted to do it to make sure that she didn't -- or you'd have some evidence that she destroyed your stuff.

Q    Right. So, go without a fear?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained. Sir, please don't do that. Ask the --

MR. SEYOUM:  What was --

THE COURT:  -- witness to -- ask the witness --

BY MR. SEYOUM:

Q    What was my demeaner when I was returning to Maryland?

MR. SIMS:  I'm going to object, Your Honor. Lack of foundation.

THE COURT:  Sustained. And please don't talk over me, sir. Sustained. Rephrase please.

BY MR. SEYOUM:

Q    So did I ask you to look up somebody for me on the Maryland case search?

A    You wanted to know the name of the attorney that had represented Lemlem in her divorce, and so you asked me if I could look it up.  So I went to Maryland Judiciary Case Search, and I looked up the name of the person and of the attorney and provided it to you.

Q    All right.  So you provided me that information regarding Ms. Redae's previous attorney?

A    Yes.

Q    Okay.  And do you know the relationship between me and that person (unintelligible 4:06:49) Mr. Gary Diamond?  Have I told you how I know him?

A    What you told me is that you were a witness in Lemlem's divorce proceedings.

Q    Right.

A    And so you thought that he had done a good job for Lemlem.

Q    Okay.

A    And that's how -- I mean, again, you wanted to -- I don't know.  I can't remember why you wanted to talk to him, but --

Q    Right.  So I wanted to talk to him?

A    Right.

Q    Right.  Okay.  So then, I inform you that I got

served, right?

MR. SIMS: I would object, Your Honor.

THE COURT: Sustained. Sir, you can't testify. You have to ask her questions about what, if anything, she saw, knows --

MR. SEYOUM: Okay.

THE COURT: -- or et cetera.

BY MR. SEYOUM:

Q At a later date, did you find out that I had legal issues?

A Legal issues?

Q Legal issues.

A Yes.

Q In regards to a protective order?

A Yes.

Q Okay. And did I inform you that I had hired an attorney, and that we wanted you to be a witness?

A Yes.

Q Okay.

A Yes.

Q Did any attorneys contact you to ask you about what I told them in regards to all this episode, and ask you to testify on my behalf?

A No.

Q No attorney called you?



A    No.   The first time I think I was contacted by an attorney was in your custody hearing --

Q    Right.

A    -- I think it was.  I think it was Atty. David Stein, I think.

Q    Right.  But for the protective order filed, did my attorney contact you and elicit the information that would be helpful to me like the way you're doing now?

A    No.

Q    Had my attorney contacted you, would you have told him the same story that you have told me now?

A    Yes.

Q    Okay.  Had he called you to testify, would you have shown up?

A    Yes.  You're my friend, and I would share what information I knew.

Q    So you were willing to go to trial and testify on my behalf, as to the circumstances to what happened that day, and you were not contacted?

A    Yes.

MR. SEYOUM:  That's all I have.

THE COURT:  I'm sorry?

MR. SEYOUM:  That's all I have.

THE COURT:  Great.  Thank you very much.  Do you have -- thank you.  Just a few more minutes of your time.  We

might have some questions. I appreciate you. I know you've been here a long time.

Do you have questions for the witness?

MR. SIMS: I do, Your Honor. If I may, just real quick.

CROSS-EXAMINATION

BY MR. SIMS:

Q Good afternoon, Ms. Adams. I'm going to be asking you the questions. We have not met; I'm Charles Sims. I'm Charles Sims.

A Hello.

Q Okay. You did say that first time you were contacted by a lawyer was in connection with all of this stuff was with Mr. Hoge, right?

A No, Mr. Stein, I think, was --

Q Okay.

A -- the first time.

Q You're correct. So Mr. Stein -- you testified in the custody proceeding, correct?

A Yes.

Q And then after the custody proceeding, Mr. Hoge contacted you?

A Yes.

Q And you all --

A Well -- yes, he must have contacted me. Otherwise, I



wouldn't have been able to show up for court.  Yes.

Q    That's right.  So he spoke with you, and then I take it your deposition was taken in the Salvado malpractice case, correct?

A    I don't think I was ever deposed.

Q    Okay.  You testified, though, at the trial?

A    At the trial for -- yes, yes.

Q    Yes.

A    For the malpractice.

Q    Right.  And prior to that testimony, I guess you had a discussion with Mr. Hoge before that, right?

A    I -- the first discussion I recall having, and -- that's, you know, well, I don't know, that was -- that's not too long ago, but, you know, I do have some memory issues.  But the first discussion I remember having was when we were in court that day and I wrote out some notes in anticipation of there being a problem because of my status as an attorney.

So I wrote out notes for background information for Mr. Hoge and I handed them to him before I went in, so that he would be able to, for lack of a better word -- if -- if I was accused of being dishonest or whatever, he would be able to explain, you know, because I had been suspended indefinitely on my license, and so I didn't want him to come in flat-footed with that.  I wanted him to have some background on why it had happened and so that he would be able to give me the

opportunity to explain if necessary.

Q    Okay.

A    All right.

Q    Okay.  And I guess at that trial, you testified that you and Mr. Seyoum had become friends --

A    Yes.

Q    -- throughout that long, right?  And when Mr. Seyoum called you, I think it was two days before Thanksgiving 2017, you had described him as being upset, agitated, and angry, correct?

A    Probably, yes.

Q    Okay.  And when you spoke to him about this plan to take his son, did you tell him that he should tell Ms. Redae before he took the son out of school?  Or did you say to him, surreptitiously go into the school, take the son, and only when you're on your way to Pennsylvania, send her a text?

