**E-FILED**
**Rachel Dombrowski, Clerk**
**Appellate Court of Maryland**
**4/24/2026 2:41 PM**

Circuit Court for Montgomery County
Case No. C-15-CV-22-004124

UNREPORTED*

IN THE APPELLATE COURT

OF MARYLAND

No. 1435

September Term, 2024

_____

YOSEPH SEYOUM

v.

CROWLEY, HOGE & FEIN, P.C., ET AL.

_____

Reed,
Zic,
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Zic, J.

_____

Filed:  April 24, 2026

EXHIBIT

I

* This is an unreported opinion.  This opinion may not be cited as precedent within the
rule of stare decisis.  It may be cited for its persuasive value only if the citation conforms
to Maryland Rule 1-104(a)(2)(B).

_____

This appeal arises from the Circuit Court for Montgomery County's grant of judgment in favor of appellees, Christopher Hoge and the law firm of Crowley, Hoge & Fein, P.C. ("CHF") (collectively, "Appellees"), on a counter-complaint for legal malpractice filed by appellant, Yoseph Seyoum. The circuit court determined that Mr. Seyoum presented insufficient evidence—specifically as to causation—to succeed on his legal malpractice claim. Mr. Seyoum, who represented himself at trial, noted this appeal.

## QUESTIONS PRESENTED

Mr. Seyoum presents five questions for our review, which we have recast and rephrased as follows:[1]

_____

[1] Mr. Seyoum phrased the questions as follows:

1. Did the [circuit] court systematically prevent [Mr. Seyoum] from presenting his case by improperly shifting burdens, denying adequate preparation time, and restricting evidence development?

2. Did the [circuit] court's removal of the case from the jury violate fundamental constitutional and procedural rights, including the right to have factual disputes resolved by a jury?

3. Did the [circuit] court's directed verdict and causation analysis fatally undermine the fairness of the proceedings by imposing an impossible standard and improperly weighing evidence?

4. Did the [circuit] court's systematic denial of cross-examination rights and prevention of evidence development constitute structural error warranting reversal?

5. Does the cumulative effect of the trial court's multiple procedural violations require reversal under Maryland law?

1. Did the circuit court err in granting judgment in favor of Appellees pursuant to Maryland Rule 2-519?

2. Did the circuit court abuse its discretion in its conduct of the trial?

For the following reasons, we answer both questions in the negative and affirm.

## BACKGROUND

The factual and procedural background that we set forth in this opinion is not intended to be a comprehensive summary of everything that happened in these cases—that is, the protective order case, the legal malpractice action against Carlos Salvado, and the legal malpractice action against Mr. Hoge. The parties themselves are well aware of the facts and procedural history. We relate only what we deem necessary for context and the discussion of the issues presently on appeal. Thus, although we do not recount everything that occurred in these three cases, we assure the parties that we have thoroughly reviewed the record before us.

### Case One:  The Protective Order Case

This appeal involves a case within a case within a case. On November 24, 2017, "D.,"[2] the mother of Mr. Seyoum's son, filed a petition for protection from domestic violence in the District Court of Maryland for Montgomery County. D. alleged that Mr. Seyoum had, in the days before Thanksgiving, taken their child and her vehicle to Pennsylvania without her knowledge or permission, and that he had on multiple occasions threatened her, thrown objects at her, and made threats against her life. After the Maryland District Court granted an interim protective order, followed by two

---

[2] We refer to Mr. Seyoum's former girlfriend using an anonymized individual.

_____

temporary protective orders in which, among other things, D. was awarded temporary custody of the child, Mr. Seyoum hired Mr. Salvado, an attorney, to represent him at the final protective order ("FPO") hearing and to pursue a custody action.

Mr. Salvado promptly filed a complaint for custody[3] in the Circuit Court for Montgomery County, which subsequently prompted the transfer of the protective order case from the District Court to the circuit court.[4]  After a hearing in December 2017 ("FPO hearing"), the circuit court granted D. an FPO.  Following closing statements, the court announced its ruling, stating:

> In the petition [for protection from domestic violence], the acts of abuse that were articulated were hitting with an object, threats of violence, stalking, and . . . mentally and emotionally -- I read that to mean that . . . the allegation was about how [D.] was feeling about [Mr. Seyoum's] treatment of her.
>
> * * *
>
> And I don't intend here to resolve the custody issues, because I don't have the evidence to do that.
>
> However, *I do have the evidence to resolve credibility.  And also to make findings about what occurred here*.  First, . . .

_____

[3] After a contested custody hearing, the circuit court awarded the parties joint physical and legal custody of their child in October 2018.

[4] Maryland Rule 3-326(c)(1) provides, in pertinent part:

> [A]fter entering a temporary protective order, the District Court, on motion or on its own initiative, may transfer the action to a circuit court for the final protective order hearing if, after inquiry, the District Court finds that (i) there is a pending action in the circuit court involving one or more of the parties in which there is an existing order or request for relief similar to that being sought in the District Court and (ii) in the interests of justice, the action should be heard in the circuit court.

> [D.] is a person eligible for relief.  She and the respondent
> have a child together.

* * *

> I am in a position to say that the testimony supports the
> allegation of stalking, both with regards to the surveillance in
> the home[,] . . . because [Mr. Seyoum] himself, the
> respondent[,] said that he did it. . . . *But it is a real issue, sir,
> that the way you decided to deal with the upset was to plant
> cameras in the home.*
>
> *Also, the call to Mr. [Gary] Diamond is very troubling.*

* * *

> *[I]t was also clear that [D.] was not in favor of the child
> going [to Pennsylvania] and [Mr. Seyoum] took him anyway.
> And I will also say that [Mr. Seyoum] on the witness stand
> was aggressive and angry.*  And this is a tough arena.  And I
> don't -- it's not lost on me that people are very often
> uncomfortable in the courtroom[,] for good reason.  But I
> don't think this was discomfort.  *I think that was [Mr.
> Seyoum] reacting in the way he was most comfortable
> reacting under the circumstances.*
>
> So I will find that [D.] is entitled to a [final] protective
> order. . . .