MR. SEYOUM:  Objection.

THE COURT:  Overruled.  If you know, ma'am, one way or another.

THE WITNESS:  I -- I don't recall, but I don't -- I don't recall the sequence, but I know I did not say -- I -- I'm pretty certain I didn't say do it in a particular order.  My thing would have been, make sure you let her know because it's her child.  So you know, send her a text.

BY MR. SIMS:

Q    Right.

A    But when I think on it, if he had told her prior to taking Aaron out of school, Lemlem could have possibly prohibited him from being able to take him from school.

Q    All right.

A    I don't you know, it would have caused the drama that Joe was trying not to have Aaron go through, so --

Q    Well --

A    -- I --

Q    -- did you consider what drama that would put on Ms. Redae, that her son was taken without her knowledge, out of school, and was headed up to Pennsylvania without her, not being able to spend Thanksgiving with her own son?

A    It, to me, did not appear that she was planning on celebrating Thanksgiving.  Based on what I had been told, she had given away the turkey that they had gotten, et cetera.  And the opportunity to celebrate with her son had been -- she had the invitation, and they were under the impression that they were going -- all going to Pennsylvania.  And then it was the day that Joe called me, that she said, no, I'm not going, and Aaron's not going.

Q    Well, let me ask you this.  Were you aware, that as of July 2017, Mr. Seyoum and Ms. Redae really weren't on speaking terms?

A    No.

MR. SEYOUM:  Objection.

THE COURT:  Overruled.

BY MR. SIMS:

Q    Were you aware that as of July 2017, Ms. Redae was not on speaking terms with Seyoum's mom?

MR. SEYOUM:  Objection.

THE COURT:  Overruled.

A    No.  I know they'd had a spat during the little vacation getaway, where my understanding is that Lemlem locked everybody out of the room.  And --

BY MR. SIMS:

Q    Yes, that understanding came to you from Mr. Seyoum, correct?

A    Yes.

Q    Right.  And everything you learn -- everything you were acting on in terms of lack of turkey and who would be celebrating Thanksgiving, was all information --

MR. SEYOUM:  Objection.

MR. SIMS:  -- that Mr. Seyoum conveyed to you --

THE COURT:  Overruled, sir.

MR. SIMS:  -- correct?

THE WITNESS:  Yes.  That --

BY MR. SIMS:

Q    You didn't ask Ms. Redae --

A    No, but --

Q    -- what the truth was, did you?

A    No, but I think I saw some of her text responses.

Q    Okay.  Now, you were asked about the fact that Mr. Seyoum indicated to you that the police had been called,  I guess the day before -- when he first took the child, correct?

A    I don't recall what day it was.

Q    Okay.  And then, subsequently, I think you testified you learned that the police wanted to serve some papers on Mr. Seyoum --

MR. SEYOUM:  Objection.

MR. SIMS:  -- correct?

THE COURT:  Overruled, sir.

A    Yes.  Maryland police -- from my understanding, Maryland police had contacted Joe in Pennsylvania, at his brother's house, and wanted to make sure that Aaron was fine, and spoke with I think his brother, or someone else.  And then they said that when he came back -- you know, go ahead, stay. Enjoy your Thanksgiving, you know, vacation.  But when you come back, you need to stop by, I think, the police station and -- because we have some documents that we need to get to you.

BY MR. SIMS:

Q    Okay.  And so you told Mr. Seyoum that most likely what was happening was Ms. Redae was seeking a restraining order --

A    No that's not --

Q     -- or a protective order?

A     No.

Q     Well, let's take a look at Defendant's Exhibit 2.

(The copy of texts between Mr.
Seyoum and Ms. Adams referred to
was marked as Defendant's Exhibit
No. 2 for identification.)

A     Okay.

THE COURT:  Does the witness have that?

MR. SIMS:  Yes, we'll need to get that.  Can you get that to her?

MR. SEYOUM:  Can I get a copy, please?

MR. SIMS:  You've got my notebook.

MR. SEYOUM:  Which one?  Defendant's Exhibit 2.

MR. SEYOUM:  What number?

MR. SIMS:  2.

MR. SIMS:  Have you got it?

UNIDENTIFIED SPEAKER:  Could you open it for her?

MR. SIMS:  Open it up when it comes out.

UNIDENTIFIED SPEAKER:  Sorry.

THE WITNESS:  No, you're fine.

MR. SIMS:  I have to wait, after -- yes.

Ms. --

MR. SEYOUM:  Objection.

MR. SIMS:  Ms. -- I'm going to lay a foundation.

THE COURT: Well, lay a foundation. Do me a favor. Could I just see -- just pull out 2 and show it to me for a minute.

THE WITNESS: I need to get my reading glasses, if that's okay.

THE COURT: Yes, of course. Feel free.

THE WITNESS: That's a little small.

THE COURT: While you're doing that --

MR. SEYOUM: I'll get you --

THE WITNESS: I have --

THE COURT: Sir, sir, sir, she'll -- she's able to get her glasses.

(Counsel confer.)

THE COURT: Am I -- counsel, again, I'm doing this elliptically because I want to move forward. Am I correct in concluding that in the blue, the declarant is Mr. Seyoum?

MR. SIMS: Correct.

THE COURT: What is your objection? Just one or two words, I'll get it.

MR. SEYOUM: My objection is this is my text, not her text.

THE COURT: Right. Overruled. That's okay. That's fine. Meaning it's not inadmissible. Ma'am, can I give that back to you?

THE WITNESS: Sure.

THE COURT: And you can put it back in the book. Do you have what you need, Mr. Clerk?