(Emphases added.)

The court found that the evidence supported issuance of the protective order on

two independent grounds:  D.'s reasonable fear of imminent bodily harm, and stalking.

The court cited Mr. Seyoum's installation of surveillance cameras in the shared residence

after the temporary protective order was issued, his phone call to D.'s attorney, Mr.

Diamond, under the guise of seeking help with a will,[5] and his demeanor on the witness

---

[5] Although Mr. Seyoum denied that he was attempting to disqualify Mr. Diamond
from representing D. in the protective order case, he admitted that he knew Mr. Diamond
had previously represented her in her earlier divorce action.

stand—which the court described as "aggressive and angry"—as grounds for granting the order. This Court affirmed, holding that the court "had more than sufficient evidence to support issuance on the first ground," D.'s reasonable fear of imminent bodily harm. *Seyoum v. Redae*, No. 2228, Sept. Term 2017, 2019 WL 366663, at *1 (Md. App. Jan. 29, 2019).

### Case Two: The Malpractice Action Against Mr. Salvado

In October 2020, Mr. Seyoum retained Appellees to represent him in a legal malpractice action against Mr. Salvado. Mr. Seyoum contended that, had Mr. Salvado called certain witnesses (including his "attorney friend[]" Sylvia Adams)[6] and introduced evidence of D.'s prior incidents of alleged violent conduct,[7] he would have prevailed in the FPO case.

---

[6] Mr. Seyoum alleged that Ms. Adams should have been called as a witness to testify that she had advised Mr. Seyoum (1) that he had a legal right to take the child to Pennsylvania for Thanksgiving so long as he informed D. or what he was doing before leaving and (2) that, prior to his installation of cameras in the residence, he was within his rights to do so.

[7] Mr. Seyoum's complaint alleged, among other things, that Mr. Salvado failed to utilize evidence that would have cast doubt on D.'s credibility, including the following four incidents: (1) a claim that shortly after the birth of their child, D. allegedly threw the nanny down a flight of stairs; (2) in 2015, D., allegedly in a fit of anger, intentionally drove the family car through the garage, causing extensive damage to the family home; (3) in 2017, while on a family beach vacation, D. allegedly intentionally locked Mr. Seyoum, his mother, and the child out of their hotel room and then got into a heated argument with Mr. Seyoum's mother about it, causing an abrupt end to the vacation; and (4) D. had once claimed (allegedly falsely) that their infant had suffered a seizure which resulted in the child undergoing an unnecessary spinal tap in the hospital (collectively, "four incidents").

_____

A four-day jury trial took place in July 2022. Again, we shall not attempt to summarize all the evidence in that case and only recount what we believe is necessary for context and for a discussion of the issues in the instant appeal. At trial, Mr. Seyoum testified about the four incidents that he claimed Mr. Salvado should have elicited in the FPO hearing. Mr. Seyoum also testified about the Thanksgiving 2017 incident, which led to D. obtaining the protective order. He testified about his desire to take the child to Pennsylvania to spend Thanksgiving with his family, D.'s opposition to that plan, and the advice that Ms. Adams allegedly provided him about the same. Moreover, Mr. Seyoum testified that, in his view, Mr. Salvado had not adequately prepared for the hearing, despite all the information that Mr. Seyoum had provided to him prior. Mr. Seyoum claimed that his demeanor on the witness stand during the FPO hearing was also affected by what he viewed as Mr. Salvado's lack of preparation and not defending the case in the manner that Mr. Seyoum had wanted.

On cross-examination, Mr. Seyoum admitted that, on the day before Thanksgiving 2017, he picked the child up from school knowing that D. did not want him to take their child to Pennsylvania. Mr. Seyoum further admitted to taking the vehicle from D.'s workplace parking lot while she was at work. Only after taking the child and the car did Mr. Seyoum tell D. that he had done so and advise D. to take a taxi home. He also admitted that he did not return with the child until the Monday after Thanksgiving, and that, despite becoming aware that D. had sought a protective order against him for which he would be served "paperwork" by the police, he installed cameras in the residence upon his return from Pennsylvania.

Ms. Adams testified on behalf of Mr. Seyoum. By then, she was no longer a practicing attorney, having been disbarred for failing to file income tax returns for several years. She confirmed that, around Thanksgiving 2017, she spoke with Mr. Seyoum by phone about wanting to take his son to Pennsylvania for the holiday and D. was opposed. He was "upset about it," and she "brainstorm[ed]" with him about how he could take the child "in a way that's least confrontational." They "came up" with the idea of Mr. Seyoum picking up the child from school and going on to Pennsylvania from there, and she suggested he text D. telling her the plans and when he would be back. Ms. Adams also recalled a prior conversation with Mr. Seyoum regarding the installation of cameras in his home. She related that Mr. Seyoum was "concerned that [D.] would tamper with some of his things in his room" and he wanted to install a camera there because he considered her to be "vindicative" in "nature." Ms. Adams explained that, in response, she told him that because he had not yet been served with any papers and he was the lessee of the premises, she "didn't see any reason" why "he could not put cameras in." Ms. Adams also testified that Mr. Salvado had never contacted her nor asked her to testify at the FPO hearing.

Mr. Seyoum called attorney Darin Rumer to testify "as an expert in family law and protective order proceedings." Mr. Rumer opined that filing the custody complaint in the circuit court prior to the resolution of the FPO was "not a good idea" because, in a large majority of cases, if a custody case is pending in the circuit court, the protective order case will be transferred there. Mr. Rumer further opined that, had the FPO proceedings occurred in the District Court and Mr. Seyoum lost, he could have taken a *de novo* appeal

to the circuit court and had "a do over." Mr. Rumer suggested this would have been the better approach in Mr. Seyoum's case. He admitted, however, that in such an instance Mr. Seyoum would have lost the right to file a direct appeal to the Appellate Court of Maryland. Significantly, Mr. Rumer testified that Mr. Salvado made "a strategic decision" to transfer the matter to the circuit court.