THE CLERK: I'll have that binder.

THE COURT: Okay.

MR. SIMS: So we'll -- I'll move to admit Exhibit 2, Your Honor.

THE COURT: Received over objection.

(The copy of texts between Mr. Seyoum and Ms. Adams marked for identification as Defendant's Exhibit No. 2 was received in evidence.)

THE COURT: It's exception to the rule against hearsay. When the statement of the party is introduced --

MR. SIMS: Can you flip that thing around?

THE COURT: -- against the party concerning a relevant matter. So.

BY MR. SIMS:

Q So, Ms. Adams --

A Uh-huh.

Q -- in this text to Ms. Redae --

THE COURT: I don't think the jury can read that.

MR. SIMS: She's going to blow it up --

THE COURT: You can flash it, but the jury can't read it. So either make it bigger or take it down.

MR. SIMS: Is that readable now?

THE COURT: Folks, can you see that?

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: No.

THE COURT: I'm getting some yeses and some no's.

MR. SIMS: Can you get it even bigger?

THE COURT: So it's got to be all yeses or not. How about that, folks? Is there anybody who cannot see it? And my eyes are older than anybody. So if you can't, I won't hold it -- I just want to make sure. I want the jury to have the same bucket of information that we all have.

Okay. Hearing no dissent. Go ahead.

BY MR. SIMS:

Q All right. So in the first line of this text, which is a text from Mr. Seyoum to Ms. Redae, he says, "My lawyer has told me that you've applied for a restraining order against me. Wow." And then it goes on about, "Because you have applied for a restraining order, and you aren't on the lease, and you don't pay rent or utilities, you need to move out of the apartment immediately."

MR. SEYOUM: Objection. You should read the whole thing.

THE COURT: I'm sorry?

MR. SEYOUM: He should read the whole thing. He's only --

THE COURT: Well, it --

MR. SEYOUM: -- reading part of it.

THE COURT: Overruled.

BY MR. SIMS:

Q    So Ms. Adams, was this one of the emails you helped -- or texts you helped him write to Ms. Redae?

A    No, I don't think so.

Q    Because you had mentioned earlier in your testimony that you were aware that he was having her -- wanted her out of the house, and this is the text where he's making that -- passing on that message?

A    Yes. But it was in connection -- it was in connection with her calling the police, from what I recall.

Q    Well, that's what's going on right here.

A    Well, this is talking about a restraining order.

Q    Right. You're the lawyer he spoke to.

MR. SEYOUM: Objection.

MR. SIMS: This is --

THE WITNESS: Well, no, I --

THE COURT: Overruled.

THE WITNESS: That's not me.

THE COURT: If you know, it's fine.

BY MR. SIMS:

Q    So where -- so did you know -- your testimony is you never told Mr. Seyoum that the documents that -- looking to be

served on him is most likely a restraining order or a protective order?

A    I don't recall, but if I think about it, in light of the fact that we were guessing, I mean, it was -- it was a blind thing.  It's like I could -- I mean, I didn't know what it would be.  I thought it would have something to do with Aaron.  But I -- I -- I was -- I -- you know, I threw things out, but this is I -- I never to my recollection, ever said this.

Q    Well, did you take into consideration that the police were looking to serve papers on him and potentially it was a restraining order -- or a protective order, when telling him, go ahead, put the cameras in the house without telling Ms. Redae?

A    No.

Q    Okay.  Did you ever advise Mr. Seyoum to do anything to de-escalate the situation?  Come back to Maryland on Thursday, deal with the court system, as opposed to putting --

THE COURT:  Well, I'm going to --

MR. SIMS:  -- cameras in?

THE COURT:  -- stop you.

MR. SIMS:  Okay.

THE COURT:  Because that's a compound question.  And in fairness to her --

MR. SIMS:  Yes.

THE COURT: -- she can only answer one question at a time.

BY MR. SIMS:

Q Okay. Did you ever advise Mr. Seyoum to de-escalate the situation?

A Yes. And one of the ways that I said that he should try to de-escalate the situation was to give her time to cool off. So it -- let -- let Aaron enjoy his family and come back when he said he was going to come back, which was on Sunday.

Q Is that what he told you? He didn't tell you that he told her that he was coming back on Thanksgiving evening?

A I don't remember.

Q Okay.

A All right. But they came back on -- if I recall correctly, they came back that Sunday because I remember saying, let her cool off.

Q Okay.

A And so that was me trying to my idea of trying to de-escalate situations, like, she's very upset right now. She just called the police, you know? So let her calm down. The police had confirmed that Aaron was safe and sound, and so she knew that he was -- but you know, of course, she knew that because he was with the father.

And so all that would come from that would be a lot of, I'm assuming, yelling and you know, upset, you know, people

being upset. So I said, just enjoy your weekend, you know, let him enjoy the weekend and then she'll have cooled down by then, hopefully.

Q Did you advise him to go get the papers from the police before putting the cameras in the house, so that you would know what the ruling -- what the order was --

MR. SEYOUM: Objection.

MR. SIMS: -- that they were looking to serve?

THE COURT: Overruled.

A No, I didn't advise him to get them before or after. I just -- when he asked the question, you know, can I put cameras in? He hadn't gotten them. That was my understanding. He had not received the papers. So he had not gotten any of the papers. So I said, well, in light of the fact that you haven't, I guess you can.

BY MR. SIMS:

Q Okay. Now, I thought earlier in this testimony, you testified that Mr. Seyoum called you and asked you to get the name -- get the address, the phone number for Mr. Diamond; is that what you -- did I hear you correctly on that?