Mr. Rumer also testified that Mr. Salvado could have been better prepared for the FPO hearing and should have contacted Ms. Adams and called her as a witness, and that evidence that Mr. Seyoum "acted calmly and reasonably in the face of provocation" by D. would have been relevant at the FPO hearing, although he acknowledged that the admission of such evidence would have been at the court's discretion.

Mr. Salvado testified in his own defense. He testified that because he identified that the issue in the case was a "he said/she said" situation, his defense strategy was for Mr. Seyoum to deny he threw anything at D. or had ever threatened her, and to impeach D.'s statements in her petition and at the temporary protective order hearing that, when she called the police and filed the petition for protection from domestic violence, she did not know the whereabouts of either her child or vehicle. He related that he had argued at the FPO hearing that D.'s motivation was to gain an advantage related to custody of the child.

Mr. Salvado also testified about why he chose not to call Ms. Adams, believing, among other things, that her testimony would have bolstered D.'s position that Mr. Seyoum was controlling and manipulative. As for his decision to transfer the case to the circuit court, Mr. Salvado testified that, based on his experience with the District Court

judges in Montgomery County and the presence in the courtroom of "court watchers" who monitor and report on such proceedings, Mr. Salvado believed that trying the case in the circuit court was the better option.

Mr. Salvado also discussed Mr. Diamond's cross-examination of Mr. Seyoum and the phone call Mr. Seyoum had made to Mr. Diamond. Mr. Salvado noted that as the cross-examination unfolded, Mr. Seyoum became "angrier and aggressive" and it "went very poorly." In Mr. Salvado's view, Mr. Seyoum's reaction on the stand to Mr. Diamond's questioning was a "major issue" in the court's ruling in favor of D.

The jury returned a verdict in Mr. Salvado's favor, finding no breach of the standard of care by Mr. Salvado. This Court affirmed. *Seyoum v. Salvado*, No. 1007, Sept. Term 2022, 2023 WL 5362477, at *1 (Md. App. Aug. 22, 2023).

### *Case Three: The Malpractice Action Against Mr. Hoge and Trial Proceedings*

CHF subsequently filed suit to collect outstanding attorneys' fees owed by Mr. Seyoum. Mr. Seyoum filed a counter-complaint alleging that Mr. Hoge committed legal malpractice in the handling of the Salvado malpractice action. Following Mr. Seyoum's engagement of, and the subsequent withdrawal of, two successive attorneys, Mr. Seyoum appeared pro se at the July 2024 jury trial.

On the first day of trial, prior to jury selection, Mr. Seyoum protested having to present his malpractice claim first—that is, prior to Mr. Hoge litigating the outstanding fee dispute. His position was that, because Mr. Hoge had been the party that instituted the litigation, he should present his case first. The court reminded Mr. Seyoum that the order of presentation had been "discussed at length" at a pre-trial conference and a

decision made then (when he still had legal representation) that the malpractice action would proceed first.[8]

At trial, Mr. Seyoum called Rebecca Deucher, a former legal associate of Mr. Hoge, as his first witness. Because she was not present, Mr. Seyoum read a deposition of Ms. Deucher previously taken by his original counsel in this case. Mr. Seyoum's former counsel asked Ms. Deucher various questions about the Salvado malpractice case, with which she had assisted Mr. Hoge. In the instant appeal, Mr. Seyoum points to nothing in Ms. Deucher's testimony which supports his allegation that Mr. Hoge had committed legal malpractice.

Mr. Seyoum then called Mr. Hoge as his principal witness, examining him at length over multiple sessions spanning more than three hours. Mr. Hoge testified that he had made it "very clear from the beginning that [Mr. Seyoum] had an arguable case . . . but that there were going to be major hurdles and obstacles to get over in order to win" and that "[i]t would be a very expensive proposition, and that it should not be

---

[8] At a pre-trial hearing on April 19, 2024, the circuit court determined that the action would proceed in two phases. The first trial would be Mr. Seyoum's malpractice claim, and upon a finding of liability, a second trial would focus on damages sustained by Mr. Seyoum and on CHF's attorneys' fees claim. The two trials were initially set to take place on May 6, 2024, and July 22, 2024. Subsequently, after the court granted Mr. Hoge's request to preclude Mr. Seyoum's "claims for, and evidence of, damage to reputation and emotional distress," Mr. Seyoum's counsel, at a pre-trial hearing held on May 2, 2024, requested that the entire case be tried together before a single jury. Mr. Seyoum's counsel confirmed that, if they prevailed on the malpractice claim, Mr. Seyoum's defense to CHF's complaint would be that he was not liable for the outstanding legal fees. Thus, with the consent of the parties (Mr. Seyoum's counsel, Mr. Hoge's counsel in defense of the malpractice claim, and CHF's counsel pursuing the outstanding attorneys' fees), the court vacated its prior order bifurcating the case and ordered that a five-day trial on all claims would commence on July 22, 2024.

entered into lightly." Mr. Hoge further testified about his attempts to resolve the matter out of court with defense counsel, which was made difficult—and ultimately, unfruitful—due to Mr. Seyoum's unyielding request that Mr. Hoge demand $1,000,000 to settle the case.

Mr. Hoge testified about Mr. Salvado's reasoning for the transfer to the circuit court, reasoning that remaining in the District Court "was not necessarily much of an advantage" because, if there had been a *de novo* appeal from the District Court's decision to the circuit court, any testimony in the District Court litigation could have been used in the circuit court matter. Upon further questioning, Mr. Hoge acknowledged that he had never viewed the transfer of the protective order case from the District Court to the circuit court "as central to the case[,]" and after Mr. Rumer (the expert hired by Mr. Hoge) had "second thoughts about that side issue that he himself had raised," he (Mr. Hoge) had "made a tactical decision that that was not going to be [the] winning issue" in the malpractice case against Mr. Salvado. Moreover, Mr. Hoge testified that Mr. Seyoum's complaint to him had always centered on Mr. Salvado's failure to call Ms. Adams and introduce into evidence the four incidents with D.—not the transfer of the case to the circuit court.

After about two hours of Mr. Seyoum examining Mr. Hoge on the second day of trial, the court advised Mr. Seyoum that he would give him another fifteen or twenty minutes with this witness, and that they would then have to move on, because "[o]therwise, we're not going to finish what you told me we could do today."