A He asked me what was the name -- could -- I can't remember how he asked it, but basically, he wanted to know the name of the attorney that Lemlem had used in her divorce.

Q Well, didn't he already know that?

A I guess he didn't.

MR. SEYOUM: Objection.

THE COURT: Overruled.

BY MR. SIMS:

Q Isn't it true at the trial, and the Salvado trial, that you testified you did not refer Mr. Seyoum to Mr. Diamond for any legal work?

A I did --

MR. SEYOUM: Objection.

MR. SIMS: Okay.

THE COURT: What is your objection, sir?

MR. SEYOUM: Relevance.

THE COURT: Overruled. If that's the (unintelligible 4:26:40).

BY MR. SIMS:

Q You also testified at the Salvado trial that you did not provide Mr. Seyoum with Mr. Diamond's contact information; isn't that correct?

A I don't remember, but I thought did --

Q Let's take a look at the transcript. It's Trial Day 2 at 225, 13. Can you put it up?

UNIDENTIFIED SPEAKER: It's okay.

MR. SIMS: Yes.

UNIDENTIFIED JUROR: Your Honor, can we take a -- can we use the bathroom --

THE COURT: Yes. We don't need to give reasons.

Let's take a five, six, seven-minute recess. Folks, do not discuss this case with anyone. Do not let them discuss it with you. Please keep an open mind. We're just going to take a comfort break, so thank you.

(The jury exits the courtroom.)

THE COURT: Ma'am, you can stretch your legs. You don't have to sit there. You can sit there if you want, but you don't have to be glued to the chair.

THE WITNESS: Thank you. I'm going to take this opportunity to tighten the straps on these shoes.

THE COURT: Okay. And if you need, there are restrooms in the jury room, if you would prefer to use those. Not that you need them, but they're available if you wish.

THE WITNESS: Okay.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: Could I use one of those?

THE COURT: Yes, of course.

UNIDENTIFIED SPEAKER: Thank you.

THE COURT: Yes. It keeps witnesses, parties, from mingling with the jury inadvertently. So there -- everyone is encouraged. (Unintelligible 4:27:52). Well, it's a public facility. I'm happy to let everybody use it. Do you have a rough estimate of time?

MR. SIMS: Oh, like another minute or two.

THE COURT: So we can finish this witness today?

MR. SIMS:  Yes.  Oh, yes.

THE COURT:  Great.

MR. SIMS:  Yes.

THE COURT:  Maybe we can at least start with Mr. Salvado today, make a little forward motion?

MR. SIMS:  There's two witnesses under subpoena for -- I think, one tomorrow, one Thursday.  Dave Mulquin and Tom Murphy.  They simply asked me to keep them apprised of scheduling.

THE COURT:  Okay.

MR. SIMS:  Would it be okay to get their contact information and have them --

THE COURT:  Any objections for?

MR. SIMS:  -- on call?

MR. SEYOUM:  I'm sorry?

THE COURT:  He wants to know if the witnesses can be on call as opposed to standing around the courthouse.

MR. SEYOUM:  Yes.

THE COURT:  Is that okay?

MR. SEYOUM:  Yes.

THE COURT:  Great.  Thank you for --

MR. SIMS:  They're across the street.

THE COURT:  Okay.  Well, that's fine.

MR. SIMS:  I'll let them know.

THE COURT:  And you'll keep everybody -- keep counsel



and all the parties advised.  And see what transpires.

Would you, sir, check on the jurors?  I'm sure that was a comfort break, so it may not be long.  If as soon as they're ready, let's ask them to come back.  But obviously, don't rush them.

THE CLERK:  No.

THE COURT:  I just know my sense was the gentleman just needed a minute.

THE WITNESS:  Your Honor, did you want me to keep the book?

THE COURT:  I'm sorry?

THE WITNESS:  Did you want me to keep the exhibit book?

THE COURT:  You can leave it there.  I'll take care of it.  If you want us to move it, we can --

THE WITNESS:  Oh no, no, that's fine, that's fine.

THE COURT:  Either way is fine.  But thank you for asking.

(Counsel conferred.)

MR. SEYOUM:  Mr. Sims, I don't recall if I gave you the exhibit that you were asking for.  Did I give it to you?

MR. SIMS:  No, you didn't.

MR. SEYOUM:  I owe you an exhibit?

MR. SIMS:  Yes.

MR. SEYOUM:  Okay.



MR. SIMS:  You didn't --

MR. SEYOUM:  I don't recall, so.

MR. SIMS:  It's the text messages.

MR. SEYOUM:  Yes.

(Counsel conferred.)

THE COURT:  This is a perfect time, thank you.

(Counsel conferred.)

MR. SIMS:  You get to carry that home.

THE CLERK:  The document --

THE COURT:  No, you don't.  No.  He's kidding.

THE CLERK:  The document he'll reference this in here.  And it's flagged with the red tags.

THE WITNESS:  Okay.

THE CLERK:  It's ready.

THE WITNESS:  Okay.

THE CLERK:  Save time on flipping through the pages for you.

THE WITNESS:  Is it okay for me to look at it now so I can --

MR. SIMS:  Yes. Go ahead.

THE COURT:  Yes, feel free --

MR. SIMS:  It's page 225, line --

THE COURT:  Yes, feel free.  Thank you for asking.

MR. SIMS:  -- line 6.  And you can take that other notebook and put it on the floor if you want to --

THE WITNESS: Okay.

MR. SIMS: -- to give yourself room.

THE COURT: Well, can you help her, I don't -- it's pretty heavy. (Unintelligible 4:32:46)

I couldn't do it.