Mr. Seyoum then attempted to elicit testimony from Mr. Hoge to the effect that, should Mr. Seyoum succeed in the malpractice claim against Mr. Hoge, Mr. Seyoum would likely defeat CHF's claim for the outstanding legal fees. Along those lines, Mr. Seyoum also sought to confirm that he and Mr. Hoge never executed a second retainer agreement once the initial retainer fee (and services to evaluate the case) had been paid and utilized. Mr. Hoge acknowledged that he did not prepare a second formal retainer agreement, but testified that he had sent Mr. Seyoum "a detailed email," Mr. Seyoum "agreed to it" and then paid a $10,000 retainer, without any further question about the bills that Mr. Hoge sent him each month.

Although Mr. Seyoum had "run down most of [his] time," the circuit court informed him he could have another fifteen minutes with Mr. Hoge if so desired. The court—not for the first time—discussed with Mr. Seyoum the importance of time management, noting that he had spent about 45 minutes with Mr. Hoge on the stand the day before, and over two and a half hours the second day, and that if he spent all of his time with Mr. Hoge, he would not have time to examine the other witnesses he intended to call. The court made clear to Mr. Seyoum that it was not stopping him from examining Mr. Hoge, but rather pointed out that asking the witness "the same question over and over again" was not an efficient use of his time.

After further examination of Mr. Hoge, another break, and more caution by the judge about his use of time, Mr. Seyoum continued to examine Mr. Hoge, including questions about Mr. Seyoum's desire to hire experts and additional outside attorneys to join Mr. Hoge in trying the case against Mr. Salvado. Mr. Seyoum also examined Mr.

Hoge about evidence that he had wanted to be presented in the Salvado case, including videos of his family at Thanksgiving in order to "humanize[] [him] in front of the judge[.]" Mr. Hoge responded that he thought the videos were irrelevant. Mr. Seyoum—as with many other topics—asked the same or similar question repeatedly and obtained the same answer from Mr. Hoge.

Mr. Seyoum continued to examine Mr. Hoge, including on topics not particularly germane to Mr. Hoge's handling of the Salvado malpractice case. For example, he spent a considerable amount of time questioning Mr. Hoge about his failure to call D.'s ex-husband as a witness. Mr. Hoge testified that, at Mr. Seyoum's insistence he did subpoena D's ex-husband, but after speaking with him, Mr. Hoge believed that such testimony "would be not only not helpful but would be actually damaging" to Mr. Seyoum.

After additional questioning, the court inquired how much more time Mr. Seyoum needed with Mr. Hoge, noting that Mr. Hoge had been on the stand for "[three] hours and 20 minutes so far." Mr. Seyoum ultimately responded that he needed ten more minutes, which the court granted. Mr. Seyoum then examined Mr. Hoge regarding information that Mr. Seyoum had provided him prior to the Salvado trial regarding his assets and his desire to collect damages to restore his online reputation. Mr. Seyoum also questioned Mr. Hoge about their discussions after the Salvado case ended and Mr. Hoge's offer to discount the fees owed him. Shortly thereafter Mr. Seyoum ended his examination of Mr. Hoge.

Upon examination by his own counsel, Mr. Hoge testified that "the issues that [the circuit court] based the protective order on" were "[w]hether Mr. Seyoum threw a remote control at [D.], . . . threatened [D.] saying that there was somebody who could easily take her life, . . . [and] whether or not he installed surveillance cameras . . . where they were living." He also testified about his early conversations with Mr. Seyoum about the case and his initial investigation of a potential malpractice claim against Mr. Salvado. Mr. Hoge testified that he had told Mr. Seyoum he thought he had a "viable claim" based on the theory that Mr. Salvado "had failed to do some things that needed to be done[,]" but that he "also told [Mr. Seyoum] that [he] did not think it was a clear winner of the case." For that reason, Mr. Hoge refused to take the case on a contingency fee basis. Moreover, his goal was to settle the case early on. His efforts to settle the case, however, were unsuccessful, which Mr. Hoge attributed to the fact that Mr. Seyoum's settlement demand was unrealistic and handily rejected by the defense.

As for the four incidents that Mr. Seyoum had insisted Mr. Salvado should have introduced at the FPO hearing, Mr. Hoge testified that he had subsequently learned that they would not have been particularly helpful. Regarding the nanny allegation, Mr. Seyoum later told Mr. Hoge that the nanny had accidently fallen down the stairs while helping D. move a heavy piece of equipment, and he was not a witness to the incident. As for D. allegedly intentionally driving the car through the back of the garage and into the family home, Mr. Hoge learned that Mr. Seyoum had placed a claim with his insurer, in which he described it as an accident. Regarding the Ocean City dispute, Mr. Hoge testified that D. characterized her locking the others out of the rental property as

unintentional. And, after obtaining the hospital records, there was no evidence to support Mr. Seyoum's assertion that D. had falsely claimed that the infant had suffered a seizure. Mr. Hoge further testified that Mr. Seyoum personally testified about the four incidents that he had wanted introduced at the FPO hearing. Moreover, Mr. Hoge testified that Ms. Adams testified at the Salvado trial, and once "contradicted Mr. Seyoum's testimony[,]" which Mr. Hodge saw as "a problem." In short, Mr. Hoge testified that he had presented all the evidence necessary to support Mr. Seyoum's malpractice claim against Mr. Salvado. Mr. Hoge testified that, in fact, the court in the Salvado case denied the Mr. Salvado's motion for judgment at the close of the Mr. Seyoum's evidence, but the jury ultimately found in Mr. Salvado's favor.

At the conclusion of the examination of Mr. Hoge by his own counsel, Mr. Seyoum inquired whether he would "get to cross [Mr. Hoge.]" The court noted that Mr. Hoge had been on the stand "all of today" and that Mr. Seyoum had examined him "for hours[.]" The court declined to allow further examination by Mr. Seyoum "right now[,]" stating instead, "We'll see." The court denied Mr. Seyoum's request to "do the cross today[,]" but noted his objection.