THE CLERK: The Court may want the copy of --

THE COURT: Yes, thank you.

THE CLERK: This too.

THE COURT: He's out there with the jury, we'll wait.

(Discussion off the record.)

THE COURT: Oh, can you do me a favor and just sort of see what's going on, if anything?

THE CLERK: I'll go find out.

THE COURT: You just need a minute?

THE CLERK: Yes.

THE COURT: Okay. That's fine. Just making sure that there are no escapes. It happens sometimes they say, well, that was interesting, but -- fortunately that's rare.

(Counsel conferred.)

THE COURT: Folks, thank you very much. Please take your seats and we will continue.

(Jury enters the courtroom.)

THE COURT: Thank you. Please be seated. Thank you. Sir, can I give this to you? Are you there?

MR. SIMS: Mr. Seyoum?

THE COURT: Mr. Seyoum, I want to make sure you're in the courtroom. You're here?

MR. SEYOUM: Oh, sorry.

THE COURT: Great. Go ahead. If you can't read my writing, let me know.

RESUMED CROSS-EXAMINATION

BY MR. SIMS:

Q    Ms. Adams, after you testified at the Salvado trial on direct examination from Mr. Hoge, you were cross-examined by Mr. Mulquin, Mr. Salvado's lawyer, correct?

A    I don't remember the name of the attorney, but it was Salvado's --

Q    Okay. And --

A    -- attorney.

Q    Right. And at that trial, you were asked the question -- and this is line -- page 225 on the second day of trial, line 6. Question: "And you've never had occasion to refer Mr. Seyoum to Mr. Diamond for any legal work, have you?" Answer: "No." Question: "And you've never had occasion to do any background investigation in terms of contact information for Mr. Diamond, phone numbers, email, addresses, or anything like that that you would have conveyed to Mr. Seyoum, have you?" Answer: "Not that I recall. I do know that he contacted Mr. Diamond, but I don't -- I don't -- I don't recall giving him any information about him." Question: "That wasn't

your referral. That wasn't on your referral or with your assistant, was it?" Answer: "No, not to my knowledge." Question: "That was something he did on his own? Mr. Seyoum decided to call Mr. Diamond and he did that independently of you, correct?" And your answer was yes.

MR. SIMS: I have no further questions.

THE COURT: Any follow-up?

MR. SEYOUM: Oh, yes.

THE COURT: Briefly. Briefly. It's getting up there.

MR. SEYOUM: Right.

THE COURT: We have other witnesses. Five minutes.

THE WITNESS: Was it a question?

MR. SEYOUM: No, I'm --

THE COURT: There will be.

MR. SEYOUM: -- doing a cross.

THE COURT: I'm encouraging him to move through it.

THE WITNESS: Oh, no, no, no. He had read it.

THE COURT: He said he was done.

MR. SEYOUM: He's done.

THE WITNESS: All right.

REDIRECT EXAMINATION

BY MR. SEYOUM:

Q    So he just asked you -- he's trying to impeach you, and he just asked you a few questions. And your answer was, I

don't recall.

THE COURT: Sir, with the pointing thing, whether an implement in your hand or not, please stop doing it.

MR. SEYOUM: It's nothing personal, Your Honor.

THE COURT: It's impolite. Please stop doing it.

MR. SEYOUM: Sorry. Just a habit.

BY MR. SEYOUM:

Q Your answer to this question was I don't recall, to the best of my knowledge, right? You just don't recall.

A Uh-huh.

Q What do you --

MR. SIMS: I'm going to ask. He's leading her. I mean.

THE COURT: Sustained. It's redirect. No leading questions.

BY MR. SEYOUM:

Q Was your answer to this question, I don't recall?

A Yes. It was, not that I recall.

Q Okay. And you did not tell me to call Mr. Diamond?

A No, I know I didn't tell you to call him.

Q Right. That was all me. I called him on my own.

A Yes.

MR. SEYOUM: Thank you. That's it.

MR. SIMS: No further questions.

THE COURT: Thank you very much. You may step down.

We'll take care of that. Let's make some -- can we stay for a little bit otherwise? For -- okay. Can you ask Mr. Salvado to come in? Didn't you acquire that 47 pound -- I know it's heavy. Yes. Thank you.

Yes. Sir, invite your next witness in.

THE WITNESS: Here you go.

THE CLERK: Thank you.

MR. SEYOUM: Go get him?

THE COURT: Well, I don't think he's going to come in here unless you ask him to come in.

MR. SEYOUM: Oh. I thought you might not want me calling him.

MS. ADAMS: Your Honor, is it okay if I sit in the back?

MR. SIMS: Yes, I don't plan on calling --

THE COURT: Yes, ma'am. You may. Thank you for asking me, I appreciate it.

Sir, please come over and take the oath. If you can't read my writing, let me know. Most people can't. Sir, face the clerk and be sworn, please.

CARLOS SALVADO

called as a witness on behalf of the plaintiff, having been first duly sworn, was examined and testified as follows:

THE COURT: Sir, have a seat. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Sir, you may inquire.

MR. SEYOUM: Okay. Give me a second.

DIRECT EXAMINATION

BY MR. SEYOUM:

Q    Mr. Salvado, it's been a while. Can you please introduce yourself?

A    Carlos Salvado.

Q    And what is your profession?

A    I'm an attorney.

Q    Okay. And where's your office?

A    My Rockville office across the street. And I have another office in Falls Church, Virginia.

Q    Okay. Can you tell me a little bit more about your educational background?