Mr. Seyoum also called Ms. Adams and Mr. Salvado as witnesses. Additionally, Mr. Seyoum testified on his own behalf. Mr. Seyoum presented Robert Lazzaro, a family law attorney, as his expert on the malpractice claim. Mr. Lazzaro opined that both Mr.

Salvado[9] and Mr. Hoge[10] had breached the standard of care in various respects. Critically, however, on cross-examination, Mr. Lazzaro acknowledged that he could not opine that Mr. Seyoum "would have been exonerated" in the FPO hearing, finding that proposition to be "ridiculous[]" and explaining that he could not "predict" that result. But he did believe that, if the FPO case had been tried in the District Court, rather than in the circuit court, there might have been a *de novo* appeal to the circuit court and a retrial to a "different judge" to "see what happens"—an unspecified outcome.

Appellees presented their own expert, Richard Berwanger, who opined that Mr. Hoge did not breach the standard of care. On cross-examination by Mr. Seyoum, when asked whether Mr. Berwanger believed Mr. Salvado had committed malpractice, Mr. Berwanger noted that he had not been retained to evaluate that (and had no opinion on the issue) but noted that a jury had found that Mr. Salvado had not.

---

[9] Mr. Lazzaro opined that Mr. Salvado had breached the standard of care by: (1)"fail[ing] to properly apprise" Mr. Seyoum of the advantages and disadvantages of moving the FPO case from the District Court to the circuit court; (2) failing to speak with Ms. Adams and call her as a witness in the FPO case to testify that she had "advised [Mr. Seyoum] that it was perfectly acceptable to take the child to Pennsylvania for Thanksgiving dinner"; and (3) failing to "order" the police report and 911 tapes generated by D.'s protective order inquiry.

[10] Mr. Lazzaro opined that Mr. Hoge had breached the standard of care because he: (1) "did not zero in on the de novo issue" by failing "to expound upon [it]" when the expert testified about the issue in the Salvado case; (2) made no attempt to rehabilitate Ms. Adams' credibility; (3) failed to advise Mr. Seyoum of the "cost-benefit analysis of the case versus trying it"; (4) should have called D. as a witness; and (5) did "not properly prepare[]" Mr. Seyoum to testify.

*The Motion for Judgment and the Circuit Court's Ruling*

Following the close of evidence on Mr. Seyoum's malpractice counterclaim, Mr. Hoge moved for judgment on the malpractice claim pursuant to Maryland Rule 2-519, arguing, among other things, that Mr. Seyoum had failed to establish that any of the alleged breaches of the standard of care caused Mr. Seyoum to lose the legal malpractice case against Mr. Salvado.

The circuit court, viewing the evidence in the light most favorable to Mr. Seyoum, granted the motion for judgment. The court identified the three elements of a legal malpractice claim—(1) the attorney's employment,[11] (2) a neglect of the standard of care, and (3) a loss or damages to the client that was proximately caused by the attorney's neglect of the standard of care—and found the causation element lacking. The court noted that, in Maryland, expert testimony is required to establish both the negligence (breach in the standard of care) and causation prongs, and that the trial court "may rule in its general power to pass upon the sufficiency of the evidence" as to whether there is legally "sufficient evidence to go to the jury." The court observed:

> Mr. Lazzaro did not opine to a reasonable degree of certainty that any or all of the breaches that he identified, committed or omitted by Mr. Salvado, caused the harm. Meaning he didn't say that had he not done that or had he done that . . . the result of [the FPO case] would have been different. And . . . the causation piece in legal malpractice needs to be aligned with the trial court result.
>
> In this trial court result, this is to say the protective order hearing[,] . . . and again I'm paraphrasing, [the court's] findings regarding why [it] believed it was legally appropriate

---

[11] The court noted that there was no dispute as to the first prong.

17

> to issue a protective order were stalking and threats of bodily harm. There was, in my judgment, no, much less no legally sufficient evidence, of causation testified to by Mr. Lazzaro in that regard. And for that reason alone, the case can't go to . . . the jury. There's no evidence of causation.
>
> Because legal malpractice cases are . . . a case within a case within a case, if case one, which is the case against Mr. Salvado falls, everything else falls.

The court also found that Mr. Lazzaro had not opined that Mr. Hoge's alleged breaches had proximately caused any damage to Mr. Seyoum. In other words, the court found that "causation is insufficient for the Salvado case" and "[c]ausation is insufficient for the Hoge case."[12] Accordingly, the court granted judgment in favor of Mr. Hoge on the malpractice counterclaim.

CHF's counsel then moved for judgment pursuant to Rule 2-519, asserting that Mr. Seyoum had not disputed the amount owed, but rather had taken the position that if he prevailed on his malpractice claim he would not be liable for the outstanding fees. After hearing argument from both parties, the court granted the motion and entered two judgments in favor of Mr. Hoge and CHF and against Mr. Seyoum: (1) a judgment of $120,624.60 (representing the outstanding attorney fees owed) and (2) a judgment "for constitutional interest" in the amount of $12,809.34.

The court subsequently denied Mr. Seyoum's motion for a new trial.

---

[12] The court also disagreed with Mr. Lazzaro's opinions regarding the breaches in the standard of care by both attorneys, finding that the matters complained of were strategic decisions or otherwise not negligent actions. The grant of the Rule 2-519 motion, however, was based on the lack of evidence to support the causation prong.

## STANDARD OF REVIEW

We review a circuit court's grant of a motion for judgment *de novo*, asking whether, on the evidence adduced and viewed in the light most favorable to the non-moving party, any reasonable trier of fact could find the elements of the claim by a preponderance of the evidence. *Thomas v. Panko Mgmt. of Md., LLC*, 423 Md. 387, 393-94 (2016). If there is "any evidence, no matter how slight," in favor of the non-movant, the motion for judgment should be denied. *Id.* at 394.

We review a trial court's control over the conduct of proceedings—including the order of presentation, management of witnesses, and rulings on requests for additional examination—for abuse of discretion. *Sumpter v. Sumpter*, 436 Md. 74, 82-83 (2013).