A    Graduated University of College Park, Maryland. Went to Baltimore School of Law. Passed the bar in Virginia. Passed the bar in Maryland.

Q    And how long have you been doing legal work?

A    Legal work since '95. As an attorney, since 2003, 2004.

Q    And how many employees do you have?

A    Between the two offices, 20.

Q    Okay. So you have 20 lawyers?

A    No, no. Twenty employees overall. Each office probably has seven or eight lawyers.

Q    Okay.  Seven or eight lawyers for each location?

A    Yes.

Q    Okay.  How many lawyers do you have in this location here by the courthouse?

A    One, two, three, four.

Q    Four attorneys.  Do you have any investigators?

A    No, I don't house investigators.

Q    Paralegals?

A    Yes.

Q    Okay.  All right.  And over the years, what kind of law do you practice?

A    Focus mainly on criminal defense.

Q    Criminal defense.  Any particular niche?

A    I mean, mostly what comes in through the door.  High crimes, child sex abuse, rape.

Q    And protective orders?

A    A lot of protective orders.

Q    And custodies?

A    What's that?

Q    Custody.  Family law.

A    A lot of custody.

Q    A lot of custody, a lot of protective orders.

A    Depends.  Not this year, but some years.

Q    Okay.  How many protective orders would you do on average, per year?

A    It's hard to say.  This year, I've done mostly civil litigation, actually.  So, just had one today.  It depends on the year.  Before the pandemic, you'd have maybe seven or eight a month.  During the pandemic with Zoom, kind of a little tick up, you know, uptick, because people were getting frustrated with each other.  But it depends on what's coming in the door.  Yes, not as many anymore.

Q    All right.  And each case is very unique, right?

A    To some extent, yes.

Q    All right.  And some of the allegations are very serious?

A    Some are very serious.

Q    And they're not just parking tickets, right?

A    No.

Q    Yes.  They're life-altering situations?

A    I think a lot of types of litigation's life-altering for people.

Q    I'm referring to protective orders.

A    It can be, yes.

Q    Okay.  So a protective order -- can you give me, like, an example of a protective order that is common?

A    Boyfriend, girlfriend get in a fight.  One alleges an assault against the other, asks the court for help.

Q    All right.  And they come to you?

A    Well, some come to me.

Q    Right?  The ones that you help, they come to you.

A    That's right.

Q    Right.  And what is your process like, of intake?  If somebody comes to you -- and usually, is it like a referral or is it, yes do you advertise?

A    We -- most of them come from referrals.

Q    Referrals from other clients?

A    Other attorneys, other clients.

Q    Other attorneys, other clients.  So you get referrals from other attorneys?

A    A lot of --

Q    Right.

A    -- referrals.

Q    And when you get referrals from other attorneys, that's like saying, I know this guy, take care of him?

A    Sometimes.

Q    Right?

A    Sometimes.

Q    Sometimes.  So if I reach out to an attorney and I said, I need help, I need a protective order.  I need a law attorney.  And they say, call Atty. Salvado.  That's the referral?

A    Yes.

Q    Do most referrals -- do the clients just get your name and the clients call you?  Is that how it works?

A    I only -- I mean I'm only involved when they call.  I don't know.

Q    So most of the time, the client calls you directly and says, hey, Mr. X, and so-and-so referred me to you?

A    No, not -- if it's a referral from an attorney, a lot of -- sometimes, well, a good number of times, the attorney will call, let me know what's going on --

Q    Let you know what's going on?

A    -- and hand off.  Yes.  Yes.

Q    Okay.  And when that happens, that's somebody saying, take care of my buddy, right?  When somebody calls you and says, like, okay, Joe needs some help, take care of him. That's what that means.  And you take it on and say, hey, I you know, if you're calling me to take this case on, I'll take care of it, correct?

A    They're calling me because I know what I'm doing.

Q    Right.  And basically, that person would be like a VIP, right?  It's not just like Joe Schmo just walking in from the street?

A    Even if he walks in from the street, all the clients are the same.  They're treated the same.

Q    Okay.  They're treated all the same?

A    Yes.

Q    And how much do you charge for a protective order?

A    Depends on the year; depends on the situation.

Q    Depends on the year, depends on -- what are you --

A    I mean, what we charge now is very different than what it was before the pandemic.

Q    Okay.  What made it change?

A    My father retired.  He used to put a limit on what we used to charge, and he's the one that started the firm.

Q    So you had a limit on how much you charged before your father retired?

A    He would control.

Q    And how much were you charging before your father retired for a protective order?

A    You do them for 1,000.  You know, these are quick proceedings.  Usually one day, two to three hours, 1,000.  No more than 2,000.

Q    1,000 flat.  Okay.  What's your hourly rate?

A    Now?

Q    Right.

A    400 an hour.

Q    Okay.  So based on that, it will be like somebody getting two hours of your time to do a protective order for $1,000 flat, right?  I mean, you charge by the hour, right?

A    Not for protective orders.

Q    Okay.  But you charge by the hour for your other services?

A    For civil.

Q Right. I mean, an attorney gets paid by the hour, usually.

A Some other -- other attorneys will charge hourly for criminal cases. We do not.

Q Okay. But you do charge by the hour?

A In certain cases.

Q And you do get compensated by the hour?

A In certain cases, yes.

Q So the more you get paid, the more work you put in?

A That's not true.

Q If the work requires more, you should be compensated more, correct?

A I would like to be compensated more. Yes.

Q Right. So if the compensation is not high, then you have no interest in putting in more work.

A That's not true.