## DISCUSSION

**I.** **THE CIRCUIT COURT DID NOT ERR IN GRANTING APPELLEES' MOTION FOR JUDGMENT ON THE MALPRACTICE COUNTERCLAIM.**

**A.** **The Parties' Arguments**

Mr. Seyoum contends that the circuit court erred in granting the Rule 2-519 motion for judgment. He argues that he presented sufficient evidence of negligence through evidence of Mr. Lazzaro's expert testimony and that the court improperly resolved factual disputes that should have been submitted to the jury.[13]

---

[13] The Court has identified several issues with the cases cited in Mr. Seyoum's brief and reply brief. Of the 51 cases cited in Mr. Seyoum's brief and reply brief, at least 17 contain a citation irregularity.

We strike the portions of Mr. Seyoum's brief and reply brief as pertinent to his arguments that "[t]he [c]ourt [i]mposed [a]n [i]mpossible [c]ausation [s]tandard"; "[t]he

(continued)

Appellees respond that the motion was properly granted because Mr. Seyoum

failed to present any legally sufficient evidence of causation—a requisite element of his

malpractice claim.

### B. Legal Framework

To prevail on a legal malpractice claim, the plaintiff must prove three elements:

"(1) the attorney's employment; (2) [the attorney's] neglect of a reasonable duty; and (3)

loss to the client proximately caused by that neglect of duty." *Blondell v. Littlepage*, 185

Md. App. 123, 138 (2009) (quoting *Flaherty v. Weinberg*, 303 Md. 116, 128 (1985)).

---

[c]ourt [i]mpermissibly [w]eighed [e]vidence"; and "[t]he [d]irected [v]erdict [v]iolated [Mr. Seyoum]'s [r]ight [t]o [a] [c]ivil [j]ury [t]rial" because of the following citation irregularities:

- *Saxon v. Harrison*, 360 Md. 227 (2000), *see* Appellant's Br. at 27, does not exist. The case found at the principal citation is *Bishop v. State Farm Mut. Auto Ins.*, 360 Md. 225, 240 (2000), a case about a primary motor vehicle insurer's payment obligation.

- *Thomas v. Bethea*, 351 Md. 513, 533 (1998), *see* Appellant's Br. at 31; Reply Br. at 17, does not contain the language that Mr. Seyoum purports to quote or stand for the proposition asserted.

- Maryland Rule 2-519, *see* Reply Br. at 13, does not contain the language that Mr. Seyoum purports to quote.

- *James v. General Motors Corp.*, 74 Md. App. 479, 484 (1988), *see* Reply Br. at 13-14, does not contain the language that Mr. Seyoum purports to quote.

- *Davis v. Slater*, 383 Md. 599, 615 (2004), *see* Reply Br. at 19, does not contain the language that Mr. Seyoum purports to quote.

We further note that, of the 51 cases cited in Mr. Seyoum's brief and reply brief, 19 were not included in the table of authorities, in violation of Maryland Rule 8-504(a)(1). We also note that several page citations in the table of authorities were incorrect. "[T]he procedural, evidentiary, and appellate rules apply alike to parties and their attorneys. No different standards apply when parties appear pro se." *Gantt v. State*, 241 Md. App. 276, 302 (2019) (citation omitted).

Expert testimony is required to establish both the negligence and causation prongs of a legal malpractice claim. *See Taylor v. Feissner*, 103 Md. App. 356, 377 (1995) ("As a general rule, expert testimony is required to establish legal malpractice, except in those cases where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts.") (quotation and marks omitted).

The third element, proximate cause, concerns whether the attorney's "alleged negligence" or breach in the standard of care "was a cause in fact" and that "but for the negligence, the injury would not have occurred." *Taylor*, 103 Md. App. at 366 (quotations omitted). In other words, the client must establish that the attorney's negligence caused him to lose a meritorious cause of action or that the client would have prevailed at trial. *Suder v. Whiteford, Taylor & Preston, LLP*, 413 Md. 230, 241 (2010) (quoting Section 53 of the *Restatement (Third) of the Law Governing Lawyers*, comment b for the proposition that "the plaintiff must [] prove by a preponderance of the evidence that, but for the defendant lawyer's misconduct, the plaintiff would have obtained a more favorable judgment in the previous action").

## C. Application

As applicable here, where we have a case within a case within a case, the issue is whether the loss of a more favorable judgment in both the protective order case and in the Salvado malpractice case was caused by the actions of the respective attorneys. In other words, but for the alleged breaches in the standard of care by Mr. Salvado, would the court have denied D.'s request for an FPO? And if the answer is yes, but for the alleged breaches in the standard of care by Mr. Hoge, would Mr. Seyoum have prevailed

in his legal malpractice claim against Mr. Salvado? We concur with the circuit court that a negative answer to the first question compels a negative answer to the second. *See Suder*, 413 Md. at 245 ("Relitigating the underlying action for the purposes of a malpractice suit is simply a tool by which the litigants are able to wind back the clock to determine whether the attorney proximately caused the injury.").

Here, the circuit court correctly determined that Mr. Seyoum failed to present any legally sufficient evidence that the alleged breaches of the standard of care by Mr. Salvado proximately caused the failure to defeat D.'s request for an FPO. *See Blondell*, 185 Md. App. at 138 (listing causation as a requirement to prove attorney malpractice). As summarized above, although Mr. Lazzaro, Mr. Seyoum's legal malpractice expert, opined that Mr. Salvado had breached the applicable standard of care, he unequivocally declined to opine that any breach caused Mr. Seyoum to lose the FPO case. Indeed, on cross-examination, Mr. Lazzaro made clear that he was not opining that Mr. Seyoum "would have been exonerated[,]" stating that he could not "predict that result." The most Mr. Lazzaro offered was that, if the FPO case had been tried in the District Court, there could have been a *de novo* appeal to the circuit court, which would have allowed a "different judge" to decide the matter "and see what happens[.]"[14] That speculative possibility is not evidence of causation.