Q Okay. So if somebody comes in to you for a protective order case and it has witnesses, so many dynamics, so many evidence, do you assess that situation and come up with an hourly rate or just a flat $1,000?

A All protective orders at our firm are flat rate.

Q Okay. Can you explain to me the economics of how you take protective order cases for $1,000, regardless of the complexity of the cases? I mean, each case is different, right? So how do you have $1,000 flat fee for all --

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.  Move to another topic, sir. This is not a trial about the economics of the practice of law, but you can ask him about your case, what he did, what he didn't do, why he did it.

MR. SEYOUM:  Okay.

THE COURT:  But not sort of this general business.

BY MR. SEYOUM:

Q    Is it only you or the whole firm that charges $1,000?

MR. SIMS:  I object, Your Honor.

THE COURT:  We just don't -- kindly move on.

BY MR. SEYOUM:

Q    Do you remember how you and I met?

A    I do remember, some.

Q    How did we meet?

A    It was seven years ago.

Q    Do you remember?

A    I remember meeting you.  I remember how you came to me, yes.

Q    How?  How did I come to you?

A    You were referred by an attorney.

Q    What's the attorney's name?

A    Andrew Lawrence.

Q    Okay.  And what did he tell you?

A    He told me that he had a client.  He asked me if I

did -- if I would take the protective order, and he warned me that you were difficult.

Q    He did?

A    He did.

Q    What did he say?

A    He said, he's a little difficult.

Q    Uh-huh.

A    A lot of people don't like him.

Q    Uh-huh.

A    And I said, I've dealt with that before.

Q    Okay.  All right.  So if Mr. Lawrence came in here and testified otherwise, would he be lying?

MR. SIMS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  You remember we talked about that you can't ask any witness if somebody's lying piece?

MR. SEYOUM:  I'm talking about Mr. Lawrence.

THE COURT:  Objection sustained.  You cannot ask any witness if anybody is lying.  Period.

MR. SEYOUM:  All right.  I got you.

BY MR. SEYOUM:

Q    If Mr. Lawrence came here and said, I would never say that about Joe.  I don't even know him that well, back then, would he be lying?

MR. SIMS:  I object, Your Honor.

THE COURT:  Sustained.

BY MR. SEYOUM:

Q    I'm sorry.  Would he be misrepresenting?

THE COURT:  It's sustained, and you know better, so please move on.

BY MR. SEYOUM:

Q    So that's very interesting.  So you just told me that the person who referred me to you said I was difficult, and what else?

A    A lot of people don't like working with you.

Q    A lot of people don't like me, or a lot of people don't like working with me?

A    Well, he said something to that effect.  It was seven years ago, but that's what I took away from it.

Q    Okay.  So you actually testified, the person that's referring me to you is saying, take this guy's case, because I don't like him and a lot of people don't like him?

A    That's not what he said.

Q    Okay.  Okay.  But he said, a lot of people don't like him and he's difficult?

A    Yes.

Q    And I came in and sat down.  Did you tell me, what's your problem?  Why don't a lot of people like you, and why don't a lot of people don't want to work with you?

A    It doesn't matter to me.

Q    It doesn't?  So --

THE COURT: You need to let him answer the question that you just asked. So, you can answer the question, please.

BY MR. SEYOUM:

Q   Mr. Salvado, you just testified, the attorney that referred me to you, told you a lot of people don't like me, and a lot of people don't like to work with me, right?

A   Seven years ago, it was something to that effect.

Q   Okay. But you do remember that?

A   Yes, I remember him saying that. That's not unusual for an attorney to say that.

Q   Right. But that's interesting that you remember it though, that's good. And is it because that's what you said in your deposition?

A   I don't remember what I said in my deposition.

Q   Well, if it's actually what you just said now, that's probably what you should be saying in your deposition --

A   I assume.

Q   -- if it's correct?

A   That's what I recall.

Q   Right. It should be consistent. I mean, unless your memory changes.

THE COURT: Sir, you need to wait for him to answer before you sort of jump in and --

A   I'm confident it was something along those lines.

BY MR. SEYOUM:

Q    Okay.  So this one's scratching my head.  If somebody told you I was difficult, that a lot of people don't like me, then why did you charge me by $1,000?  I mean, if I'm supposed to be difficult and a lot of people don't like me, that means I need a lot of hand-holding.  Why don't you just charge me by the hour?

A    My father set these prices, because of his philosophy, that we follow.

Q    But you just said I'm supposed to be difficult, that a lot of people don't like me.  So you're going to -- what is it?  A charity?

A    It's a service.

Q    You're doing me a favor?

A    It's a service, Mr. Seyoum.

Q    Okay.  So you have a service to clients who are difficult and a lot of people don't like?

A    I'm the attorney.

Q    Okay.  Thank you.  That means a lot.  Okay.  But you could have charged me more, right?

A    Sure.

Q    And did Mr. Lawrence tell you that I am financially secured?  That I have lots of properties?  I'm well-off, I can afford more than $1,000?

A    I knew who you were.

Q    Okay.  So if you knew I had money, why would you just

charge me $1,000?

A    Because the prices were set by my father.  It is a family firm.  He had a philosophy as to how you service the public.  And that's what we follow.

Q    So I came in.  We had a sit down, right?

A    That's right.

Q    Who was in the room?

A    I mean, that's a long time ago.  It may have been -- may have been Soon Ei Sweeney, whose -- has the family law department, but I can't -- that's typically who may be involved in something like that, but I cannot pinpoint.

Q    Okay.  Did you bring up the whole office and parade saying, like, hey, we're a big law firm, we know how to do this and introduce me to all the other attorneys?