---

[14] Mr. Lazzaro also testified, incorrectly, that if the case had been retried in the circuit court, "you can still get your appeal to the . . . [Appellate Court of Maryland] for . . . review." When asked if he was confident this was correct, Mr. Lazzaro responded, "I'm not 100 percent certain." We clarify that, in this procedural situation, any appellate review would be pursuant to a grant of a petition for writ of certiorari by the Supreme

(continued)

Viewed in the light most favorable to Mr. Seyoum, the record contains not even a scintilla of evidence that, but for Mr. Salvado's alleged negligence, the circuit court would have declined to issue the FPO. *See Thomas*, 423 Md. at 393-94. The FPO court based its ruling on D.'s credible testimony of fear of imminent bodily harm and stalking—independent grounds unconnected to Ms. Adams' proposed testimony or the other evidence Mr. Seyoum claims should have been introduced. Accordingly, because Mr. Seyoum failed to establish causation as to the underlying FPO case, a necessary element for proving legal malpractice, Mr. Seyoum's malpractice claim against Mr. Hoge likewise fails.

Thus, we hold that the circuit court did not err in granting Appellees' Rule 2-519 motion for judgment on Mr. Seyoum's malpractice counterclaim.

## II. THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN ITS CONDUCT OF THE TRIAL.

### A. The Parties' Arguments

Mr. Seyoum's remaining arguments focus on what he perceives to be the circuit court's mishandling of the trial. We address what we discern are the arguments properly before us and not necessarily in the order set forth in Mr. Seyoum's brief, because the

---

Court of Maryland. *See Zimmerman v. State*, 490 Md. 402, 409-10 (2025) ("[A]ppellate review of final judgments from the circuit court [on appeal from the District Court] must be sought by petition for writ of certiorari to the Supreme Court. The statutory language is unambiguous, and . . . any further review must be exclusively by certiorari.") (citation omitted).

brief is not particularly well-organized and some of the contentions are simply bald assertions.[15]

Mr. Seyoum contends that the circuit court committed various procedural errors in the handling of the trial,[16] including: (1) requiring him to present his malpractice counterclaim first;[17] (2) denying him additional preparation time; (3) restricting evidence

---

[15] In some instances, Mr. Seyoum's refers us to papers filed in the circuit court case in support of his position. Mr. Seyoum, however, was required to include argument in support of his position *in his brief.* Md. Rule 8-504(a)(6). *See also Tallant v. State*, 254 Md. App. 665, 689 (2022) ("Maryland courts have the discretion to decline to address issues that have not been adequately briefed by a party.") (citations omitted).

[16] We strike the portions of Mr. Seyoum's reply brief as it pertains to his argument that "the cumulative effect of the trial court's errors fundamentally altered the framework of the trial" because of the following citation irregularity: *Med. Mut. Liab. Ins. Soc'y v. Evans*, 330 Md. 1, 25-26 (1993), *see* Reply Br. at 21, does not contain the language that Mr. Seyoum purports to quote.

[17] We strike the portions of Mr. Seyoum's brief and reply brief as they pertain to his argument that the court erred in ordering him to present his argument first because of the following citation irregularities:

- *Pickett v. Noba*, 122 Md. App. 566, 573 (1998), *see* Appellant's Br. at 21, does not contain the language that Mr. Seyoum purports to quote.

- Maryland Rule 2-519(b), *see* Appellant's Br. at 24, does not contain the language that Mr. Seyoum purports to quote.

- *Higgins v. Barnes*, 310 Md. 532, 542 (1987), *see* Appellant's Br. at 24, does not contain the language that Mr. Seyoum purports to quote.

- *Davis v. Slater*, 383 Md. 599, 615 (2004), *see* Appellant's Br. at 24, does not contain the language that Mr. Seyoum purports to quote.

- *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77 (2001), *see* Reply Br. at 7, does not contain the language that Mr. Seyoum purports to quote.

development;[18] (4) denying him the opportunity to further cross-examine Mr. Hoge;[19] and (5) excluding witnesses not on his witness list.[20]  Appellees respond that the court exercised its discretion appropriately through the trial.

### B.    Legal Framework

Trial courts are vested with a "great deal of discretion and responsibility" in the conduct of trials, and their decisions will not be disturbed on appeal absent a clear abuse of that discretion.  *Sumpter*, 436 Md. at 82-83.  Maryland Rule 5-611(a) provides that the court "shall exercise reasonable control over the mode and order of interrogating

---

[18] We strike the portions of Mr. Seyoum's brief as it pertains to his argument that the court restricted evidence development because of the following citation irregularity: *Monmouth Meadows v. Hamilton*, 416 Md. 325, 333 (2010), *see* Appellant's Br. at 37-38, does not contain the language that Mr. Seyoum purports to quote.

[19] We strike the portions of Mr. Seyoum's reply brief as it pertains to his argument that the court's denial of Mr. Seyoum's further cross-examination of Mr. Hoge was an "egregious procedural error" and "fundamentally undermined fairness" because of the following citation irregularities:

- *Food Lion, Inc. v. McNeill*, 393 Md. 715, 735 (2006), *see* Reply Br. at 7, does not contain the language that Mr. Seyoum purports to quote.

- *Martin v. Women's Healthcare Specialists*, 141 Md. App. 259, 270 (2001), *see* Reply Br. at 8, does not exist.  The case found at that citation is *Gabaldoni v. Bd. of Phys. Quality Assurance*, 141 Md. App. 259, 292 (2001), a case dealing with an administrative agency's finding that a physician had breached the applicable statutory standard of care.

- *Zaremba v. Rosseu*, 395 Md. 857, 874 (2006), *see* Reply Br. at 9, does not exist. Neither page 857 nor page 874 exists in Volume 395 of the Maryland Reports.

[20] We strike the portions of Mr. Seyoum's brief as it pertains to his argument that "[t]he [c]ourt [e]xcluded [c]ritical [e]vidence" that in turn "violated fundamental principles of fairness in civil proceedings" because of the following citation irregularity: *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77 (2001), *see* Appellant's Br. at 36, does not contain the language that Mr. Seyoum purports to quote.

witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Whether to allow re-direct or re-cross examination is committed to the court's discretion. *Thurman v. State*, 211 Md. App. 455, 468 (2013).