A    We do -- I introduce to every client --

Q    Right.

A    -- everyone that may be involved in the case.

Q    Right.  So you brought them up?

A    Yes.

Q    And you introduced me?

A    Of course.

Q    So you were selling it, like, you know, we're a big firm.  We can take care of it?

A    That's not the reason.

Q    Okay.  So you're charging -- you brought up all those

people, and they're supposed to be working on my case, but you're only charging me $1,000, right?

A    Mr. Seyoum.

Q    I'm just asking you.  You charged me $1,000.

THE COURT:  Sir, we've been over the fee and the why.  It's 5:00.  If you want to ask him something about what happened, go ahead.  But we've exhausted the philosophy of their fee structure.

BY MR. SEYOUM:

Q    Okay.  Then after that, I came in.  And do you remember the conversation we had?

A    I don't remember specifically the pinpoint.  It was seven years ago, but I remember the gist.

Q    What was the gist?

A    You had an issue with your child's mother, centered around going to Pennsylvania for Thanksgiving.

Q    Uh-huh.

A    While you were up there, she called the police, and then you found out she had a protective order on you.  You wanted to fight for custody.  That's what I recall from our first meeting.

Q    Okay.  But at no time during our first meeting, you say, did you tell me or inform me, what's up with you?  Your friend Andrew Lawrence, the guy who's referring you, is saying negative things about you.  And what's the issue with your

personality or what?

A   Not at all.  I represent child sex abusers.  That's not a question you ask any client.

Q   So you get a referral or the guy's say, this is a sex offender, take care of him?

A   I'm a lawyer, I don't -- it's not a personal thing.  It's a service.

Q   Could it be possible that you said that statement at the deposition just to get under my skin, but it never actually happened?

A   What statement?

Q   The statement that Mr. Andrew Lawrence called you and told you that --

MR. SIMS:  Yes, I'm going to object.

THE COURT:  All right, sustained.  Folks, I think we've exhausted everything for today.  It's 5:00.  I'm going to release you until tomorrow at 9:30.  I'm sorry, it's just --

THE WITNESS:  That's okay.

THE COURT:  -- long day.  Do not discuss this case with anyone.  Do not let anyone discuss it with you.  Do not even discuss it amongst yourselves.  Just keep an open mind.  Don't speak with any parties, counsel, or witnesses.  Thank you for your patience.  And I'll have them stay here and we'll see what we can do.  Sir, can you come back tomorrow?  I don't know what you're --

THE WITNESS: I'll move my deposition for tomorrow.

THE COURT: All right. So he'll come back tomorrow. So thank you. Why don't you go, we'll see you tomorrow. Thank you. Thank you, folks.

(Jury exits the courtroom.)

THE WITNESS: I'm sorry about that.

THE COURT: No, no. Take your time, sir. We appreciate your patience.

MR. SIMS: Yes.

THE COURT: All right folks, the reason I called it was my sense of that jury had been sitting in that box since 9:30 this morning, and it's now after 5:00, and that's just a long time to sit there. So why don't we come back tomorrow when we're fresh and we can continue with the testimony of Mr. Salvado?

MR. SIMS: Can I ask who we're expecting tomorrow?

THE COURT: Yes. Who's after Mr. Salvado, sir?

MR. SEYOUM: I think would be Mr. Gary Diamond and Mr. Lazzaro.

THE COURT: Okay. So be ready for Diamond and Lazzaro.

MR. SEYOUM: Thank you.

THE COURT: Thank you for that. Folks, just so you know, I'm going through the jury instructions, and I will -- I think the way I'd like to do it is when it's the time, I will

present you with what I think it should be, and then listen to your comments that are helpful, if any. But just having a general jury charge in this case, I don't think would be productive of anything. I'm also going to recut the verdict sheet and present it to you. I'll take input, but I think that's the better way to handle it here is if I do it and then you say yes, no, or whatever. I'll let you do all that business and then we'll see where we go as opposed to having a town hall meeting. Yes?

MR. SEYOUM: I had submitted a jury instruction.

THE COURT: Yes, I've got everybody's. I'm sort of --

MR. SEYOUM: Okay.

THE COURT: Just so you know I -- me and most of my colleagues, but I'll just speak for me. I consider what the parties ask for. I find it interesting, but at the end of the day, it's my job to make sure the jury is instructed as to the law that applies, that the instructions apply to the case that's actually tried, and that the instructions are given in a way that the jury will understand.

So I take input, but it's up to me at the end of the day. And, so I'm just -- that's why I'm telling you I'm doing it, so you don't have to spend any of your time focused on that. It will be ready to go.

MR. SEYOUM: Okay.

THE COURT: Okay. Thanks.

MR. SEYOUM: Thank you.

THE COURT: Thank you, sir. Would you let tech services know we're going to swap out the port or something?

THE CLERK: I believe they will.

THE COURT: All right. Thank you. Thank you. Sorry about that. So we'll see you tomorrow. And we all know what we're doing, and we'll be ready to go. Could you read my writing? Maybe not.

THE CLERK: 9:30, I think.

(The proceedings were concluded.)

escribers
www.escribers.net | 800-257-0885

Digitally signed by Julie Kelley

DIGITALLY SIGNED CERTIFICATE

**eScribers, LLC.** hereby certifies that the attached pages represent an accurate transcript of the electronic sound recording of the proceedings in the Circuit Court for Montgomery County in the matter of:

Civil No. C-15-CV-22-004124

CROWLEY, HOGE & FEIN, P.C.

v.

YOSEPH SEYOUM

By:

Julie Kelley

JULIE KELLEY
Transcriber