### C. Analysis

We address Mr. Seyoum's contentions against the circuit court's conduct of the trial in turn.

#### 1. Order of Presentation

The decision to proceed with Mr. Seyoum's malpractice counterclaim first was made and agreed to by all parties—including Mr. Seyoum's then-counsel—at a pre-trial conference months before trial. Mr. Seyoum suffered no prejudice from this arrangement. In short, we are not persuaded that the circuit court "forced" Mr. Seyoum to present his malpractice counterclaim first. We discern no abuse of discretion. *See Sumpter*, 436 Md. at 82-83.

#### 2. Denial of Additional Preparation Time

Mr. Seyoum asserts that the court denied his "requests" for additional preparation time but does not identify any specific rulings. Nonetheless, we discern no abuse in the court's discretion to proceed with the trial as scheduled because the schedule had been in place for months.

### 3. Cross-Examination of Mr. Hoge

Mr. Seyoum contends that the court denied him "any opportunity to cross-examine Mr. Hoge, the central figure in both the fee claims and malpractice allegations." He claims that his "inability to cross-examine Mr. Hoge deprived [him] of the opportunity to explore key discrepancies, such as the lack of a formal retainer agreement, the necessity and reasonableness of the work performed, and the strategic decisions made during the course of representation." According to Mr. Seyoum, "[e]ach of these issues was crucial to assessing whether the fees claimed were justified and whether the representation met the standard of care."

We note first, with regard to his legal malpractice counterclaim, that Mr. Seyoum called Mr. Hoge as a witness and examined him extensively over multiple sessions totaling more than three hours, including on the very topics that he indicates were "crucial" to his case. When Mr. Hoge's own counsel concluded examination, the court declined to allow Mr. Seyoum further examination, noting that the witness had been on the stand "all of today[,]" that Mr. Seyoum had spent hours cross-examining him and had "go[ne] over the same thing" repeatedly, and that other witnesses had been waiting to testify.

When Mr. Seyoum renewed his request the following day, the court declined, stating: "I ruled you all spent enough time and have completely ventilated it, and you've run out your clock." Significantly, Mr. Seyoum does not identify for this Court what he expected to elicit from further examination of Mr. Hoge. Thus, we cannot conclude that Mr. Seyoum suffered any prejudice from the court's denial of his request for further

examination of Mr. Hoge. Moreover, Mr. Hoge was subsequently called by his own counsel in connection with the fee claim, after which Mr. Seyoum cross-examined Mr. Hoge. We discern no abuse of discretion. *See Thurman*, 211 Md. App. at 468.

### 4. *Exclusion of Witnesses*

Mr. Seyoum asserts that the court "excluded critical evidence," that is, "prevented development of evidence vital to establishing both malpractice and causation[.]" In support of his position, he claims that "[e]xpert testimony regarding professional standards was summarily excluded"; Mr. Diamond was "inexplicably barred from testifying"; "[e]vidence about strategic decisions was blocked"; and "[d]ocumentation supporting causation was excluded[.]" He does not, however, elaborate or support these bald allegations with citations to the record. And this Court "cannot be expected to delve through the record to unearth factual support favorable to [the] appellant." *Rollins v. Capital Plaza Assocs., L.P.*, 181 Md. App. 188, 201 (2008) (quoting *von Lusch v. State*, 31 Md. App. 271, 282 (1976)). Nor is it the role of the appellate court to "search for law to sustain [the] party's position." *Tallant v. State*, 254 Md. App. 665, 689 (2022) (citing *Rollins*, 181 Md. App. at 202).

Witnesses whom Mr. Seyoum sought to call, including Mr. Rumer and Mr. Diamond, were not on his witness list and had not been deposed by Appellees, who objected to their last-minute addition. We note, however, that Mr. Seyoum did present his expert witness, Mr. Lazzaro, who testified in support of his legal malpractice claim. We discern no abuse of discretion.

### 5.    *General Conduct of Proceedings*

Mr. Seyoum claims that the court "systematically prevented development of evidence crucial to establishing causation." Specifically, he claims that the court "precluded [him] from demonstrating how the attorneys' failure to obtain police reports and witness testimony directly impacted the underlying proceedings' outcome[s]." He further states that "[t]hese restrictions severely curtailed his ability to substantiate his malpractice claims." These are bald assertions that Mr. Seyoum fails to support with references to the record.[21] *See* Md. Rule 8-504(a)(4) (providing that references to the record extract or transcripts shall be made to support factual assertions set forth in the brief). Having reviewed the trial transcripts in this case, however, we are unpersuaded. There was plenty of testimony regarding the attorneys' failure to obtain police reports, 911 calls, and subpoena or call certain witnesses that Mr. Seyoum had deemed necessary.

With regard to Appellees' claim for outstanding legal fees incurred in their representation of Mr. Seyoum in the Salvado malpractice action, Mr. Seyoum claims that the court "allowed extensive testimony about hourly rates" billed by Mr. Hoge and his associate, but "prevented questioning about the necessity of work performed or results achieved." He also complains that the court "cut off inquiry" and "curtly dismissed" his line of questioning or advised him to "move on."

---

[21] We strike the portions of Mr. Seyoum's reply brief pertaining to his argument that "Appellees' [p]rocedural [a]rguments [s]hould [b]e [r]ejected" because of the following citation irregularity: *Broadwater v. State*, 303 Md. 461, 467 (1985), *see* Reply Br. at 5, cited twice, does not contain the language that Mr. Seyoum purports to quote.

Again, having reviewed the trial transcripts in full, we are satisfied that the circuit court exercised considerable patience in managing a complex, multi-day trial in which Mr. Seyoum, a non-lawyer, represented himself. The court provided consistent guidance on time management and relevance while affording Mr. Seyoum ample opportunity to present his case. Thus, we discern no abuse of discretion in the court's overall conduct of the proceedings.

## CONCLUSION

We hold that the circuit court did not err in granting Appellees' Rule 2-519 motion for judgment, and the court did not abuse its discretion in its conduct of the trial.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**